Lauren M. Rule (OSB # 015174)
Elizabeth H. Potter (OSB # 105482)
Andrew R. Missel (OSB # 181793)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org
amissel@advocateswest.org

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **WATERWATCH OF OREGON**, **NORTHWEST ENVIRONMENTAL DEFENSE CENTER**, and **WILDEARTH GUARDIANS**, | Case No.: **3:20-cv-413** |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| **U.S. ARMY CORPS OF ENGINEERS** and **R.D. JAMES, in his official capacity as Assistant Secretary of the Army (Civil Works)**, | |
| Defendants. | |

## INTRODUCTION

1.      Plaintiffs WaterWatch of Oregon, Northwest Environmental Defense Center, and

WildEarth Guardians challenge Defendants' actions that will result in a reallocation of the water

COMPLAINT                                    1

stored in the Willamette River Basin Flood Control Project ("Willamette Project"). The U.S. Army Corps of Engineers ("Corps") is violating and will continue to violate the Endangered Species Act ("ESA") by moving forward with its reallocation plan before completing its ongoing consultation with the National Marine Fisheries Service ("NMFS") over the effects of the Willamette Project as a whole on two species of salmon and steelhead listed as threatened under the ESA. The reallocation plan will tie the Corps' hands and limit the agencies' ability to develop reasonable and prudent alternative measures that may be necessary to protect those fish species from the impacts of the Project, which will, in turn, further jeopardize their existence.

2.      Two of the plaintiffs here and another group previously sued the Corps for failing to make changes to the operation of the Willamette Project that are necessary to provide for the survival and recovery of threatened Upper Willamette River ("UWR") Chinook salmon and steelhead—species that have continued to decline and are at increasing risk of extinction due primarily to impacts from the Project. *See NEDC v. U.S. Army Corps of Eng'rs*, No. 3:18-cv-437-HZ (D. Or., filed Mar. 13, 2018).

3.      Shortly after that lawsuit was filed, the Corps reinitiated ESA consultation with NMFS over the Willamette Project as a whole in April 2018.[1] Since then, the Corps has been under a legal duty to refrain from pursuing its reallocation plan pending completion of consultation. As the Corps itself recognized in 1999–2000 when it first consulted with NMFS over impacts of the Project, reallocating water during the consultation process would prejudice the outcome of that process by limiting the range of available fish-protective measures that could

---

[1] The parties are still litigating over whether the Corps must make immediate changes to its operations pending completion of the new consultation to prevent ongoing ESA violations.

be developed and implemented. The same reasoning applies now, yet the Corps has failed to put the reallocation on hold.

4.     Last year, NMFS warned the Corps that the reallocation plan will further jeopardize the existence of UWR Chinook salmon and steelhead by allocating Willamette Project water in a way that fails to provide flows sufficient to protect the fish, and that the plan will prevent the Corps and NMFS from developing measures to avoid jeopardy as part of the agencies' ongoing ESA consultation over the Willamette Project as a whole. Despite those warnings, the Corps has elected to push forward with its plan, in violation of the ESA.

5.     This Court must vacate the Chief's Report—the agency document containing the Corps' reallocation plan—and enjoin the Corps and the Assistant Secretary of the Army (Civil Works) ("ASA(CW)") from taking any further actions regarding the reallocation plan until the Corps and NMFS have completed their ESA consultation over the Willamette Project as a whole.

## JURISDICTION AND VENUE

6.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the ESA, 16 U.S.C. § 1531 *et seq.*, a federal law. Jurisdiction is also proper under 16 U.S.C. § 1540(g).

7.     Venue is proper in this Court under 16 U.S.C. § 1540(g)(3)(A) because the violations giving rise to Plaintiffs' claim are occurring and will occur in this district. Venue is also proper in this Court under 28 U.S.C. § 1391(e) because at least one Plaintiff resides in this district and there is no real property at issue in this case. Venue is proper in the Portland Division of this district because the events and omissions giving rise to this claim have occurred, are occurring, and will occur in this division.

8.      The federal government waived sovereign immunity in this action pursuant to 16 U.S.C. § 1540(g)(1).

9.      As required by the ESA, Plaintiffs provided Defendants notice of their intent to bring this action more than 60 days prior to filing this lawsuit.

## PARTIES

10.      Plaintiff WaterWatch of Oregon ("WaterWatch") is a nonprofit conservation organization based in Portland, Oregon. WaterWatch's mission is to protect and restore flows in Oregon's rivers to sustain the native fish, wildlife, and people who depend on healthy rivers. WaterWatch and its members have specific interests in the continued health of native Pacific salmon and steelhead species and their habitats.

11.      Plaintiff Northwest Environmental Defense Center ("NEDC") is a nonprofit environmental organization based in Portland, Oregon. Its members include attorneys, law students, and members of the public. NEDC's mission is to preserve and protect the natural environment in the Pacific Northwest by identifying legal and policy solutions to address threats to natural resources. NEDC and its members have specific interests in the continued health of native Pacific salmon and steelhead species and their habitats.

12.      Plaintiff WildEarth Guardians is a nonprofit conservation organization with offices in Oregon and six other western states. WildEarth Guardians has more than 184,000 members and supporters across the United States and works to protect and restore wildlife, wild places, wild rivers, and the health of the American West. WildEarth Guardians and its members have specific interests in the continued health of native Pacific salmon and steelhead species and their habitats.

13.     Plaintiffs, and their staffs and members, have deep and long-standing interests in preserving water flows in the Willamette Basin to protect Pacific salmon and steelhead, as well as other species, which interests are directly harmed or threatened by Defendants' actions challenged herein. Plaintiffs' staffs and members regularly use and enjoy the Willamette River and its tributaries, including the area affected by the Willamette Project, in order to fish for, observe, photograph, study, and enjoy salmon and steelhead and to engage in other personal, recreational, and professional activities. Plaintiffs and their members derive recreational, scientific, aesthetic, spiritual, and economic benefits from these pursuits and the existence in the wild of native salmon and steelhead. Plaintiffs will continue to use the Willamette River and its tributaries in 2020 and beyond for these purposes, and their interests will be impaired if the UWR Chinook salmon and steelhead populations remain at low numbers or further decline.

14.     Plaintiffs have been long-time advocates for Pacific salmon and steelhead, including UWR Chinook salmon and steelhead, and have long-standing concerns about the threat to these species from the operation of the Willamette Project. Plaintiffs have engaged in public outreach and education, advocacy with agencies, agency administrative processes, and litigation to promote the protection of UWR Chinook salmon and steelhead. For instance, NEDC and WildEarth Guardians are plaintiffs in the March 2018 lawsuit over the Corps' operation of the Willamette Project, and WaterWatch has engaged with the Corps numerous times regarding this reallocation process.

15.     Plaintiffs' interests in protecting and enjoying UWR Chinook salmon and steelhead are being and, unless the relief prayed for is granted, will continue to be adversely affected and irreparably injured by Defendants' violations of law.

16.    Defendant U.S. Army Corps of Engineers is an agency or instrumentality of the United States, under the U.S. Department of the Army and the Department of Defense, and owns, operates, and maintains the Willamette Project. The Corps maintains an office in Portland, Oregon that serves as the headquarters of the Northwest Division, which includes the Portland District. The Corps is responsible for consulting with NMFS over the effects of the Willamette Project on UWR Chinook salmon and steelhead.

17.    Defendant R.D. James is sued in his official capacity as the Assistant Secretary of the Army (Civil Works). Assistant Secretary James is responsible for reviewing the Chief's Report, which contains the Corps' reallocation plan, and for submitting that report to Congress.

## LEGAL BACKGROUND

### I.    The ESA Consultation Process

18.    Section 7 of the Endangered Species Act imposes a substantive obligation on federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of" habitat that has been designated as critical for such species. 16 U.S.C. § 1536(a)(2). Jeopardy results where an action reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species. 50 C.F.R. § 402.02. Destruction or adverse modification of critical habitat occurs where there is a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. *Id.*

19.    To help fulfill the substantive mandate of section 7, the ESA requires that a federal agency considering taking an action that could affect listed species first consult with an

expert agency—either the U.S. Fish and Wildlife Service ("USFWS") or NMFS, depending on the species at issue. The ESA's implementing regulations allow an agency to enter into informal consultation with the relevant expert agency to determine whether its action is "likely to adversely affect" threatened or endangered species or their critical habitats. 50 C.F.R. § 402.13. Usually this is done by completing a biological assessment and submitting it for the expert agency's concurrence. *Id.* § 402.12(j), (k). If, through the informal consultation process or otherwise, the "action" agency determines that its action is "likely to adversely affect" listed species or their critical habitats, formal consultation is required. *Id.* § 402.14(a).

20.     During the formal consultation process, the expert agency determines whether the action under consideration "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4). If the expert agency makes a "jeopardy determination"—that is, if it concludes that the action *is* likely to jeopardize the continued existence of listed species—then the action agency and expert agency must work together to formulate "reasonable and prudent alternatives" (RPAs) to the action that will both fulfill the purpose of the action and "avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(5), (g)(8); *id.* § 402.02. At the end of the consultation process, the expert agency issues a biological opinion ("BiOp") that includes the RPAs developed by the expert agency and the action agency. *Id.* § 402.14(h). Though an expert agency's BiOp "theoretically serves an 'advisory function,' . . . in reality it has a powerful coercive effect on the action agency." *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (citation omitted).

21.     One of the key procedural requirements of consultation is set out in section 7(d) of the ESA. Section 7(d) prohibits a federal agency that is in the middle of the consultation

process over some agency action from "mak[ing] any irreversible or irretrievable commitment of resources with respect to th[at] action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d). This prohibition "continues until the requirements of section 7(a)(2) are satisfied." 50 C.F.R. § 402.09. "Section 7(d) was enacted to ensure that the status quo would be maintained during the consultation process . . . ." *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034–35 (9th Cir. 2005), *abrogated on other grounds as recognized by Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1092 (9th Cir. 2015). In short, section 7(d) ensures that an action agency does not prejudice the outcome of the ESA consultation process by committing resources in a way that reduces the RPA options available to the agency and the consulting expert agency.

## II.     The Water Resources Development Project Process

22.     Congress authorizes and funds water resources development projects in biennial statutes called Water Resources Development Acts ("WRDAs"). Water resources development projects include such things as channel deepening and improvement projects, levee construction, construction of seawalls and storm surge barriers, and ecosystem restoration. The reallocation of the water stored in the Willamette Project is considered a water resources development project.

23.     Typically, Congress or a congressional committee first authorizes the Corps to undertake a study of a particular project. These studies, called feasibility studies, result in a feasibility report and some form of environmental analysis under the National Environmental Policy Act ("NEPA")—usually an environmental impact statement ("EIS"). 33 U.S.C. § 2215(d)(2), § 2282, § 2282a(c)(1). The feasibility report is supposed to "describe, with reasonable certainty, the economic, environmental, and social benefits and detriments of the recommended plan [for the project] and alternative plans considered . . . and the engineering

features (including hydrologic and geologic information), the public acceptability, and the purposes, scope, and scale of the recommended plan." *Id.* § 2282(a)(2).

24.     A feasibility study is finalized by the Corps when the Chief of Engineers ("Chief") signs a "Chief's Report" recommending to Congress a plan for executing the water resources development project analyzed in the feasibility report. 33 U.S.C. § 2282a(f); 33 C.F.R. pt. 230 app. A. Once signed, the Chief's Report is sent to the relevant congressional committee(s) and is also sent to the ASA(CW) and the Office of Management and Budget ("OMB") for "Administration review." 33 U.S.C. § 2282a(f)(2)(B); 33 C.F.R. pt. 230 app. A. Following that review, the ASA(CW) sends the Chief's Report to Congress. 33 U.S.C. § 2282b. Congress often authorizes projects based on Chief's Reports received directly from the Corps before the completion of Administration review.

25.     Congressional authorization of a water resources development project requires, as both a practical and policy matter, a completed Chief's Report. *See* 33 U.S.C. § 701b-8 ("It is declared to be the policy of the Congress that . . . [n]o project or any modification not authorized, of a project for flood control or rivers and harbors, shall be authorized by the Congress unless a report for such project or modification has been previously submitted by the Chief of Engineers . . . in conformity with existing law.").

26.     Once a Chief's Report recommending a particular project is submitted to Congress, it is virtually assured that Congress will authorize the project as described in the Chief's Report. Every Chief's Report recommending authorization of a water resources development construction project submitted to Congress in the interim between WRDA 2014 and WRDA 2016 was approved in WRDA 2016. Every Chief's Report submitted to Congress in the interim between WRDA 2016 and WRDA 2018 was approved in WRDA 2018.

COMPLAINT                                      9

27.    A Chief's Report is not just a *trigger* for water resources development project legislation, it is the *substance* of that legislation: the portion of each WRDA that authorizes water resources development projects simply adopts the Corps' plans as described in Chief's Reports. In the last WRDA bill, for instance, Congress authorized 13 projects based on Chief's Reports, and each authorization directed that the project "be carried out . . . substantially in accordance with the plans, and subject to the conditions, described in the" associated Chief's Report. America's Water Infrastructure Act of 2018, Pub. L. No. 115-270, §§ 1401–02, 132 Stat. 3765, 3835–40 (2018). Similarly, the WRDA passed in 2016 authorized 30 projects based on Chief's Reports, and each authorization directed that the project "be carried out . . . in accordance with the plans, and subject to the conditions, described in the" associated Chief's Report. Water Infrastructure Improvements for the Nation Act, Pub. L. No. 114-322, § 1401, 130 Stat. 1628, 1708–15 (2016).

## STATEMENT OF FACTS

### I.    Upper Willamette River Chinook Salmon and Steelhead

28.    The Willamette River provides habitat for numerous runs of salmon and steelhead, but only two are native to the Upper Willamette River above Willamette Falls: Upper Willamette River ("UWR") Chinook salmon and UWR steelhead. Each of these species is listed as a threatened species under the ESA and has designated critical habitat. 70 Fed. Reg. 37,160 (June 28, 2005) (UWR Chinook salmon), 71 Fed. Reg. 834 (Jan. 5, 2006) (UWR steelhead), 70 Fed. Reg 52,630 (Sept. 2, 2005) (critical habitat for both species). Each species consists of multiple local populations that inhabit different portions of the Upper Willamette Basin.

29.    There are seven populations of UWR Chinook, which occur in the Clackamas, Molalla, North Santiam, South Santiam, Calapooia, McKenzie, and Middle Fork Willamette

Rivers. These seven river basins also contain designated critical habitat for UWR Chinook salmon. UWR Chinook adapted an early migration timing compared to other salmon because they could get over Willamette Falls only during high flows in winter and spring. They begin appearing in the lower Willamette River in January or February, with most of the run ascending the falls in April and May. Spawning occurs from late August through early October and incubation of eggs in the gravel lasts until the following spring. After emerging from their eggs, some juveniles promptly emigrate downriver while others wait for several months or up to a year before emigrating. Historically, the Upper Willamette supported hundreds of thousands of Chinook salmon, but populations of UWR Chinook have declined dramatically. About 90% of UWR Chinook are hatchery fish, with less than 10,000 wild fish returning each year. Five of the seven populations are at very high risk of extinction. The risk of extinction for UWR Chinook as a whole is high.

30.     UWR steelhead consists of four populations: Molalla, Calapooia, North Santiam, and South Santiam. Designated critical habitat for UWR steelhead is found in each of the four river basins. These steelhead are winter run steelhead, entering the Willamette River in January and February and migrating to their spawning areas thereafter. They spawn between March and June, and eggs incubate in gravels through the summer. After spending up to a few years in the tributary rivers, juvenile steelhead migrate to the ocean in the spring. There are no hatchery fish in the UWR winter steelhead run. Instead, out-of-basin summer steelhead are released into the Upper Willamette for recreational fishing. As of 2011, extinction risk was considered low to moderate for each of the four populations as well as for UWR steelhead as a whole, but numbers have continued to decline over the last decade and fish counts for the last few years have been extremely low. The extinction risk for UWR steelhead as a whole is now moderate.

COMPLAINT                                        11

## II.    The Willamette River Basin Flood Control Project

31.    The Willamette Project consists of thirteen dams, 42 miles of revetments along the banks of the Willamette River and its tributaries, and five hatcheries that produce salmon and steelhead to mitigate for the impacts of the dams. The principal purpose of the dams is flood control, but they also are used for power, storage for irrigation, recreation, and fish and wildlife.

32.    The Willamette Project can store approximately 1,590,000 acre-feet of water.[2] The entire storage capacity of the Willamette Project is currently federally authorized for "joint use," which means that, as a matter of federal law, none of the capacity is allocated for a particular use. This gives the Corps maximum flexibility when making operational decisions.

33.    One of the major ways that the Willamette Project dams affect UWR Chinook salmon and steelhead is by cutting off their historic spawning habitat. In the Middle Fork Willamette, for instance, dams cut off more than 90% of the historic Chinook spawning habitat, while in the North and South Santiam sub-basins, dams cut off about 70% of the Chinook spawning habitat. For UWR steelhead, a greater amount of spawning habitat exists below the dams compared to Chinook, but the dams still block access to about 1/3 of historic steelhead spawning habitat.

34.    In addition to blocking access to habitat, the dams and reservoirs impact salmon and steelhead in various ways. They alter the natural flows of the river, storing water in reservoirs and releasing it in quantities that are sometimes lower and sometimes higher than natural flows. This creates conditions downstream of the dams that are not appropriate for high quality fish habitat and can adversely affect spawning, incubation, and downriver and upriver

---

[2] An acre-foot of water is the volume of water needed to fill a perfectly flat area of one acre with one foot of water. An acre-foot is equal to 325,851 gallons.

migration. These flow alterations also cause downstream water quality problems, particularly water temperatures and dissolved gas levels that are outside the optimum range for salmon and steelhead. And by blocking peak flows, sediment, and large woody debris, the dams prevent attributes necessary for creating good fish habitat, thereby reducing the quality of downstream spawning and rearing habitat for Chinook and steelhead. Reservoirs behind the dams are large bodies of stagnant water that prove difficult for juvenile salmon and steelhead to navigate when they migrate downriver because there is no flow to direct them. The reservoirs also are habitat for warm water fisheries that can prey upon the juveniles and contain bacteria that cause disease and infections in juvenile fish. The fisheries and large bodies of calm water attract recreational boaters and fishermen to many of these reservoirs. Keeping reservoirs at high levels during the summer to appease recreationists can cause low flows below dams that create poor water quality and poor fish habitat.

35.    Because of the impacts of the dams on salmon and steelhead, the Corps funds five hatcheries run by the Oregon Department of Fish and Wildlife ("ODFW") that provide spring Chinook to the North Santiam, South Santiam, McKenzie, and Middle Fork Willamette rivers as well as summer steelhead to the North and South Santiam rivers. The use of hatchery fish is problematic for maintaining wild fish genes because hatchery fish can occupy limited spawning grounds and preclude wild fish from spawning, compete for resources with wild fish, interbreed with wild fish, and if wild fish are captured and incorporated into hatchery broodstock, they cannot spawn naturally.

### III.    ESA Consultation Over the Willamette Project and the 2008 BiOp

36.    The Corps exercises general control over the Willamette Project as a whole. Two other federal agencies play a more limited role in the Project: the Bonneville Power

Administration markets power generated at the dams, and the Bureau of Reclamation ("Reclamation") manages contracts for irrigation storage water. In 1999, these three agencies began an ESA consultation with NMFS over the effects of the Willamette Project on ESA-listed salmon and steelhead species and their designated critical habitat. The three action agencies submitted a biological assessment to NMFS in 2000, but consultation efforts stalled. In 2007, NEDC was a plaintiff in a lawsuit against the Corps, NMFS, and other federal defendants that forced the agencies to complete consultation.

37.    NMFS completed the consultation by issuing a biological opinion in 2008 ("2008 BiOp"). The 2008 BiOp was intended to last until 2023, but could be extended upon request by the action agencies and approval by NMFS. NMFS determined in the 2008 BiOp that the Corps' proposal for its continued operation of the Project was likely to jeopardize UWR Chinook salmon and steelhead and adversely modify their critical habitat. NMFS concluded that the Corps' proposed action was not sufficient to avoid jeopardy to both species and adverse modification of their critical habitats because it lacked specific on-the-ground measures that were certain to occur within a definite timeframe. Instead, NMFS stated that continued impacts to the fish and degradation of habitat would cause further decline of the species and put them at even higher risk of extinction.

38.    The 2008 BiOp set forth a reasonable and prudent alternative ("RPA") that would allow continued operation of the Willamette Project in a way that would avoid jeopardy to the species and adverse modification of critical habitat. The RPA added mitigation measures for flow management, water quality (particularly water temperature and dissolved gas levels), fish passage, irrigation contracts, hatcheries, habitat, and research and monitoring. Many of these measures had deadlines for completion. Some measures were to be implemented in the first

seven years of the biological opinion to improve population viability and reduce short-term risk

of extinction. Longer-term measures were to be completed in the second half of the fifteen-year

term and would contribute significantly to both species' survival and potential for recovery.

39.    Several measures in the RPA pertained to ensuring proper instream flows for fish.

For instance, the RPA included a measure allowing the Corps to forecast in any given year that

there would be a water deficit and curtail water deliveries to irrigation users for that year. Other

measures required the Corps to operate the Willamette Project to meet or exceed minimum flow

objectives for the Willamette River and its tributaries. Fish passage measures required the Corps

to "adjust timing of storage and release of flow at Fall Creek Reservoir to promote downstream

passage of juvenile Chinook salmon through the reservoir and dam," and to consider similar

measures at other dams to improve downstream fish passage.

### IV.    The Willamette Basin Review Feasibility Study

40.    In 1988, the House Committee on Public Works and Transportation[3] authorized

the Corps to conduct a water resources study of the Willamette River Basin. In 1991, the Corps

completed a reconnaissance study and recommended conducting a full feasibility study to

determine whether changes in the storage and allocation of water in the basin's reservoirs would

better serve water resources needs in the Willamette Valley. The Corps, together with the Oregon

Water Resources Department ("OWRD"), began conducting that feasibility study in 1996.

41.    The feasibility study was scheduled to be completed in 2001, but the Corps and

OWRD put the study on hold in 2000 after UWR Chinook salmon and steelhead were listed as

threatened under the ESA and the Corps began consulting with NMFS over the Willamette

Project. The Corps recognized that it could not complete a proper feasibility study without first

---

[3] That committee is now known as the House Committee on Transportation and Infrastructure.

COMPLAINT                                    15

knowing what recommendations and criteria would appear in the BiOps then being prepared by

NMFS and USFWS:

> Following the listing [of steelhead and spring Chinook salmon in March 1999], it became obvious that final decisions on operational criteria for fish would be only made as part of the [ESA] Section 7 consultation process. Since it would be impossible to determine how much of the water stored in the reservoirs would be available for other purposes until after the requirements for ESA-listed fish had been clearly specified, the Executive Committee agreed to extend completion of the study . . . .

> The extension will allow information developed for the Biological Opinion on reservoir operations to be used in crafting the final alternatives for the study. Criteria developed by fisheries agencies to protect declining runs are likely to play a major role in shaping future reservoir operations. Following release of the opinion, . . . [t]he first activity will be to determine changes in the study plan needed to respond to recommendations [in the BiOp].

42.    The feasibility study remained paused during the long ESA consultation process

that culminated in the 2008 BiOp. The Corps did not resume the Willamette Basin feasibility

study until 2015.

43.    In November 2017, the Corps released for public comment a draft integrated

feasibility report and NEPA environmental assessment ("EA") on the reallocation of water stored

in the Willamette Project. The reallocation plan tentatively chosen by the Corps involved

allocating 962,800 acre-feet of stored water for fish and wildlife uses, allocating 327,250 acre-

feet of water for agricultural, municipal, and industrial uses, and leaving 299,950 acre-feet of

water as "joint use" in order to "provide flexibility in making revised reservoir operations that

may be required in the future." The Corps indicated that it would submit a biological assessment

to NMFS based on its tentatively selected reallocation plan.

44.    After receiving comments on the draft feasibility report, the Corps decided to

change its proposed reallocation plan. Under the revised plan, no water would be left allocated

for "joint use," and the 1,590,000 acre-feet of water in the system would be allocated as follows:

COMPLAINT                                16

1,102,600 acre-feet for fish and wildlife, 159,750 acre-feet for municipal and industrial uses, and

327,650 acre-feet for agricultural (irrigation) uses. Once authorized by Congress, the plan would

be implemented by the Corps and Reclamation: the agencies, working with Oregon state

agencies, would take steps to make it possible for water users to enter into contracts with either

the Corps (municipal and industrial users) or Reclamation (irrigation users) for the rights to

stored water up to the allocated amounts. The Corps would then operate the Willamette Project

in such a way to meet contracted demand for those water users.

> **V.    Reinitiation of ESA Consultation over the Willamette Project and
> Initiation of Consultation Over the Proposed Reallocation Plan**

45.    A few months after the release of the draft integrated feasibility report and EA,

NEDC, WildEarth Guardians, and another group filed their lawsuit against the Corps over its

operation of the Willamette Project as a whole. *NEDC v. U.S. Army Corps of Eng'rs*, No. 3:18-

cv-437-HZ, ECF No. 1 (D. Or. Mar. 13, 2018). Among the plaintiffs' claims in that case was a

claim that the Corps needed to reinitiate consultation with NMFS over its operation of the

Willamette Project. On April 8, 2018—less than a month after the suit was filed—the Corps

reinitiated consultation with NMFS over the operation of the entire Willamette Project. The

Corps has asserted that consultation will be completed sometime in 2023. At that time, NMFS

will issue a new BiOp.

46.    In January 2019, WaterWatch and several other organizations sent a letter to the

Corps expressing their concerns with the revised reallocation plan. The letter pointed out several

problems with the plan, including the following:

> a.    The plan would allow municipal, industrial, and irrigation users to dictate water
> releases, interfering with the Corps' ability to meet flow targets from the 2008
> BiOp that it has already struggled to meet;

COMPLAINT                                    17

    b.   The plan's "share the pain" approach—its approach of reducing allocations to all use categories proportionally in low-water years rather than prioritizing water for fish and wildlife uses—would unnecessarily harm fish in drought years, especially given that the 2008 BiOp flow targets are already reduced for low-water years; and

    c.   Proposing and implementing the plan while the Corps and NMFS are engaged in ESA consultation over the effects of the Willamette Project as a whole makes no sense, because (1) the flow needs of fish—one of the key inputs to the reallocation plan—will likely change as a result of that consultation, and (2) reallocation could interfere with the agencies' ability to develop RPA measures during the consultation process to protect fish.

47.    The letter from WaterWatch recommended that the Corps either defer reallocation until after the completion of ESA consultation over the Willamette Project as a whole or combine the reallocation process with the overall Willamette Project ESA/NEPA process.

48.    Soon after reinitiating consultation with NMFS over the operation of the Willamette Project as a whole, the Corps submitted its biological assessment on the water reallocation proposal to NMFS. The biological assessment reflected the Corps' determination that the (revised) proposed reallocation plan would be unlikely to adversely affect UWR Chinook and steelhead. However, NMFS did *not* concur with the Corps' determination, leading the Corps and NMFS to initiate formal ESA consultation over the effects of the proposed reallocation on UWR Chinook and steelhead.

49.    That ESA consultation resulted in a BiOp from NMFS in June 2019 ("2019 Reallocation BiOp"). In the 2019 Reallocation BiOp, NMFS concluded that "the proposed

[reallocation] is likely to jeopardize the continued existence of UWR Chinook salmon and UWR steelhead and destroy or adversely modify their designated critical habitats." According to NMFS, increased diversion of water from the mainstem Willamette by municipal, industrial, and irrigation users will lead to higher temperatures in the reach between Willamette Falls and the Santiam River, causing a higher rate of pre-spawn mortality in UWR Chinook salmon. UWR steelhead, meanwhile, will be harmed when filling reservoirs for municipal, industrial, and irrigation use in the spring is given a higher priority than ensuring proper instream flows for outmigrating juveniles. And for both Chinook salmon and steelhead, reallocation will impair critical habitat. NMFS predicted that the Corps' "share the pain" approach would lead to reduced instream flows and higher water temperatures in low-water years, thus harming fish. According to NMFS, the proposed plan would result in a higher likelihood of missing the flow targets contained in the 2008 BiOp, not to mention more fish-protective flow targets that might be adopted in the next Project-wide BiOp due to be completed in 2023.

50.    NMFS set out five RPA measures in the 2019 Reallocation BiOp that "together" would allow the Corps to avoid jeopardy to UWR Chinook salmon and steelhead. One of those measures—RPA Measure 1—would require the Corps to "include a recommendation" in the final feasibility report and the Chief's Report "that the Corps will retain sufficient local authority to modify th[e] reallocation without further Congressional action, as necessary to complete all actions related to the storage and release of water from the [Willamette Project] that are already called for in [the 2008 BiOp], any biological opinion that will be issued as a result of [the 2018] reinitiation of . . . consultation, and any biological opinion that may be issued as the result of a future ESA consultation related to the storage and release of stored water from the WVS." Essentially, RPA Measure 1 called for the Corps to retain authority to revisit the reallocation

COMPLAINT                                      19

plan to ensure compliance with the 2008 BiOp and, eventually, the BiOp that is expected to be released in 2023.

51.    Another RPA measure—RPA Measure 4—would require the Corps to take steps to prioritize water for fish during low-water years. In essence, RPA Measure 4 would undo the "share the pain" approach and instead required the Corps to give instream flows for fish a higher priority than other uses in dry years.

52.    In the 2019 Reallocation BiOp, NMFS stated that the Corps' proposed reallocation "would limit the Corps' flexibility to comply with the 2008 BiOp and RPA provisions that are still incomplete, as well as ESA Section 7(d) requirements in relation to the separate reinitiation of the 2008 BiOp now underway." NMFS pointed to the adoption of RPA Measure 1 as being essential to "ensure that the Corps retains the capability to comply with ESA Section 7(d) requirements in relation to the separate consultation now underway for reinitiation of the 2008 BiOp and RPA, and for any future ESA consultations that will affect the management of water stored in the [Willamette Project]."

**VI.    The Chief's Report**

53.    In September 2019, the Corps released a "final draft" of the integrated feasibility report and EA. Without explicitly referencing RPA Measure 1, the report recommended, consistent with that measure, that the Corps retain sufficient discretion to revisit reallocation after the completion of the ESA consultation process over the Willamette Project as a whole. The report concluded that, if the Corps did adopt that measure, the resultant reallocation plan would not have a significant adverse impact on the environment. Consistent with that finding, the Corps released a draft "finding of no significant impact" ("FONSI") in lieu of completing a full EIS under NEPA.

54.    The reallocation plan recommended in the final draft report still used the "share the pain" approach for low-water years—that is, the Corps did not elect to adopt RPA Measure 4.

55.    In October 2019, the Corps released a proposed Chief's Report containing the reallocation plan that the Corps intended to recommend to Congress. In that report, the Chief of Engineers rejected the final draft feasibility report's recommendation that the Corps incorporate RPA Measure 1 into the recommended reallocation plan. The Chief gave the following reasons for not adopting RPA Measure 1:

> [Adopting RPA Measure 1] would add unacceptable risk for the reliability of the new storage levels once authorized by Congress. In addition, the prospect of future undefined administrative modifications to the reallocation would be inconsistent with the Corps' historically limited discretion for water supply reallocation at its reservoirs and would undermine Congressional prerogatives to define the public benefits to be derived from a project. Congress authorized the project to serve specific purposes and an undefined, unlimited Congressional grant of authority to the Army to modify the reallocation in the future, as recommended, could create conflicts with those Congressionally-authorized project purposes if future Endangered Species Act consultations require changes that would seriously affect project purpose or otherwise involve major operational changes. Further, such a grant of authority could also undermine the ability of the Corps to continue implementing the current allocation should the environmental circumstances change.

56.    The proposed Chief's Report also rejected RPA Measure 4, agreeing with the recommendation in the final draft feasibility report to reduce water for all uses in low-water years rather than prioritizing water for fish and wildlife uses.

57.    Following the issuance of the proposed Chief's Report, several federal and state agencies—as well as stakeholders such as Plaintiffs—commented on the proposed report. NMFS sent comments to the Corps on November 8, 2019. In its comments, NMFS made clear that *all five* RPA measures needed to be implemented in order for the reallocation plan to avoid the jeopardy and adverse modification determinations in the 2019 Reallocation BiOp. NMFS recommended that the Corps either (1) modify the plan to include all RPA measures from the

COMPLAINT                                21

2019 Reallocation BiOp, (2) meet with NMFS to develop new measures to avoid jeopardy, or (3) delay submission of a Chief's Report until "resolution of uncertainties regarding litigation and re-initiation" of consultation over the Willamette Project as a whole.

58.      In December 2019, the Corps released a final integrated feasibility report and EA. In the final feasibility report, the Corps adopted the same approach to dealing with water shortages in low-water years as it had adopted in the "final draft" report. However, the Corps described the approach differently: rather than characterizing the reduction in water for all use categories in low-water years as "proportional," the Corps simply stated that water would be "reduced" for all uses in low-water years. The approach adopted in the final feasibility report would not prioritize water for fish and wildlife, as required by RPA Measure 4. The final integrated feasibility report and EA, like the "final draft" report, recommended adopting RPA Measure 1.

59.      On December 18, 2019, the Chief of Engineers signed a final Chief's Report. The final Chief's Report is substantially identical to the proposed Chief's Report. In particular, the final Chief's Report recommends a reallocation plan that does *not* include RPA Measures 1 and 4—*i.e.*, the recommended plan does not include the retention of sufficient discretion by the Corps to reallocate water based on new measures developed as part of the ongoing ESA consultation over the Willamette Project as a whole (Measure 1), and the recommended plan does not prioritize water for fish and wildlife in low-water years (Measure 4).

60.      As determined by NMFS, the reallocation plan recommended in the Chief's Report will further jeopardize the existence of UWR Chinook salmon and steelhead and adversely modify those species' critical habitat. And, given the Corps' position that it lacks discretion to change the reallocation in the future, the plan is already affecting and will continue

to affect the agencies' ability to develop measures to protect UWR Chinook and steelhead during the ESA consultation process currently occurring for the entire Willamette Project.

61.    On December 19, 2019, Plaintiffs sent Defendants a 60-day notice-of-intent-to-sue letter. In that letter, Plaintiffs informed Defendants that they intended to sue under the ESA if Defendants continued to push forward their reallocation plan by submitting it to Congress.

62.    The signed Chief's Report represents the Corps' final reallocation determination based on its feasibility study. As mentioned earlier, the Chief's Report is sent to Congress through two paths: the Corps sends the report directly to the relevant Congressional committees and also sends it for Administration review to the ASA(CW) and OMB, after which the ASA(CW) sends the report to Congress. Congress often authorizes projects recommended in Chief's Reports before those reports have made it through Administration review.

63.    The final Chief's Report for Willamette Basin reallocation has already been sent directly to the House Committee on Transportation and Infrastructure. Plaintiffs are aware that the report was also submitted for Administration review but do not know if the ASA(CW) has sent it on to Congress.

64.    The House Committee on Transportation and Infrastructure and the Subcommittee on Water Resources and Environment have signaled their desire to consider and pass out of committee a WRDA in 2020. According to Congressman DeFazio, Chair of the Committee on Transportation and Infrastructure, the "Committee plans to consider a new WRDA for 2020 in the spring."

## CLAIM FOR RELIEF
## VIOLATION OF ESA § 7(d): IRREVERSIBLE COMMITMENT OF RESOURCES

65.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

66.    This claim is brought under the ESA citizen suit provision, 16 U.S.C. § 1540(g). The Corps' decision to move forward with its reallocation plan violates section 7(d) of the ESA because it is prejudicing the ongoing consultation process over the Willamette Project as a whole by foreclosing possible reasonable and prudent alternative measures relating to water releases and instream flows that might be necessary to protect UWR Chinook salmon and steelhead. Thus, the Corps is making and will continue to make an unlawful irreversible and irretrievable commitment of resources with respect to the operation of the Willamette Project during consultation over the effects of that operation, in violation of ESA section 7(d).

67.    The agencies' inability to develop reasonable and prudent alternative measures to protect UWR Chinook and steelhead during the current consultation process for the Project will further jeopardize those species' survival, leading to lower numbers of fish and impaired critical habitat.

68.    The harm to UWR Chinook salmon and steelhead will, in turn, harm Plaintiffs and their members by reducing the recreational, scientific, aesthetic, spiritual, and economic benefits they derive from fishing for, observing, photographing, and/or studying those species.

69.    The Court must remedy the Corps' violations by vacating the Chief's Report, declaring the Corps' actions unlawful, and enjoining Defendants from proceeding with the reallocation plan.


WHEREFORE, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

A.    Adjudge and declare that Defendants are violating and will violate section 7(d) of the ESA by proposing and implementing the reallocation plan;

B.    Vacate the Chief's Report signed on December 18, 2019 and any other Chief's Report already submitted to Congress;

C.    Order the Corps to formally disavow and/or rescind the Chief's Report already submitted to Congress;

D.    Enjoin the Corps from submitting to Congress any revised, updated, or new Chief's Report concerning Willamette reallocation until the completion of ESA consultation over the Willamette Project as a whole;

E.    Enjoin the ASA(CW) from submitting to Congress any revised, updated, or new Chief's Report concerning Willamette reallocation until the Corps and NMFS have completed ESA consultation over the Willamette Project as a whole;

F.    Enjoin the Corps and any other agency acting in concert with the Corps, including Reclamation, from taking any steps to implement any Willamette reallocation plan until the Corps and NMFS have completed consultation over the Willamette Project as a whole;

G.    Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by Plaintiffs;

H.    Award Plaintiffs their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the ESA, 16 U.S.C. § 1540(g) and/or the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq.; and

I.    Grant such further relief as the Court deems just and proper in order to provide Plaintiffs with relief and protect the public interest.

Dated: March 12, 2020

Respectfully submitted.

s/ Lauren M. Rule

Lauren M. Rule (OSB # 015174)
Elizabeth H. Potter (OSB # 105482)
Andrew R. Missel (OSB # 181793)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
Tel: (503) 914-6388


Attorneys for Plaintiffs

COMPLAINT                              26