Lauren M. Rule (OSB # 015174)
Elizabeth H. Potter (OSB # 105482)
Andrew R. Missel (OSB # 181793)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org
amissel@advocateswest.org

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **WATERWATCH OF OREGON, NORTHWEST ENVIRONMENTAL DEFENSE CENTER**, and **WILDEARTH GUARDIANS**, | **Case No. 3:20-cv-00413** |
| Plaintiffs, | **MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT** |
| v. | |
| **U.S. ARMY CORPS OF ENGINEERS** and **R.D. JAMES, in his official capacity as Assistant Secretary of the Army (Civil Works)**, | **Expedited Hearing Requested** |
| Defendants. | |

## MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs WaterWatch of Oregon,

Northwest Environmental Defense Center, and WildEarth Guardians hereby move to obtain an

order from this Court requiring the U.S. Army Corps of Engineers ("Corps") and the Assistant

MOTION FOR PRELIMINARY INJUNCTION                                          1

Secretary of the Army (Civil Works) ("ASA(CW)") to take certain actions to rectify the Corps'

violation of section 7(d) of the Endangered Species Act ("ESA") and prevent any future ESA

violations pending final judgment in this case. Plaintiffs' counsel consulted counsel for

Defendants and reached an agreement on a briefing schedule for this preliminary injunction

proceeding, which is reflected in a scheduling motion to be filed with this Court presently.

The Corps is violating and will continue to violate ESA section 7(d) by pushing forward

a plan to reallocate the water stored in the Willamette River Basin Flood Control Project

("Willamette Project") while engaged in ESA consultation with the National Marine Fisheries

Service over the effects of the Willamette Project on two species of fish listed as threatened

under the ESA. The Corps' plan will further endanger these species, which are already on the

decline. A preliminary injunction is necessary to preserve the status quo because the reallocation

process will likely be irreversible by the time of final judgment.

In order to preserve this Court's ability to award effective relief, Plaintiffs respectfully

ask that this Court order the Corps and the ASA(CW) to disavow and/or rescind any "Chief's

Report" concerning the reallocation plan that has been submitted to Congress, and to refrain

from signing or submitting to Congress any new or revised Chief's Report concerning

Willamette reallocation pending final judgment in this case. Plaintiffs also ask that this Court

enjoin the Corps from taking any other steps to implement or further the reallocation plan

pending final judgment.

Given the nature of this litigation and Plaintiffs' nonprofit status, Plaintiffs request that

this Court waive any injunction bond under Federal Rule of Civil Procedure 65(c).

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS...........................................................................................2

I.      Upper Willamette River Chinook Salmon and Steelhead ............................2

II.     The Willamette River Basin Flood Control Project ....................................4

III.    The Willamette Basin Review Feasibility Study ........................................7

IV.     Reinitiation of ESA Consultation over the Willamette Project
        and Initiation of Consultation over the Reallocation Plan.......................11

V.      The Report of the Chief of Engineers........................................................14

ARGUMENT .............................................................................................................17

I.      THERE ARE SERIOUS QUESTIONS GOING TO THE MERITS OF
        PLAINTIFFS' ESA SECTION 7(d) CLAIM ..........................................18

        A.      Legal Background ...........................................................................18

                1.      Water Resources Development Acts ....................................18

                2.      Section 7(d) of the Endangered Species Act ....................20

        B.      The Corps Is Violating Section 7(d) ............................................22

                1.      The Reallocation Plan Will Preclude Several RPA Measures........22

                2.      NMFS and Ninth Circuit Precedent Strongly Support
                        Plaintiffs' Claim ........................................................25

II.     PLAINTIFFS WILL LIKELY SUFFER IRREPARABLE HARM
        WITHOUT PRELIMINARY INJUNCTIVE RELIEF..............................29

        A.      The Threatened Harm is "Irreparable" ....................................29

        B.      The Irreparable Harm is Likely To Occur
                Without Preliminary Injunctive Relief ......................................31

III.    PLAINTIFFS HAVE STANDING TO SEEK RELIEF .............................33

CONCLUSION .........................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .......................................17

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
271 F. Supp. 2d 230 (D.D.C. 2003) ...........................................................................31

*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ....................................29, 30

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*,
733 F.3d 939 (9th Cir. 2013) .....................................................................................34

*Bennett v. Spear*, 520 U.S. 154 (1997) .........................................................................21, 35

*Cal. Tow Truck Ass'n v. City & Cty. of San Francisco*,
807 F.3d 1008 (9th Cir. 2015) ...................................................................................22

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) ..............................................................34

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) ..............................................................................21, 26

*Crowder v. Kelly*, 928 F. Supp. 2 (D.D.C. 1996)...................................................................32

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019)..................................................33, 34

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) ...........................................17

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975) .....................................................31

*Enyart v. Nat'l Conference of Bar Exam'rs*,
630 F.3d 1153 (9th Cir. 2011) ...................................................................................33

*Landwatch v. Connaughton*, 905 F. Supp. 2d 1192 (D. Or. 2012)..........................................35

*Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290 (9th Cir. 1992) .......................................28

*Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996)..........................................17

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
524 F.3d 917 (9th Cir. 2008) .....................................................................................20

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018) ...................................................17, 18, 29, 30, 31, 32

*NRDC v. Houston*, 146 F.3d 1118 (9th Cir. 1998) ..................................................21, 27, 28, 34

*NEDC v. U.S. Army Corp of Eng'rs*,
Case No. 3:18-cv-00437-HZ, 2019 WL 2372591 (D. Or. June 5, 2019) ...........1, 11, 29, 30, 31

*Renee v. Duncan*, 623 F.3d 787, 795 (9th Cir. 2010) ...............................................................18

*Republic of the Philippines v. Marcos*,
862 F.2d 1355 (9th Cir. 1988) (en banc) ...................................................................18, 29, 32

*Salmon Spawning & Recovery All. v. Gutierrez*,
545 F.3d 1220 (9th Cir. 2008) .............................................................................31, 33, 34, 35

*Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987) ...............................................................26

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .........................................................34

*United States v. NCR Corp.*, 688 F.3d 833 (7th Cir. 2012) .......................................................32

*Wash. Toxics Coal. v. EPA*, 413 F.3d 1024 (9th Cir. 2005) ......................................................21

*W. Watersheds Project v. Grimm*,
921 F.3d 1141 (9th Cir. 2019) ..............................................................................................35

*W. Watersheds Project v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2011) ................................................................................................26

*Willamette Riverkeeper v. U.S. Army Corps of Eng'rs*,
Case No. 07-CV-1399 PK, ECF No. 19 (D. Or. Feb. 26, 2008)....................................................5

*Winter v. NRDC*, 555 U.S. 7 (2008) ...............................................................................17, 29

*Wishtoyo Found. v. United Water Conservation Dist.*,
Case No. CV 16-3869-DOC, 2018 WL 6265099 (C.D. Cal. Sept. 23, 2018) ...................26, 27

## Statutes

16 U.S.C. § 1536.................................................................................................*passim*

33 U.S.C. 701b-8 ..........................................................................................................19

33 U.S.C. § 2215 .............................................................................................................7

33 U.S.C. § 2282 .............................................................................................................7

33 U.S.C. § 2282a ........................................................................................................7, 8

33 U.S.C. § 2282b ...........................................................................................................8

Pub. L. No. 114-322, 130 Stat. 1628 ............................................................................19

Pub. L. No. 115-270, 132 Stat. 3765 .......................................................................19, 20

## Regulations

33 C.F.R. pt. 230 .........................................................................................................7, 8

50 C.F.R. § 402.02 ....................................................................20, 21, 23, 24, 25

50 C.F.R. § 402.09 ........................................................................................................21

50 C.F.R. § 402.14 ...............................................................................20, 21, 27

64 Fed. Reg. 14,308 (Mar. 24, 1999)..............................................................................8

64 Fed. Reg. 14,517 (Mar. 25, 1999)..............................................................................8

70 Fed. Reg. 37,160 (June 28, 2005) ..............................................................................2

70 Fed. Reg. 52,630 (Sept. 2, 2005) ............................................................................2, 3

71 Fed. Reg. 834 (Jan. 5, 2006) ......................................................................................2

# INTRODUCTION

The Willamette River provides habitat for several runs of salmon and steelhead, but only two are native to the Upper Willamette River ("UWR") above Willamette Falls: UWR Chinook salmon and UWR steelhead. Historically, the Upper Willamette supported hundreds of thousands of Chinook salmon and steelhead, but now both species are listed as threatened under the Endangered Species Act ("ESA"), and their numbers have been in steep decline in recent years.

Less than a year ago, this Court found that "the condition of the UWR Chinook and steelhead continues to deteriorate," due in large part to the U.S. Army Corps of Engineers' ("Corps") operation of the Willamette River Basin Flood Control Project ("Willamette Project"), a large network of dams, reservoirs, and hatcheries in the Willamette River Basin. *NEDC v. U.S. Army Corps of Eng'rs*, Case No. 3:18-cv-00437-HZ, 2019 WL 2372591, at *9 (D. Or. June 5, 2019). By the time this Court made that determination, the Corps had recognized the dire state of the species and reinitiated ESA section 7 consultation with the National Marine Fisheries Service ("NMFS") over the operation and maintenance of the Willamette Project. At that time, the Corps promised NMFS that, consistent with its statutory and regulatory obligations, it would be "open to considering measures designed for the protection of ESA-listed fish species."

However, at the same time the Corps was promising to work with NMFS to develop measures to protect UWR Chinook and steelhead, it was also pursuing a plan that would make it impossible to keep its promise and comply with its legal obligations. That plan—a proposal to reallocate the quantity of water stored in the Willamette Project to be used for various purposes (including fish and wildlife)—should have been put on hold as soon as the Corps reinitiated consultation with NMFS in April 2018, because ESA section 7(d) forbids agencies engaged in consultation from making commitments that limit their ability to develop measures to benefit

endangered species. Indeed, when the Corps faced almost this exact same situation in 1999–2000, it understood that the ESA required it to put off its reallocation plan until after the end of consultation, and it acted accordingly.

Now, though, the Corps has elected to charge ahead. NMFS has determined that the Corps' reallocation plan will further jeopardize the existence of UWR Chinook salmon and steelhead and prejudice the agencies' ongoing ESA consultation by foreclosing the development of measures to protect those species. The Corps has ignored NMFS' admonition and proceeded to propose its plan to Congress, in blatant violation of its duties under the ESA.

If this Court does not award preliminary injunctive relief soon, the Corps will likely succeed in its effort to have its water reallocation plan rubber-stamped by Congress. If that happens, it will lock in the reallocation plan for decades, gravely prejudicing the ongoing consultation process and further endangering listed fish. And the harm will be irreversible, because the Corps' plan will be enshrined in a statute. To preserve the status quo and ensure that this Court can award effective relief at the time of final judgment, preliminary injunctive relief is necessary.

## STATEMENT OF FACTS

### I.      Upper Willamette River Chinook Salmon and Steelhead

UWR Chinook salmon and UWR steelhead are the only two anadromous fish species native to the Upper Willamette River above Willamette Falls. Pls.' Ex. 1 at 2-1 to 2-8. Each of these species is listed as a threatened species under the ESA and has designated critical habitat. 70 Fed. Reg. 37,160 (June 28, 2005) (UWR Chinook salmon); 71 Fed. Reg. 834 (Jan. 5, 2006) (UWR steelhead); 70 Fed. Reg. 52,630 (Sept. 2, 2005) (critical habitat for both species).

There are seven populations of UWR Chinook, which occur in the Clackamas, Molalla,

North Santiam, South Santiam, Calapooia, McKenzie, and Middle Fork Willamette Rivers. Pls.'
Ex. 1 at 2-10. These seven river basins also contain designated critical habitat for UWR Chinook
salmon. 70 Fed. Reg. at 52,720–21. UWR Chinook adapted an early migration timing compared
to other salmon because they could get over Willamette Falls only during high flows in winter
and spring. Pls.' Ex. 1 at 2-3. They begin appearing in the lower Willamette River in January or
February, with most of the run ascending the falls in April and May. *Id.* at 2-4. Spawning occurs
from late August through early October and incubation of eggs in the gravel lasts until the
following spring. *Id* at 2-4 to 2-5. After emerging from their eggs, some juveniles promptly
emigrate downriver while others wait for several months or up to a year before emigrating. *Id.* at
2-5 to 2-6. Historically, the Upper Willamette supported hundreds of thousands of Chinook
salmon, but populations of UWR Chinook have declined dramatically. *Id.* at 4-3. About 90% of
UWR Chinook are hatchery fish, with less than 10,000 wild fish returning each year. *Id.* Five of
the seven populations are at very high risk of extinction. *Id*. The risk of extinction for UWR
Chinook as a whole is high. Pls.' Ex. 2 at 96.

UWR steelhead consists of four populations: Molalla, Calapooia, North Santiam, and
South Santiam. Pls.' Ex. 1 at 2-11. Designated critical habitat for UWR steelhead is found in
each of the four river basins. 70 Fed. Reg. at 52,848–49. These steelhead are winter run
steelhead, typically entering the Willamette River beginning in January and February and
migrating to their spawning areas thereafter. Pls.' Ex. 1 at 2-8. They spawn between March and
June, and eggs incubate in gravels through the summer. *Id.* at 2-8 to 2-9. After spending up to a
few years in the tributary rivers, juvenile steelhead migrate to the ocean in the spring. *Id.* at 2-8.
There are no hatchery fish in the UWR winter steelhead run. *Id.* at 2-11. Instead, out-of-basin
summer steelhead are released into the Upper Willamette for recreational fishing. *Id.* As of 2011,

extinction risk was considered low to moderate for each of the four populations as well as for UWR steelhead as a whole, but numbers have continued to decline over the last decade and fish counts for the last few years have been extremely low. *Id.* at 4-4, 4-7; Pls.' Ex. 3. The extinction risk for UWR steelhead as a whole is now moderate. Pls.' Ex. 2 at 96.

## II.    The Willamette River Basin Flood Control Project

The Willamette Project consists of thirteen dams, 43 miles of revetments along the banks of the Willamette River and its tributaries, and five hatcheries that produce salmon and steelhead to mitigate for the impacts of the dams. Pls.' Ex. 1 at 1-10. The principal purpose of the dams is flood control, but other authorized uses include power production, storage for irrigation, recreation, and fish and wildlife conservation. Pls.' Ex. 4 at 12.

The Willamette Project can store approximately 1,590,000 acre-feet of water in its reservoirs.[1] *Id.* at 1. The entire storage capacity of the Project is currently federally authorized for "joint use": as a matter of federal law, none of the capacity is allocated for a particular use. *Id.* This gives the Corps maximum flexibility when making operational decisions. *Id.* at 92–93.

One of the major ways that the Willamette Project affects UWR Chinook salmon and steelhead is by cutting off their historic spawning habitat. Pls.' Ex. 1 at 5-8; Pls.' Ex. 2 at 33, 68. In the Middle Fork Willamette, for instance, dams cut off more than 90% of the historic Chinook spawning habitat, while in the North and South Santiam sub-basins, dams cut off about 70% of the Chinook spawning habitat. Pls.' Ex. 5 at 4.2-32, 4.5-11, 4.6-8. For UWR steelhead, a greater amount of spawning habitat exists below the dams compared to Chinook, but the dams still block access to about 1/3 of historic steelhead spawning habitat. *Id.* at 4.10-11.

In addition to blocking access to habitat, the dams and reservoirs impact salmon and

---

[1] An acre-foot of water is the volume of water needed to fill a perfectly flat area of one acre with one foot of water. An acre-foot is equal to 325,851 gallons.

steelhead in various ways. *See generally* Domingue Decl. Exs. 1 & 2. They alter the natural flows of the river, storing water in reservoirs and releasing it in quantities that are sometimes lower and sometimes higher than natural flows. Pls.' Ex. 5 at 4.1-8. This creates conditions downstream of the dams that are not appropriate for high quality fish habitat and can adversely affect spawning, incubation, and downriver and upriver migration. *Id.*; Pls.' Ex. 1 at 5-26 to 5-77. These flow alterations also cause downstream water quality problems, particularly water temperatures and dissolved gas levels that are outside the optimum range for salmon and steelhead. Pls.' Ex. 2 at 56, 61; Pls.' Ex. 5 at 4.1-11. And by blocking peak flows, sediment, and large woody debris, the dams prevent attributes necessary for creating good fish habitat, thereby reducing the quality of downstream spawning and rearing habitat for Chinook and steelhead. Pls.' Ex. 5 at 4.1-6, 4.2-12, 4.3-12.

The Corps exercises general control over the Willamette Project as a whole. Pls.' Ex. 4 at 1. Two other federal agencies play a more limited role in the Project: the Bonneville Power Administration markets power generated at the dams, and the Bureau of Reclamation ("Reclamation") manages contracts for irrigation storage water. *Id.* at 10–11. In 1999, these three agencies began an ESA consultation with NMFS and the U.S. Fish and Wildlife Service ("USFWS") over the effects of the Willamette Project on several species, including ESA-listed salmon and steelhead species. Pls.' Ex. 2 at 2. The three action agencies submitted a biological assessment to NMFS in 2000, but consultation efforts stalled. Pls.' Ex. 5 at 1-3. A lawsuit filed in 2007 against the Corps, NMFS, and other federal defendants forced the agencies to complete consultation. *See Willamette Riverkeeper v. U.S. Army Corps of Eng'rs*, Case No. 07-CV-1399 PK, ECF No. 19 (D. Or. Feb. 26, 2008) (stipulated settlement agreement).

NMFS completed the consultation by issuing a biological opinion in 2008 ("2008

BiOp"). Pls.' Ex. 5 at 1-3. The 2008 BiOp was intended to last until 2023, but could be extended upon request by the action agencies and approval by NMFS. *Id.* at 1-11. NMFS determined in the 2008 BiOp that the Corps' proposed operation of the Project was likely to jeopardize UWR Chinook salmon and steelhead and adversely modify their critical habitat. *Id.* NMFS reached this conclusion because the Corps' proposed action lacked specific on-the-ground measures that were certain to occur within a definite timeframe. *Id.* at 7-6 to 7-15. Instead, NMFS stated that continued impacts to the fish and degradation of habitat would cause further decline of the species and put them at even higher risk of extinction. *Id.* at 5.2-21, 5.3-19, 8-4 to 8-5.

The 2008 BiOp set forth a reasonable and prudent alternative ("RPA") action that would allow continued operation of the Willamette Project in a way that would avoid jeopardy to the species and adverse modification of critical habitat. *Id.* at Ch. 9. The RPA added mitigation measures for flow management, *id.* at 9-10 to 9-26; water quality (particularly water temperature and dissolved gas levels), *id.* at 9-60 to 9-68; fish passage, *id.* at 9-33 to 9-60; irrigation contracts, *id.* at 9-26 to 9-33; hatcheries, *id.* at 9-68 to 9-76; habitat, *id.* at 9-76 to 9-81; and research and monitoring, *id.* at 9-83 to 9-88. Several measures in the RPA pertained to ensuring proper instream flows for fish. For instance, the RPA included a measure allowing the Corps to forecast in any given year that there would be a water deficit and curtail water deliveries to irrigation users for that year. *Id.* at 9-30 to 9-33. Other measures required the Corps to operate the Willamette Project to meet or exceed minimum flow objectives for the Willamette River and its tributaries. *Id.* at 9-11 to 9-15. Another measure required the Corps to "adjust timing of storage and release of flow at Fall Creek Reservoir to promote downstream passage of juvenile Chinook salmon through the reservoir and dam," and to consider similar measures at other dams to improve downstream passage *Id.* at 9-42 to 9-44.

### III.    The Willamette Basin Review Feasibility Study

In 1988, the House Committee on Public Works and Transportation[2] authorized the

Corps to conduct a water resources study of the Willamette River Basin. H.R. Rep. No. 100-

1121, at 90 (1988) (Conf. Rep.). In 1991, the Corps completed a "reconnaissance study" and

recommended conducting a full "feasibility study" to determine whether changes in the storage

and allocation of water in the basin's reservoirs would better serve water resources needs in the

Willamette Valley. Pls.' Ex. 6 at 32. The Corps, together with the Oregon Water Resources

Department ("OWRD"), began that feasibility study five years later, in 1996.[3] *Id.*

Under the statutory framework that governs water resources development projects,[4] a

feasibility study results in a feasibility report and some form of environmental analysis under the

National Environmental Policy Act ("NEPA")—usually an environmental impact statement

("EIS"). 33 U.S.C. § 2215(d)(2), § 2282, § 2282a(c)(1); Pls.' Ex. 7 at 10–12. A feasibility report

is supposed to "describe, with reasonable certainty, the economic, environmental, and social

benefits and detriments of the recommended plan [for the project] and alternative plans

considered . . . and the engineering features . . ., the public acceptability, and the purposes, scope,

and scale of the recommended plan." 33 U.S.C. § 2282(a)(2).

A feasibility study is finalized by the Corps when the Chief of Engineers ("Chief") signs

a "Chief's Report" recommending to Congress a plan for executing the water resources

development project analyzed in the feasibility report. *Id.* § 2282a(f); 33 C.F.R. pt. 230 app. A.

Once signed, the Chief's Report is sent to the relevant congressional committee(s) and is also

---

[2] That committee is now known as the House Committee on Transportation and Infrastructure.
[3] A timeline of the key events relevant to this case can be found in Exhibit 23.
[4] Water resources development projects include such things as navigation channel improvement projects, levee construction, and ecosystem restoration. Pls.' Ex. 7 at 1. The reallocation of the water stored in the Willamette Project is considered a water resources development project.

sent to the ASA(CW) and the Office of Management and Budget ("OMB") for "Administration review." 33 U.S.C. § 2282a(f)(2)(B); 33 C.F.R. pt. 230 app. A; Pls.' Ex. 7 at 11. Following that review, the ASA(CW) sends another copy of the Chief's Report to Congress. 33 U.S.C. § 2282b. The Secretary of the Army has an opportunity to provide Congress with "any recommendations . . . regarding the water resources project" described in the Chief's Report within 120 days of the Chief's signing of the report. *Id.* § 2282a(g). Congress often authorizes projects based on Chief's Reports received directly from the Corps before the completion of Administration review. Pls.' Ex. 7 at 11.

The Willamette Basin feasibility study was scheduled to be completed in 2001, but the Corps and OWRD put the study on hold in 2000 after UWR Chinook salmon and steelhead were listed as threatened under the ESA and the Corps began consulting with NMFS over the Willamette Project.[5] Pls.' Ex. 8 at 3–4. The Corps recognized that it could not complete a proper feasibility study on the allocation of storage water without first knowing what recommendations and criteria would appear in the biological opinions then being prepared by NMFS and USFWS:

> Following the listing [of steelhead and spring Chinook salmon], it became obvious that final decisions on operational criteria for fish would be only made as part of the [ESA] Section 7 consultation process. Since it would be impossible to determine how much of the water stored in the reservoirs would be available for other purposes until after the requirements for ESA-listed fish had been clearly specified, the Executive Committee agreed to extend completion of the study . . . .
>
> The extension will allow information developed for the Biological Opinion on reservoir operations to be used in crafting the final alternatives for the study. Criteria developed by fisheries agencies to protect declining runs are likely to play a major role in shaping future reservoir operations. Following release of the opinion, . . . [t]he first activity will be to determine changes in the study plan needed to respond to recommendations [in the BiOp].

---

[5] NMFS's initial determinations that UWR Chinook salmon and steelhead were "threatened" occurred in 1999. *See* 64 Fed. Reg. 14,308 (Mar. 24, 1999) (UWR Chinook); 64 Fed. Reg. 14,517 (Mar. 25, 1999) (UWR steelhead).

*Id.* at 3.

The feasibility study remained paused during the long ESA consultation process that culminated in the 2008 BiOp. As the Corps expected, that BiOp seriously affected the choices available to the agency in the reallocation process. For instance, the 2008 BiOp included RPA 2.9, a measure that required the Corps to "facilitate conversion of stored water to an instream flow water right" so that minimum flows for fish could be protected from illegal diversion. Pls.' Ex. 5 at 9-24 to 9-25. That RPA measure also required the Corps to "identify stored water in addition to the minimum . . . streamflows that could be allocated from reservoirs to enhance salmon and steelhead survival" and "proceed with necessary actions to allocate and protect water for this purpose." *Id.* In essence, the 2008 BiOp, consistent with the national policies reflected in the ESA, put a thumb on the scale in favor of fish, so that any reallocation plan would need to take the needs of fish into account *first*.

The Corps was supposed to make progress on securing instream flow rights for ESA-listed fish by the end of 2009, *id.*, but it failed to do so. When the Corps did finally initiate compliance with RPA 2.9 in 2015, Pls.' Ex. 4 at i, it did so by resuming the Willamette Basin feasibility study—that is, it decided to address instream water rights for fish as part of a broader effort to reallocate all the water stored in the Willamette Basin. Pls.' Ex. 9 at iv–v. NMFS told the Corps that the broader reallocation effort was *inconsistent* with RPA 2.9 and that, more generally, reallocation would affect the Corps' ability to comply with the 2008 BiOp, thus triggering the need to reinitiate consultation over the Willamette Project as a whole. Pls.' Ex. 10 at 3–5. But the Corps marched on, electing to pursue a broad reallocation plan that included, as one small part, securing instream water rights to protect flows for fish. And it did so without reinitiating consultation over the entire Willamette Project—the Corps treated reallocation as a

distinct action to be addressed in a separate ESA consultation, despite NMFS's warning that "the appropriate consultation mechanism" would be to evaluate reallocation as part of a consultation over the Willamette Project as a whole.. Pls.' Ex. 10 at 5.

In November 2017, the Corps released for public comment a draft integrated feasibility report and NEPA environmental assessment ("EA") on the reallocation of water stored in the Willamette Project. Pls.' Ex. 9. The reallocation plan tentatively chosen by the Corps involved allocating 962,800 acre-feet of stored water for fish and wildlife uses, allocating 327,250 acre-feet of water for agricultural, municipal, and industrial uses, and leaving 299,950 acre-feet of water as "joint use" in order to "provide flexibility in making revised reservoir operations that may be required in the future." *Id.* at 87. The Corps indicated that it would submit a biological assessment to NMFS based on its tentatively selected reallocation plan. *Id.* at 131–32.

After receiving comments on the draft feasibility report, the Corps decided to change its proposed reallocation plan. Pls.' Ex. 11 at 93. Under the revised plan, no water would be left allocated for "joint use," and the 1,590,000 acre-feet of water in the system would be allocated as follows: 1,102,600 acre-feet for fish and wildlife, 159,750 acre-feet for municipal and industrial uses, and 327,650 acre-feet for agricultural (irrigation) uses. *Id.* at 94–95. Once authorized by Congress, the plan would be implemented by the Corps and Reclamation: the agencies, working with Oregon state agencies, would take steps to make it possible for water users to enter into contracts with either the Corps (municipal and industrial users) or Reclamation (irrigation users) for the rights to stored water up to the allocated amounts. *Id.* at 11–13, 109–10; Pls.' Ex. 2 at 11–18; Domingue Decl. ¶ 15. The Corps would then operate the Willamette Project in such a way to meet contracted demand for those water users. Pls.' Ex. 2 at 18–23; Domingue Decl. ¶¶ 13–15.

IV.    **Reinitiation of ESA Consultation over the Willamette Project and Initiation of Consultation Over the Proposed Reallocation Plan**

A few months after the release of the draft integrated feasibility report and EA, Plaintiff Northwest Environmental Defense Center ("NEDC"), Plaintiff WildEarth Guardians, and another group filed a lawsuit against the Corps over its operation of the Willamette Project as a whole. *NEDC v. U.S. Army Corps of Eng'rs*, Case No. 3:18-cv-437-HZ, ECF No. 1 (D. Or. Mar. 13, 2018). Among the plaintiffs' claims in that case was a claim that the Corps needed to reinitiate consultation with NMFS over its operation of the Willamette Project. On April 9, 2018—less than a month after the suit was filed—the Corps reinitiated consultation with NMFS over the operation of the entire Willamette Project. Pls.' Ex. 12. The Corps and NMFS anticipate that consultation will be completed sometime in 2023. Pls.' Ex. 2 at 15. At that time, NMFS will issue a new BiOp. *Id.*

In January 2019, Plaintiff WaterWatch of Oregon ("WaterWatch") and several other organizations sent a letter to the Corps expressing their concerns with the revised reallocation plan. Pls.' Ex. 13. The letter pointed out several problems with the plan. For one, it would allow municipal, industrial, and irrigation users to dictate water releases, interfering with the Corps' ability to meet flow targets from the 2008 BiOp that it has already struggled to meet. *Id.* at 3–4. Second, the plan's "share the pain" approach of reducing allocations to all use categories proportionally in low-water years rather than prioritizing water for fish and wildlife uses would harm fish in drought years, especially given that the 2008 BiOp flow targets are already reduced for low-water years. *Id.* at 4. Third, proposing and implementing the plan while the Corps and NMFS are engaged in ESA consultation over the effects of the entire Willamette Project makes no sense, because (1) the estimated flow needs of fish—one of the key inputs to the reallocation plan—will likely change as a result of that consultation, and (2) reallocation could interfere with

the agencies' ability to develop RPA measures during the consultation process. *Id.* at 6. The letter from WaterWatch recommended that the Corps either defer reallocation until after the completion of ESA consultation over the Willamette Project as a whole or combine the reallocation process with the overall Willamette Project NEPA/ESA process. *Id.*

Soon after reinitiating consultation with NMFS over the operation of the entire Willamette Project, the Corps submitted its biological assessment on the revised water reallocation proposal to NMFS. Pls.' Ex. 2 at 3. The biological assessment reflected the Corps' determination that the revised reallocation plan would be unlikely to adversely affect UWR Chinook salmon and steelhead. *Id.* But NMFS did *not* concur with the Corps' determination, leading the agencies to initiate formal ESA consultation over the proposed reallocation. *Id.*

That ESA consultation resulted in a biological opinion from NMFS in June 2019 ("2019 Reallocation BiOp"). *Id.* at 3–4. In the 2019 Reallocation BiOp, NMFS concluded that "the proposed [reallocation] is likely to jeopardize the continued existence of UWR Chinook salmon and UWR steelhead and destroy or adversely modify their designated critical habitats." *Id.* at 96. According to NMFS, increased diversion of water from the mainstem Willamette by municipal, industrial, and irrigation users will lead to higher temperatures in the river between Willamette Falls and the Santiam River, causing a higher rate of pre-spawn mortality in UWR Chinook salmon. *Id.* at 94. UWR steelhead, meanwhile, will be harmed when filling reservoirs in the spring to reserve water for later municipal, industrial, and irrigation use is given a higher priority than ensuring higher instream flows for outmigrating juveniles. *Id.* And for both Chinook salmon and steelhead, reallocation will impair critical habitat. *Id.* NMFS predicted that the Corps' "share the pain" approach would lead to reduced instream flows and higher water temperatures in low-water years, thus harming fish. *Id.* at 99, 101–02. According to NMFS, the proposed plan would

result in a higher likelihood of missing the flow targets contained in the 2008 BiOp, not to mention more fish-protective flow targets that could be adopted in the next Project-wide BiOp due to be completed in 2023. *Id.*

NMFS set out five RPA measures in the 2019 Reallocation BiOp that "together" would allow the Corps to avoid jeopardy to UWR Chinook and steelhead. *Id.* at 102. One of those measures—RPA Measure 1—would require the Corps to "include a recommendation" as part of its reallocation plan "that the Corps will retain sufficient local authority to modify th[e] reallocation without further Congressional action, as necessary to complete all actions related to the storage and release of water from the [Willamette Project] that are already called for in [the 2008 BiOp], any biological opinion that will be issued as a result of [the 2018] reinitiation of . . . consultation, and any biological opinion that may be issued as the result of a future ESA consultation related to the storage and release of stored water from the WVS." *Id.* at 97. Essentially, RPA Measure 1 called for the Corps to retain authority to revisit the reallocation plan to ensure compliance with the 2008 BiOp and, eventually, the BiOp that is expected to be released in 2023. *Id.* at 97, 100.

Another RPA measure—RPA Measure 4—would require the Corps to take steps to prioritize water for fish during low-water years. *Id.* at 99, 101–02. In essence, RPA Measure 4 would undo the "share the pain" approach and instead require the Corps to give instream flows for fish a higher priority than other uses in dry years. Pls.' Ex. 14 at 2.

In the 2019 Reallocation BiOp, NMFS stated that the Corps' proposed reallocation "would limit the Corps' flexibility to comply with the 2008 BiOp and RPA provisions that are still incomplete, as well as ESA Section 7(d) requirements in relation to the separate reinitiation of the 2008 BiOp now underway." Pls.' Ex. 2 at 95. NMFS pointed to the adoption of RPA

Measure 1 as being essential to "ensure that the Corps retains the capability to comply with ESA Section 7(d) requirements in relation to the separate consultation now underway for reinitiation of the 2008 BiOp and RPA, and for any future ESA consultations that will affect the management of water stored in the [Willamette Project]." *Id.* at 100.

### V.    The Report of the Chief of Engineers

In September 2019, the Corps released a "final draft" of the integrated feasibility report and EA for its proposed reallocation project. Pls.' Ex. 11. Without explicitly referencing RPA Measure 1, the report was consistent with that measure by recommending that the Corps retain sufficient discretion to revisit reallocation after the completion of the ESA consultation process over the Willamette Project as a whole. *Id.* at 151. The report concluded that, if the Corps did adopt that measure, the resultant reallocation plan would not have a significant adverse impact on the environment. *Id.* Consistent with that finding, the Corps released a draft "finding of no significant impact" in lieu of completing a full EIS under NEPA. *Id.* The reallocation plan recommended in the final draft report still used the "share the pain" approach for low-water years—that is, the Corps refused to adopt RPA Measure 4. *Id.* at 93–96.

In October 2019, the Corps released a proposed Chief's Report containing the reallocation plan that the Corps intended to recommend to Congress. Pls.' Ex. 15. In the proposed report, the Chief of Engineers rejected the final draft feasibility report's recommendation that the Corps incorporate RPA Measure 1 into the recommended reallocation plan. *Id.* at 2. The Chief of Engineers gave the following reasons for not adopting RPA Measure 1:

> [Adopting RPA Measure 1] would add unacceptable risk for the reliability of the new storage levels once authorized by Congress. In addition, the prospect of future undefined administrative modifications to the reallocation would be inconsistent with the Corps' historically limited discretion for water supply

reallocation at its reservoirs and would undermine Congressional prerogatives to define the public benefits to be derived from a project. Congress authorized the project to serve specific purposes and an undefined, unlimited Congressional grant of authority to the Army to modify the reallocation in the future, as recommended, could create conflicts with those Congressionally-authorized project purposes if future Endangered Species Act consultations require changes that would seriously affect project purpose or otherwise involve major operational changes. Further, such a grant of authority could also undermine the ability of the Corps to continue implementing the current allocation should the environmental circumstances change.

*Id.* The proposed Chief's Report also rejected RPA Measure 4, agreeing with the recommendation in the final draft feasibility report to reduce water for all uses in low-water years rather than prioritizing water for fish and wildlife uses. *Id.* at 3.

Following the issuance of the proposed Chief's Report, several federal and state agencies—as well as stakeholders such as Plaintiffs—commented on the proposed report. NMFS sent comments to the Corps on November 8, 2019. Pls.' Ex. 14. In its comments, NMFS made clear that the Corps must implement *all five* RPA measures in order for the reallocation plan to avoid the jeopardy and adverse modification impacts found by the 2019 Reallocation BiOp, and that the plan in the proposed Chief's Report was contrary to RPA Measures 1 and 4. *Id.* at 2–3. NMFS recommended that the Corps either (1) modify the plan to include all RPA measures from the 2019 Reallocation BiOp, (2) meet with NMFS to develop new measures to avoid jeopardy, or (3) delay submission of a Chief's Report until "resolution of uncertainties regarding litigation and re-initiation" of consultation over the Willamette Project as a whole. *Id.* at 3.

In December 2019, the Corps released a final integrated feasibility report and EA. Pls.' Ex. 4. In the final feasibility report, the Corps described the same approach to dealing with water shortages in low-water years as it had described in the "final draft" report. *Compare* Pls.' Ex. 11 at 93–96 (final draft report) *with* Pls.' Ex. 4 at 93–96 (final report). The Corps changed one word in the description of its approach: rather than stating that water for "all authorized project

purposes would be reduced proportionally" in low-water years, the final report states that water for "all authorized project purposes would be reduced" in low-water years. *Compare* Pls.' Ex. 11 at 96 (final draft report) *with* Pls.' Ex. 4 at 96 (final report). Notably, the approach adopted in the final feasibility report would not *prioritize* water for fish and wildlife, as required by RPA Measure 4. Pls.' Ex. 4 at 93–96; Pls.' Ex. 2 at 99, 101–02; Pls.' Ex. 14 at 2–3. The final integrated feasibility report and EA, like the "final draft" report, recommends adopting RPA Measure 1. Pls.' Ex. 4 at 152.

On December 18, 2019, the Chief of Engineers signed a final Chief's Report. Pls.' Ex. 16. The final Chief's Report is substantially identical to the proposed Chief's Report. In particular, the final Chief's Report rejects the feasibility report's recommendation to adopt RPA Measure 1. *Id.* at 2–3. And, because the final Chief's Report otherwise adopts the final integrated feasibility report and EA, it necessarily rejects RPA Measure 4, as well. *Id.* The Corps has sent the final Chief's Report to the House Committee on Transportation and Infrastructure. Pls.' Ex. 17 at 3.[6] Plaintiffs are aware that the report was also submitted for Administration review, but they do not know if the ASA(CW) has sent it to Congress.

The House Committee on Transportation and Infrastructure and the Subcommittee on Water Resources and Environment have signaled their desire to consider and pass out of committee a WRDA in 2020. Pls.' Ex. 18. According to Congressman DeFazio, Chair of the Committee on Transportation and Infrastructure, the "Committee plans to consider a new WRDA for 2020 in the spring." Pls.' Ex. 19.

On December 19, 2019, Plaintiffs sent Defendants a 60-day notice-of-intent-to-sue letter.

---

[6] *See also* https://www.youtube.com/watch?v=R90eVjDYTW4&feature=emb_title (video of Jan. 9, 2020 meeting of the Subcommittee on Water Resources and Environment at which the Chief's Report was discussed).

Pls.' Ex. 20. In that letter, Plaintiffs informed Defendants that they intended to sue under the ESA if Defendants continued to push forward their reallocation plan. *Id.* at 1–2. Plaintiffs filed the complaint in this case on March 12, 2020.

## ARGUMENT

When deciding whether to grant a preliminary injunction, a court considers four factors: (1) the likelihood that the plaintiffs will ultimately succeed on the merits of their claims, (2) the likelihood that the plaintiffs will suffer irreparable harm without preliminary injunctive relief, (3) the balance of equities between the parties, and (4) whether preliminary injunctive relief is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

In an ESA case, the "balance of [equities] always tips sharply in favor of endangered or threatened species." *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996), *abrogated on other grounds by Winter*, 555 U.S. at 22. Because Defendants in this case are federal government entities, the "public interest" factor also necessarily favors injunctive relief. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (noting that the "balance of equities" and "public interest" factors merge when the government is a defendant); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. ("NWF v. NMFS 2018")*, 886 F.3d 803, 817 (9th Cir. 2018) (noting that courts lack discretion to deny injunctive relief in ESA cases based on these two factors). And the fact that the balance of equities tips "sharply" in favor of endangered species in this case means that Plaintiffs need only show that there are "serious questions going to the merits" to be entitled to preliminary injunctive relief. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Therefore, Plaintiffs are entitled to preliminary injunctive relief if they show that (1) there are "serious questions going to the merits" of their section 7(d) claim, *id.*, and that (2) "irreparable injury 'is *likely* in the absence of an injunction,'" *NWF v.*

*NMFS 2018*, 886 F.3d at 818 (quoting *Winter*, 555 U.S. at 22).

## I.  THERE ARE SERIOUS QUESTIONS GOING TO THE MERITS OF PLAINTIFFS' ESA SECTION 7(d) CLAIM[7]

"Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc).

Even at this early stage, Plaintiffs have amassed substantial evidence demonstrating that the Corps is violating ESA section 7(d). Despite being told by NMFS that its reallocation plan will further jeopardize UWR Chinook salmon and steelhead and prejudice the ongoing ESA consultation process, and despite its past acknowledgment that the ESA consultation process must run its course before reallocation can proceed, the Corps has charged ahead with its reallocation plan. In choosing to do so, the Corps is violating ESA section 7(d) by limiting the range of fish-protection options that could be included in the next biological opinion on the operation of the entire Willamette Project. The Corps' actions are the opposite of "maintaining the status quo," which is what section 7(d) requires.

### A.  Legal Background

#### 1.  *Water Resources Development Acts*

Congress authorizes and funds water resources development projects in biennial statutes called Water Resources Development Acts ("WRDAs"). Pls.' Ex. 7 at 2. As discussed *supra* pp. 7–8, the Corps is responsible for conducting feasibility studies of potential water resources development projects. Each feasibility study culminates in a Chief's Report, in which the Corps

---

[7] Because analysis of the preliminary injunction factors in this case largely subsumes the Article III standing analysis, standing will be addressed last. *See, e.g.*, *Renee v. Duncan*, 623 F.3d 787, 795 (9th Cir. 2010) (discussing the merits first because "discussion of the merits will help the reader understand [the] discussion of Article III standing"), *opinion supplemented on reh'g*, 686 F.3d 1002 (9th Cir. 2012).

recommends to Congress a plan for executing the project analyzed during the study. Pls.' Ex. 7 at 11. Congressional authorization of a project requires, as both a practical and policy matter, a completed Chief's Report. *Id.* at 4–5, 9–11; 33 U.S.C. § 701b-8 ("It is declared to be the policy of the Congress that . . . [n]o project or any modification not authorized, of a project for flood control or rivers and harbors, shall be authorized by the Congress unless a report for such project or modification has been previously submitted by the Chief of Engineers, United States Army, in conformity with existing law."). In fact, a Chief's Report is not just a *trigger* for water resources development project legislation, it is the *substance* of that legislation: the portion of each WRDA that authorizes water resources development projects simply adopts the Corps' plans as described in its Chief's Reports. In the last WRDA bill, for instance, Congress authorized 13 projects based on Chief's Reports, and each authorization directed that the project "be carried out . . . substantially in accordance with the plans, and subject to the conditions, described in the" associated Chief's Report. America's Water Infrastructure Act of 2018, Pub. L. No. 115-270, §§ 1401–02, 132 Stat. 3765, 3835–40 (2018). Similarly, the WRDA passed in 2016 authorized 30 projects based on Chief's Reports, and each authorization directed that the project "be carried out . . . in accordance with the plans, and subject to the conditions, described in the" associated Chief's Report. Water Infrastructure Improvements for the Nation Act, Pub. L. No. 114-322, § 1401, 130 Stat. 1628, 1708–15 (2016).

Once a Chief's Report recommending a particular project is submitted to Congress, it is virtually assured that Congress will authorize the project as described in the Chief's Report. Every Chief's Report for a water resources development construction project submitted to Congress in the interim between WRDA 2014 and WRDA 2016 was approved in WRDA 2016. Pls.' Ex. 21 at 4–5; *compare* Pls.' Ex. 22 *with* 130 Stat. at 1708–15. Every Chief's Report for a

water resources development construction project submitted to Congress in the interim between

WRDA 2016 and WRDA 2018 was approved in WRDA 2018. *Compare* Pls.' Ex. 22 *with* 132

Stat. at 3835–40. As noted earlier, Congress often authorizes projects based on Chief's Reports

received directly from the Corps and does not await "Administration Review"—that is, review

by the ASA(CW) and OMB. Pls.' Ex. 7 at 11.

   2. *Section 7(d) of the Endangered Species Act*

   Section 7 of the ESA imposes a substantive obligation on federal agencies to "insure that

any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the

continued existence of any endangered or threatened species or result in the destruction or

adverse modification of" habitat that has been designated as critical for such species. 16 U.S.C.

§ 1536(a)(2); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 924 (9th Cir.

2008). Jeopardy results where an action "reasonably would be expected, directly or indirectly, to

reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild

by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

Destruction or adverse modification of critical habitat occurs where there is a direct or indirect

alteration that appreciably diminishes the value of critical habitat for both the survival and

recovery of a listed species. *Id.*

   To help fulfill the substantive mandate of section 7, the ESA requires that a federal

agency considering taking an action that could affect listed species first consult with an expert

agency—USFWS or NMFS, depending on the species. For actions that are "likely to adversely

affect" listed species or their critical habitats, the expert agency must determine whether the

action "is likely to jeopardize the continued existence of listed species or result in the destruction

or adverse modification of critical habitat." *Id.* § 402.14(g)(4). If the expert agency concludes

that the action *is* likely to jeopardize the continued existence of listed species, then the action agency and expert agency must work together to formulate RPAs to the action that will fulfill the purpose of the action but avoid the likelihood of jeopardizing the continued existence of listed species or destroying or adversely modifying critical habitat. *Id.* § 402.14(g)(5), (g)(8); *id.* § 402.02. At the end of the consultation process, the expert agency issues a BiOp that includes the RPAs developed by the expert and action agencies. *Id.* § 402.14(h). Though an expert agency's BiOp "theoretically serves an 'advisory function,' . . . in reality it has a powerful coercive effect on the action agency." *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (citation omitted).

One of the key procedural requirements of consultation is set out in section 7(d) of the ESA. Section 7(d) prohibits an action agency that is in the middle of the consultation process from "mak[ing] any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d). This prohibition "continues until the requirements of section 7(a)(2) are satisfied"—that is, until the consultation process is complete. 50 C.F.R. § 402.09. "Section 7(d) was enacted to ensure that the status quo would be maintained during the consultation process . . . ." *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034–35 (9th Cir. 2005), *abrogated on other grounds as recognized by Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1092 (9th Cir. 2015). Compliance with section 7(d) guards "against the *risk* of a substantive violation and ensures that environmental concerns will be properly factored into the decision-making process as intended by Congress." *NRDC v. Houston*, 146 F.3d 1118, 1128–29 (9th Cir. 1998). In short, section 7(d) ensures that an action agency does not prejudice the outcome of the ESA consultation process by committing resources

in a way that reduces the RPA options available to the agency and the consulting expert agency.

**B.    The Corps Is Violating Section 7(d)**

There is no dispute that the Corps is currently engaged in consultation with NMFS over the operation of the Willamette Project as a whole. And the reallocation of Project storage water for various uses is a commitment of resources "with respect to," 16 U.S.C. § 1536(d), the operation of the Willamette Project as it will influence the quantity and timing of water releases from Project reservoirs. *See Cal. Tow Truck Ass'n v. City & Cty. of San Francisco*, 807 F.3d 1008, 1021 (9th Cir. 2015) ("The phrase 'with respect to' is generally understood to be synonymous with the phrase 'relating to.' And, although the breadth of the words 'related to' does not mean the sky is the limit, . . . the ordinary meaning of the words 'related to' is a broad one, meaning 'having a connection with or reference to.'" (citations, some internal quotations, and alterations omitted)); Domingue Decl. ¶¶ 20–21, 24–35 (describing impacts of reallocation). The applicable question, then, is whether reallocation represents an "irreversible or irretrievable" commitment of resources that will "foreclose[e] the formulation or implementation of . . . reasonable and prudent alternative measures" to protect UWR Chinook salmon and steelhead. In other words, will the reallocation plan prejudice the ongoing consultation process over the Willamette Project? Plaintiffs' evidence demonstrates that it will.

*1.    The Reallocation Plan Will Preclude Several RPA Measures*

The reallocation plan will limit the Corps' flexibility to control the amount of stored water that can be used for fish and wildlife purposes and the timing of water releases. Pls.' Ex. 4 at 92–93, 95–96; Pls.' Ex. 2 at 71–85; Domingue Decl. ¶ 20, 24, 29. Those future limitations on the Corps' operational flexibility will have the *immediate* effect of limiting the range of RPA measures that NMFS and the Corps may consider during the current consultation process for the

entire Project, because the agencies will have to account for the Corps' reduced future flexibility when developing those measures. Domingue Decl. ¶ 20, 28–29, 32–35; *see also* 16 U.S.C. § 1536(b)(3)(A) ("If jeopardy or adverse modification is found, [NMFS] shall suggest those [RPAs] which [it] believes would not violate subsection (a)(2) and *can* be taken by the [action] agency" (emphasis added)); 50 C.F.R. § 402.02 ("Reasonable and prudent alternatives refer to alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the [action] agency's legal authority and jurisdiction, [and] that is economically and technologically feasible  . . . ."). Thus, as NMFS and Plaintiffs' expert have recognized, the reallocation of storage water will prejudice the ongoing consultation process over the entire Willamette Project by foreclosing the consideration of some RPA measures. Pls.' Ex. 2 at 95, 97, 100; Pls.' Ex. 10 at 3–5; Domingue Decl. ¶¶ 28–29, 32–35. Specifically, reallocation will foreclose consideration of at least three potential RPA measures: deep drawdowns of reservoirs, prioritization of flows for fish in low-water years, and increased minimum instream flows.

The Corps' reallocation plan will foreclose the development and implementation of "deep drawdown" measures meant to facilitate downstream fish passage through reservoirs and dams. A deep drawdown occurs when reservoir levels are significantly lowered and kept at that level for some period of time. Pls.' Ex. 5 at 9-42 to 9-43; Domingue Decl. Ex. 3 at 3–5. Keeping reservoir levels relatively low can benefit fish in at least two ways. First, it drops the reservoir surface to near the elevation of the "regulating outlets" in the dams, which allows juvenile fish to find and pass through these outlets.[8] Domingue Decl. ¶ 31; Domingue Decl. Ex. 3 at 2–5. Such

---

[8] Regulating outlets are found towards the bottom of dams, lower than the power turbines. Normal operations keep reservoir levels much higher than the level of the regulating outlets and fish are not able to dive deep enough to find them. Domingue Decl. ¶ 31 n.4.

passage has higher survival rates than other routes through the dams, such as through power turbines. *Id.* Second, lower reservoir levels reduce juvenile fish travel time through reservoirs, reducing the likelihood of parasitic infection and predation. Domingue Decl. Ex. 3 at 3–5. But deep drawdowns reduce the probability of reservoir refill, which can affect the amount of stored water available to users. Domingue Decl. ¶ 32. According to Plaintiffs' expert, the reallocation plan, once implemented, "would impose obligations and liabilities on the Corps that would limit its ability or willingness to provide deeper seasonal drafts [drawdowns] of the reservoirs to benefit fish." *Id.* Authorization of the reallocation plan will therefore "foreclose or severely limit consideration" of such drawdowns during the current consultation process over the entire Willamette Project. *Id.* ¶¶ 32–35.

A "prioritize fish" strategy for low-water years—in which maintaining adequate flows for fish would take precedence over other water uses—would also be foreclosed by the Corps' reallocation plan. Maintaining adequate instream flows for UWR Chinook salmon and steelhead is vital for their survival, but doing so can be challenging in low-water years. Pls.' Ex. 5 at 9-11 to 9-13. The Corps can meet flow targets more often in low-water years by choosing to prioritize water for fish and wildlife over other uses. For instance, the Corps could elect to curtail water releases for other uses when needed to meet flow objectives for fish. Pls.' Ex. 2 at 99, 101–02. However, the Corps' reallocation plan would preclude consideration of such "fish-first" measures, because the plan specifically *rejects* such an approach. *See* Pls.' Ex. 4 at 93–96 (rejecting an approach that would "prioritize[]" water for fish "up to its allocated amount" in low-water years); *supra* pp. 14–16 (discussing how the plan does not incorporate RPA Measure 4, which requires that water for fish receive priority over other uses in low-water years). Once authorized by Congress, the reallocation plan will make it impossible for the Corps and NMFS to

consider a drought strategy that would conflict with the plan, cutting off a measure that NMFS has already identified as necessary to avoid jeopardy in the 2019 Reallocation BiOp. Pls.' Ex. 2 at 99, 101–02; 50 C.F.R. § 402.02 (RPAs must be "consistent with the scope of the [action] agency's legal authority and jurisdiction . . . .").

Finally, the reallocation plan will make it impossible for the agencies to consider higher instream flow targets for fish as a RPA measure in the new BiOp. The 2008 BiOp set minimum instream flow targets for the mainstem Willamette and the tributaries, but it anticipated that those targets would be revised in the future. Pls.' Ex. 5 at 9-16 to 9-18. One obvious RPA measure that NMFS and the Corps could consider during the current consultation over the entire Willamette Project is higher minimum flow targets. But, in much the same way that reallocation would foreclose adoption of a "prioritize fish" RPA measure, reallocation would severely limit the agencies' ability to set more fish-protective flow targets. Pls.' Ex. 4 at 92–93. Indeed, NMFS determined that the reallocation plan will make it more difficult for the Corps to meet the existing flow targets from the 2008 BiOp, Pls.' Ex. 2 at 80–81, 93, which makes the development of higher flow targets during the ongoing consultation process an impossibility. More generally, as the Corps itself previously acknowledged, it is "impossible to determine how much of the water stored in the reservoirs would be available for other purposes until after the requirements for ESA-listed fish [are] clearly specified." Pls.' Ex. 8 at 3. Accordingly, fixing the amount of water available for other uses *before* the completion of ESA consultation necessarily limits the amount of water available to fish, thus prejudicing the current consultation process.

2.    *NMFS and Ninth Circuit Precedent Strongly Support Plaintiffs' Claim*

A strong piece of evidence supporting Plaintiffs' claim is that NMFS—one of the agencies that administers the ESA—has determined that the Corps is violating section 7(d). In

the 2019 Reallocation BiOp, NMFS stated that the reallocation plan will "limit the Corps' flexibility to comply with . . . ESA Section 7(d) requirements in relation to the" agencies' current consultation over the Willamette Project as a whole. Pls.' Ex. 2 at 95. NMFS also stated that the Corps, by refusing to adopt RPA Measure 1 in the reallocation plan, was failing to "ensure that [it] retains the capability to comply with ESA Section 7(d) requirements in relation to the . . . consultation now underway  . . ., and for any future ESA consultations that will affect the management of water stored in the [Willamette Project]." *Id.* at 100.

Likewise, in its comments on the proposed Chief's Report, NMFS stated that failure to adopt RPA Measure 1 would "foreclose[e] . . . reevaluation of existing minimum instream flows" as well as actions "that may be required as part of" the ongoing consultation. Pls.' Ex. 14 at 2. Even in its comments on the Corps' initial plan—which was more favorable to fish than the plan ultimately adopted—NMFS expressed its opinion that the plan "could limit options in the future for fish protection," including deep drawdowns and temperature control operations.[9] Pls.' Ex. 10 at 3–4. As one of the agencies that administers the ESA, NMFS's opinion with respect to the Corps' compliance with its ESA obligations is entitled to deference. *See Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987) (deferring to USFWS's conclusion concerning the Corps' duty to reinitiate consultation), *abrogated on other grounds as recognized by Cottonwood Envtl. Law Ctr.*, 789 F.3d at 1092; *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011) (deferring to USFWS's conclusions regarding another agency's compliance with the ESA); *Wishtoyo Found. v. United Water Conservation Dist.*, Case No. CV 16-3869-DOC, 2018 WL 6265099, at *17 (C.D. Cal. Sept. 23, 2018) (relying heavily on NMFS's jeopardy and

---

[9] Temperature control operations involve releasing water from different reservoir levels through different outlets to improve downstream water temperatures at certain times of the year. Domingue Decl. Ex. 2 ¶ 30.

"take" conclusions in its BiOp to find that the defendants were violating the ESA), *aff'd* 795 F.

App'x 541 (9th Cir. Feb. 26, 2020).

Indeed, it is difficult to think of an ESA context in which deference to the expert agency

is *more* appropriate than the 7(d) context: NMFS, as the Corps' partner in the consultation

process, is tasked with developing RPA measures during that process, and is thus in a unique

position to opine on the potential effects that reallocation will have on its ability to develop those

measures. *See* 50 C.F.R. § 402.14(g)(5) (requiring NMFS to "identify[]" RPAs with help from

the action agency), § 402.14(g)(8) ("In formulating . . . any reasonable and prudent alternatives[]

. . ., the [expert agency] will use the best scientific and commercial data available . . . ."model).

NMFS's concerns about the Corps' lack of compliance with section 7(d) show that there are *at

the very least* "serious questions" as to whether the Corps is violating section 7(d) by pushing

forward its reallocation plan.

Additionally, the situation in this case is strikingly similar to that in *NRDC v. Houston*,

where the Ninth Circuit concluded that the Bureau of Reclamation's decision to renew water

contracts with irrigation districts during ESA consultation violated section 7(d). 146 F.3d at

1127–28 & 1128 n.5. As here, the agency's chosen course of action in *Houston* limited its

discretion in making future operational changes to benefit ESA-listed species. *See id.* at 1128

(noting that the 40-year water contracts at issue "prohibit[ed] an adjustment in the amount of

water delivered" to irrigation users). And, as in this case, that limitation of *future* discretion

reduced the range of RPA measures that the agencies could consider during the *present*

consultation process, thus prejudicing the outcome of that process and violating section 7(d). *See

id.* (holding that Reclamation violated section 7(d) by renewing the water contracts because

doing so foreclosed "the reasonable and prudent alternative of reallocating contracted water from

irrigation to conservation"). The court's reasoning in *Houston*, applied to the facts of this case, shows that the Corps is violating section 7(d) by pushing forward its reallocation plan.

Congress's role in authorizing the Corps' reallocation plan does not alter this analysis. By proposing the plan to Congress, the Corps has taken all the discretionary steps that it needs to take to effectuate a commitment of resources that will prejudice the consultation process. The fact that Congress has not yet adopted the plan in WRDA does not negate the Corps' section 7(d) violation. Agency decisions to commit resources frequently require some other party to act before the decision takes effect, and a court need not wait for such action to occur before enjoining the agency under the ESA. If, for instance, an agency decided to authorize a timber sale during an ESA consultation, a court could step in to enjoin the timber sale under section 7(d) notwithstanding the fact that the sale would require willing buyers before the commitment of resources was truly "irreversible." *See, e.g.*, *Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 293, 295 (9th Cir. 1992) (enjoining the Bureau of Land Management "from conducting any new [timber] sales" under section 7(d), even those that had not yet been announced). Indeed, given the nature of a section 7(d) violation—an "*irreversible or irretrievable* commitment of resources"—judicial relief will usually only be meaningful before the commitment of resources becomes truly irreversible.

Plaintiffs have made a strong showing that the Corps is violating ESA section 7(d). Plaintiffs' expert and NMFS have both determined that the Corps' reallocation plan will seriously impair the ability of the Corps and NMFS to develop RPAs to protect UWR Chinook salmon and steelhead during the ongoing consultation process for the Willamette Project, in violation of ESA Section 7(d). Furthermore, this case bears a striking similarity to *NRDC v. Houston*, where the Ninth Circuit found a section 7(d) violation under similar circumstances.

Accordingly, Plaintiffs have established a likelihood of success on the merits of their claim.

### III.    PLAINTIFFS WILL LIKELY SUFFER IRREPARABLE HARM WITHOUT PRELIMINARY INJUNCTIVE RELIEF

"The purpose of a preliminary injunction is to preserve the court's power to render meaningful relief after a trial on the merits." *Marcos*, 818 F.2d at 1480 (citation omitted). For that reason, to be entitled to preliminary injunctive relief, Plaintiffs must show that it is likely that waiting until the time of final judgment to award some relief will lead to harm that cannot be remedied by this Court. *See NWF v. NMFS 2018*, 886 F.3d at 818 (plaintiffs seeking preliminary injunctive relief "must demonstrate that irreparable injury 'is *likely* in the absence of an injunction.'" (quoting *Winter*, 552 U.S. at 22)).

This case presents a different mechanism of likely irreparable harm than most cases involving dam operations and their effects on ESA-listed fish. Typically, preliminary injunctive relief is requested in such cases to mitigate ongoing harm to the species from dam operations while awaiting a judgment on the merits or some other event. *See NWF v. NMFS 2018*, 886 F.3d at 815–17 (discussing how the plaintiffs sought "interim injunctive measures" to protect fish while awaiting a new BiOp); *NEDC v. U.S. Army Corps of Eng'rs*, 2019 WL 2372591, at *3 (listing "interim operational measures" sought by the plaintiffs). Here, though, the focus of the harm is not the ongoing operations of the dams—rather, the threat is that waiting for a final judgment will ensure that future harm from the reallocation becomes inevitable because events will occur that will "lock in" that harm. To demonstrate a likelihood of irreparable harm in such a circumstance, a plaintiff must show that the threatened harm is "irreparable" and that the events that will lead to that harm are likely to occur before the court can enter final judgment.

### A.    The Threatened Harm Is "Irreparable"

The type of harm that justifies preliminary injunctive relief is "irreparable" harm—"harm

for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). In an ESA case, it is presumed that remedies at law are inadequate. *NWF v. NMFS 2018*, 886 F.3d at 817. And harm to ESA-listed species—and to a plaintiff's aesthetic, spiritual, and recreational interests in those species—is precisely the sort of "irreparable" harm that calls for injunctive relief, even when the harm is not so great as to result in extinction. *Id.* at 818–19, 822. "The ESA accomplishes its purpose in incremental steps, which include protecting the remaining members of a species"; "[h]arm to those members is irreparable because once a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult." *Id.* at 818 (citations, internal quotation, and alteration omitted).

If the reallocation plan is authorized, it will cause irreparable harm to UWR Chinook salmon and steelhead. As this Court found less than a year ago, "UWR Chinook and steelhead are in a more precarious condition today than they were" in 2008, and "the condition of [both species] is deteriorating." *NEDC v. U.S. Army Corps of Eng'rs*, 2019 WL 2372591, at \*10–11. UWR Chinook salmon are at "high risk" for extinction and may be at "very high risk" soon. Pls.' Ex. 2 at 92. In the 2019 Reallocation BiOp, NMFS concluded that the water reallocation will "significantly reduce abundance and productivity of most UWR Chinook salmon and steelhead populations," which "will appreciably reduce the likelihood of both the survival and recovery of the species.[10] *Id.* at 91–96. NMFS also concluded that reallocation will "appreciably diminish[]

---

[10] Some of the harm to UWR Chinook salmon and steelhead will result from the existence of the dams themselves and the Corps' operations that are unrelated to reallocation, but that does not make the harm here any less "irreparable" for purposes of injunctive relief. *See NWF v. NMFS 2018*, 886 F.3d at 819–20 ("a plaintiff need not . . . show that the action sought to be enjoined is the exclusive cause of the injury" (internal quotation and citation omitted)). The key is that there is a "sufficient causal connection" between reallocation and the threatened harm to fish, *id.*, as evidenced by NMFS's jeopardy determination in the 2019 Reallocation BiOp.

the value of designated critical habitat for the conservation [of] UWR Chinook salmon and steelhead." *Id.* at 96. The impacts of the reallocation added to the highly imperiled status of the species establishes that irreparable harm will occur from the Corps' reallocation plan.

Moreover, the reallocation plan *cannot be undone* by the Corps once Congress authorizes it—indeed, the Corps has refused to retain such discretion. *Supra* pp. 14–16. Nor could a court unwind the reallocation plan—which is expected to govern the Corps' operation of the Willamette Project for up to 50 years, Pls.' Ex. 4 at v, 7, 89, 130—once it is approved by Congress. *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975) (discussing how courts cannot compel Congress to enact or repeal legislation). The situation will be similar to that in *Salmon Spawning & Recovery Alliance v. Gutierrez*, where NMFS's procedural ESA violation facilitated the United States' entry into a treaty, which then rendered the violation irremediable because no court could order the United States to withdraw from the treaty. 545 F.3d 1220, 1226–27 (9th Cir. 2008). If the Corps manages to get its reallocation plan rubber-stamped by Congress, it will be impossible for a court or the Corps to reverse or revise the plan.

In short, the reallocation plan will "materially diminish the species' prospects for future survival or recovery and/or will appreciably diminish the value of their critical habitat," thereby causing irreparable harm to the species. *NEDC v. U.S. Army Corps of Eng'rs*, 2019 WL 2372591, at *11 (citation and internal quotation omitted); *see also Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 258–60 (D.D.C. 2003) (finding irreparable harm based on NMFS's jeopardy determination), *appeal dismissed*, 2003 WL 22890061 (D.C. Cir. Dec. 4, 2003). That, in turn, will harm Plaintiffs, who have aesthetic, recreational, and spiritual interests in the survival and abundance of UWR Chinook salmon and steelhead. *See* DeVoe Decl. ¶¶ 8–14 (describing personal interests); Brumitt Decl. ¶¶ 6–8 (same); Marla Fox Decl. ¶¶ 4–15 (same);

Jason Fox Decl. ¶¶ 5–8 (same); *see also NWF v. NMFS 2018*, 886 F.3d at 822 (holding that the plaintiffs had "shown irreparable harm to their own interests stemming from the irreparable harm to the listed species").

> **B.    The Irreparable Harm Is Likely To Occur
>          Without Preliminary Injunctive Relief**

A preliminary injunction is appropriate only if the plaintiff cannot wait for a final judgment: it must be "likely" that waiting until final judgment to grant relief will lead to irreparable harm. *NWF v. NMFS 2018*, 886 F.3d at 822. But the actual on-the-ground harm to a plaintiff's interests need not be likely to occur by the time of final judgment; rather, it must be likely that waiting for final judgment will make that harm impossible for the court to repair or prevent. *See Marcos*, 818 F.2d at 1480 ("The purpose of a preliminary injunction is to preserve the court's power to render meaningful relief after a trial on the merits." (citation omitted)); *United States v. NCR Corp.*, 688 F.3d 833, 842–43 (7th Cir. 2012) (finding that delaying cleanup of a river would cause irreparable harm because it would "allow[] [polluted water] to continue to flow into Green Bay and ultimately Lake Michigan," at which point "the problem becomes irreparable, as there are not any effective methods of cleaning [pollutants] from such deep bodies of water"); *Crowder v. Kelly*, 928 F. Supp. 2, 5–6 (D.D.C. 1996) (finding irreparable harm to support a preliminary injunction based in part on the "long term effects on [the plaintiffs'] health" from exposure to cigarette smoke during the time before trial). As the Corps itself has put it, "the typical purpose of a preliminary injunction" is to "preserve the status quo," Fed. Defs.' Oppo. to Pls.' PI Mot. at 19, *NEDC v. U.S. Army Corps of Eng'rs*, Case No. 3:18-cv-00437-HZ, ECF No. 64 (Feb. 25, 2019). Thus, a preliminary injunction is appropriate to prevent a party from acting in a way that will make return to the status quo impossible.

Here, the reallocation plan will surely cause irreparable harm to UWR Chinook salmon

and steelhead, as discussed above. And, based on the facts in the record, it is likely that the plan will be authorized by Congress before this Court can enter judgment on the merits. *See Enyart v. Nat'l Conference of Bar Exam'rs*, 630 F.3d 1153, 1165–66 (9th Cir. 2011) (treating the district court's determination of the likelihood of irreparable harm as a factual question). The record demonstrates the following: (1) in the last two WRDAs, Congress has authorized *every* water resources development construction project proposed by the Corps, *supra* pp. 19–20; (2) each authorization has approved the Corps' plan with no modifications, *supra* p. 19; (3) the Corps has already submitted a Chief's Report to Congress for its reallocation plan, *supra* p. 16; and (4) the relevant Congressional committees have signaled their intent to develop a new WRDA in spring 2020, *id*. Given all this, it seems *very* likely that the Corps' reallocation plan will be authorized in the next few months absent intervention by this Court.

Once adopted in a WRDA, the reallocation plan will gravely prejudice the ongoing ESA consultation process and influence water management at Willamette Project dams for decades, causing harm to many generations of UWR Chinook and steelhead and the people—such as Plaintiffs—who derive pleasure from their existence. This Court will be unable remedy that harm. To preserve its ability to award meaningful relief against the Corps at the time of final judgment, this Court should award preliminary injunctive relief now.

### IV.    PLAINTIFFS HAVE STANDING TO SEEK RELIEF

"To have standing [under Article III], a plaintiff must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Dep't of Commerce v. New York*, 139 S. Ct.

2551, 2565 (2019) (citation and internal quotation omitted).[11]

Threatened future harm is sufficient for Article III standing if "there is a substantial risk that the [harm] will occur." *Dep't of Commerce*, 139 S. Ct. at 2565 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Whether threatened harm is sufficiently likely to occur for standing purposes turns on its probability *in fact*; for that reason, future harm may be sufficient for standing even if its occurrence depends on the actions of third parties not before the court, provided that those third parties' actions are reasonably predictable. *Id.* at 2565–66. Here, for the same reasons that irreparable harm is likely in the absence of preliminary injunctive relief, there is a "substantial risk" that Plaintiffs will suffer harm. *Supra* pp. 29–33.

When a plaintiff alleges a procedural violation,[12] the traceability and redressability standards are "relaxed." *Salmon Spawning & Recovery All.*, 545 F.3d at 1229. To show traceability, a plaintiff need only demonstrate that adherence to the proper procedures *could* protect their concrete interests. *Id.* at 1226. Similarly, a plaintiff shows redressability by demonstrating "that the relief requested . . . *may* influence the agency" in a way that will inure to the benefit of the plaintiff's concrete interests. *Id.* at 1226–27 (emphasis added). "This is not a high bar to meet." *Id.* at 1227. As discussed earlier, were the Corps to wait until the end of the

---

[11] "[A]n organization has standing to sue on behalf of its members if (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to vindicate are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 950 n.19 (9th Cir. 2013) (internal quotations and citations omitted). Here, the latter two organizational standing factors are clearly met. *See* DeVoe Decl. ¶¶ 3–7 (describing WaterWatch's interests); Wierenga Decl. ¶ 3 (describing WildEarth Guardians' interests).

[12] A section 7(d) claim is a procedural violation claim. *Houston*, 146 F.3d 1126–28; *see also Conner v. Burford*, 848 F.2d 1441, 1455 n.34 (9th Cir. 1988) ("[S]ection 7(d) clarifies the requirements of section 7(a), ensuring that the status quo will be maintained during the consultation process."). The procedural requirements of section 7(d) are intended to guard "against the *risk* of a substantive [ESA] violation." *Houston*, 146 F.3d at 1128.

Willamette Project consultation to develop and propose a reallocation plan, it would be able to consider (together with NMFS) more fish-protective RPA measures during the consultation process. *Supra* pp. 22–29. Those measures, once adopted in a new BiOp, would have a "powerful coercive effect" on the Corps, *Bennett v. Spear*, 520 U.S. at 169, causing it to operate the Willamette Project in a manner that would do less harm to UWR Chinook and steelhead. Further, any new reallocation plan would be informed by the new RPA measures, and therefore would likely be better for fish. Thus, compliance with section 7(d) could lead to a better outcome for fish, and Plaintiffs satisfy the traceability prong. For similar reasons, the relief requested by Plaintiffs *could* lead to a better BiOp for the overall Willamette Project and a better reallocation plan, benefitting fish and Plaintiffs, which establishes redressability for this procedural violation. *See Salmon Spawning & Recovery All.*, 545 F.3d at 1229 (finding traceability and redressability satisfied because reinitiation of consultation *could* lead to a jeopardy determination); *W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1147–49 (9th Cir. 2019) (holding that the plaintiffs had established redressability even though a third party might act to cause them the same harm as the defendant). Under the facts of this case, Plaintiffs have demonstrated that they meet the relaxed requirements for standing.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion for a preliminary injunction and order their requested relief. Given the nature of this litigation and Plaintiffs' nonprofit status, Plaintiffs request that this Court waive any injunction bond under Rule 65(c). *E.g.*, *Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012).

Dated: March 20, 2020        Respectfully submitted,


*/s/ Andrew R. Missel*
Lauren M. Rule (OSB # 015174)
Elizabeth H. Potter (OSB # 105482)
Andrew R. Missel (OSB # 181793)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave, Suite B
Portland, OR  97202
Tel: (503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org
amissel@advocateswest.org

Attorneys for Plaintiffs

**Exhibits to Plaintiffs' Motion for Preliminary Injunction**

Exhibit 1       *Excerpts from* NMFS & Or. Dep't of Fish & Wildlife, *Upper Willamette River Conservation & Recovery Plan for Chinook Salmon & Steelhead* (Aug. 2011)

Exhibit 2       NMFS, *Final Biological Opinion on the Willamette Basin Review Feasibility Study* (June 28, 2019)

Exhibit 3       Or. Dep't of Fish & Wildlife, *1961–2019 Willamette Falls Annual Fish Passage Counts* (2019)

Exhibit 4       U.S. Army Corps of Eng'rs, *Willamette Basin Review Feasibility Study: Final Integrated Feasibility Report and Environmental Assessment* (Dec. 2019)

Exhibit 5       *Excerpts from* NMFS, *Final Biological Opinion on the Willamette River Basin Flood Control Project* (July 11, 2008)

Exhibit 6       *Excerpts from* U.S. Army Corps of Eng'rs, *Water Resources Development in Oregon 2000* (2000)

Exhibit 7       Cong. Research Serv., *Army Corps of Engineers: Water Resource Authorization and Project Delivery* (Apr. 19, 2019)

Exhibit 8       *Excerpt from* U.S. Army Corps of Eng'rs & Or. Water Res. Dep't, *Willamette Basin Reservoir Study Interim Report* (Jan. 2000)

Exhibit 9       *Excerpts from* U.S. Army Corps of Eng'rs, *Willamette Basin Review Feasibility Study: Draft Integrated Feasibility Report and Environmental Assessment* (Nov. 2017)

Exhibit 10      NMFS, *Willamette Basin Review Tentatively Selected Plan–NMFS Comments* (June 28, 2017)

Exhibit 11      *Excerpts from* U.S. Army Corps of Eng'rs, *Willamette Basin Review Feasibility Study: Final Draft Integrated Feasibility Report and Environmental Assessment* (Sept. 2019)

Exhibit 12      Joyce E. Casey, U.S. Army Corps of Eng'rs, *Letter re: Reinitiation of Consultation on the 2008 Endangered Species Act Section 7(a)(2) Consultation Biological Opinion and Magnuson-Stevens Fishery Conservation & Management Act Essential Fish Habitat Consultation for the Willamette River Basin Flood Control Project* (Apr. 9, 2018)

Exhibit 13      WaterWatch of Oregon et al., *Letter re: Willamette Basin Review* (Jan. 23, 2019)

LIST OF EXHIBITS TO MEMORANDUM IN SUPPORT OF MOTION FOR PI

Exhibit 14       NMFS, *Comments and Recommendations on the Final Draft of the Project Report and the Chief's Proposed Report for the Willamette River Basin Review Reallocation Study, Oregon* (Nov. 8, 2019)

Exhibit 15       Todd T. Semonite, Chief of Engineers, *Proposed Report re: Willamette River Basin Review Reallocation Study, Oregon* (Sept. 2019)

Exhibit 16       Todd T. Semonite, Chief of Engineers, *Final Report re: Willamette River Basin Review Reallocation Study, Oregon* (Dec. 18, 2019)

Exhibit 17       Staff, Subcomm. on Water Res. & Envt. of the H. Comm. on Transp. & Infrastructure, *Memo re: Subcommittee Hearing on "Proposals for a Water Resources Development Act of 2020"* (Jan. 3, 2020)

Exhibit 18       *Committee Leaders Kick Off Bipartisan Development of WRDA 2020*, House Committee on Transportation & Infrastructure (Jan. 17, 2020), https://transportation.house.gov/news/press-releases/committee-leaders-kick-off-bipartisan-development-of-wrda-2020-

Exhibit 19       *Chairs DeFazio, Napolitano Statements from Hearing on WRDA 2020 Proposals*, House Committee on Transportation & Infrastructure (Jan. 9, 2020), https://transportation.house.gov/news/press-releases/chairs-defazio-napolitano-statements-from-hearing-on-wrda-2020-proposals

Exhibit 20       *Notice of Intent to Sue for Violations of the Endangered Species Act Related to the Proposed Willamette Basin Reallocation* (Dec. 19, 2019)

Exhibit 21       U.S. Army Corps of Eng'rs, *2017 Report to Congress on Future Water Resources Development* (Mar. 2017)

Exhibit 22       *Planner's Library: Signed Chief's Reports*, U.S. Army Corps of Engineers (last visited Mar. 19, 2020), https://planning.erdc.dren.mil/toolbox/library.cfm?Option=Direct&Group=Main&Item=Chief%20Report&Sub=None&Sort=YearDesc

Exhibit 23       Demonstrative Exhibit Showing Timeline of Key Actions and Decisions Related to Reallocation

LIST OF EXHIBITS TO MEMORANDUM IN SUPPORT OF MOTION FOR PI