JEAN E. WILLIAMS, Deputy Assistant Attorney General
SETH M. BARSKY, Chief
S. JAY GOVINDAN, Assistant Chief
MICHAEL R. EITEL, Senior Trial Attorney
KAITLYN POIRIER, Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 307-6623
Facsimile: (202) 305-0275
Email: kaitlyn.poirier@usdoj.gov; michael.eitel@usdoj.gov

Attorneys for Federal Defendants

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| **WATERWATCH OF OREGON, et al.,** | Case No. 3:20-cv-00413-HZ |
| Plaintiffs, | |
| v. | **FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF 7)** |
| **U.S. ARMY CORPS OF ENGINEERS, et al.,** | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

I.    The Endangered Species Act ...................................................................................2

II.   The Willamette Valley Project (WVP) ...................................................................3

    A.    The Corps' ongoing operation of the WVP .......................................................3

    B.    The Corps' Willamette basin review and feasibility study.................................6

        1.    WVP reservoir storage addressed by the Corps' feasibility study. ......................6

        2.    NMFS's 2008 RPA addressing conservation storage and instream flow rights. 8

        3.    The Corps' 2019 feasibility study. ..................................................................8

        4.    NMFS's 2019 biological opinion on the feasibility study. ................................10

        5.    The Corps' final feasibility study, the Chief of Engineers' report and recommendation, and ongoing reviews. .................................................11

STANDARD OF REVIEW ...................................................................................................12

ARGUMENT ...................................................................................................................13

I.    The Court lacks jurisdiction over Plaintiffs' claim for injunctive relief. .................................13

    A.    Plaintiffs' injunctive relief violates the Constitution's separation of powers. ..............14

        1.    Plaintiffs' requested relief intrudes on areas the Constitution commits to the political branches. ..............................................................14

        2.    Neither the Constitution nor any statute contemplates review of communications between the political branches..................................17

    B.    Plaintiffs cannot establish the other Article III standing requirements. .......................21

II.   Plaintiffs have no likelihood of success on their ESA Section 7(d) claim..............................26

III.  Plaintiffs' allegations of irreparable harm are legally and factually unfounded.....................31

IV.   The balance of harms and the public interest favor denial of Plaintiffs' proposed injunction...................................................................................................33

CONCLUSION ...................................................................................................................35

# **TABLE OF AUTHORITIES**

<u>CASES</u>                                                                                                   <u>PAGE</u>

*All. for the Wild Rockies v. Krueger*, 35 F. Supp. 3d 1259 (D. Mont. 2014) .........................................33

*All. for Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ............................................................13

*Arizona v. California*, 283 U.S. 423 (1931) .........................................................................................16

*Chem. Weapons Working Grp. v. U.S. Dep't of Army*, 111 F.3d 1485 (10th Cir. 1997) ......................18

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013).............................................................................14

*Clinton v. City of New York*, 524 U.S. 417 (1998) ...............................................................................14

*Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102 (D.C. Cir. 2012)...................................22

*Consejo de Desarrollo Economico, Mexicali v. United States*, 482 F.3d 1157 (9th Cir. 2007)...................27

*Cramer v. Brown*, 2012 WL 13059699 (C.D. Cal. Sept. 12, 2012).......................................................22

*Cty. of Vernon v. United States*, 933 F.2d 532 (7th Cir. 1991) ...............................................................18

*Dalton v. Specter*, 511 U.S. 462 (1994)................................................................................................26

*Davis v. Federal Election Comm'n*, 554 U.S. 724 (2008)......................................................................13

*Defs. of Wildlife v. Bureau of Ocean Energy Mgmt., Regulation, Enf't,* 871 F. Supp. 2d 1312 (S.D. Ala.
    2012)....................................................................................................................................................3

*Derryberry v. TVA*, 182 F.3d 916 (6th Cir. 1999) ...............................................................................18

*DISH Network Corp. v. FCC*, 653 F.3d 771 (9th Cir. 2011) ...............................................................13

*Garcia v. Google Inc.*, 786 F.3d 733 (9th Cir. 2015) ...........................................................................31

*Guerrero v. Clinton*, 157 F.3d 1190 (9th Cir. 1998)....................................................2, 15, 18, 19, 20, 24

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239 (9th Cir. 2013) .............................. 31-32

*Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252 (W.D. Wash. 2015)............34

*Izaak Walton League of Am. v. Marsh*, 655 F.2d 346 (D.C. Cir. 1981) ................................................18

*Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020) .................................................. 2, 14, 17, 21, 24

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012) ................................. 18, 19, 27

*Loving v. United States*, 517 U.S. 748 (1996)........................................................................................16

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ...................................................................................13

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) .............................................................................16

*Mazurek v. Armstrong*, 520 U.S. 968 (1997).......................................................................................12

*McKart v. United States*, 395 U.S. 185 (1969) ......................................................................................32

*Miccosukee Tribe of Indians v. U.S. Army Corps of Eng'rs*, 619 F.3d 1289 (11th Cir. 2010) ................24

*Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) ........................................................................20

*Missouri v. Jenkins*, 515 U.S. 70 (1995) ....................................................................................17

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ......................................................30

*Murrelet v. Babbitt*, 83 F.3d 1068 (9th Cir. 1996) ............................................................... 19, 27

*Nat. Res. Def. Council v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988) ..........................................15, 18, 20

*Nat. Res. Def. Council v. Houston*, 146 F.3d 1118 (9th Cir. 1998) ......................................... 25, 30

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644 (2007) ..................................... 23, 28

*Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803 (9th Cir. 2018) ..........................................................33

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,* 366 F.3d 930 (D.C. Cir. 2004) ...................................25

*Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508 (1941) .......................................16

*Or. Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982 (D. Or. 2010) ...........................................18

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631 (9th Cir. 2015) ...........................32

*Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011) .....................................................31

*Perkins v. Lukens Steel Co.,* 310 U.S. 113 (1940) .......................................................................25

*Renee v. Duncan*, 686 F.3d 1002 (9th Cir. 2012) ...................................................................2, 19, 20

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ......................................................................17

*Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 1995) ............................................................ 19, 27

*Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019) ...................................................................33

*Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142 (D.D.C. 2011) .........................................31

*Taylor Bay Protective Ass'n v. EPA*, 884 F.2d 1073 (8th Cir. 1989) ......................................... 18, 21

*United States v. Erves*, 880 F.2d 376 (11th Cir. 1989) ..............................................................18

*United States v. Martinez-Cortez*, 924 F.2d 921 (9th Cir. 1991) ............................................. 2, 18

*United States v. White*, 869 F.2d 822 (5th Cir. 1989) ...............................................................18

*Util. Air Regulatory Grp. v. EPA,* 573 U.S. (2014) ....................................................................22

*Wash. Envtl. Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013) ....................................................24

*Webster v. Doe*, 486 U.S. 596 (1988) .....................................................................................14

*Wildlands Def. v. Seesholtz*, 755 F. App'x 640 (9th Cir. 2018) ....................................................29

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ..........................................................13, 32, 33

STATUTES                                                                                    PAGE

16 U.S.C. § 1536(a)(2) ..................................................................................... 2, 27

16 U.S.C. § 1536(b)(3)(A) ............................................................................... 3, 27

16 U.S.C. § 1536(b)(4) ......................................................................................... 3

16 U.S.C. § 1536(d) ................................................................................. 3, 25, 27

16 U.S.C. § 1540(g)(1)(A) ................................................................................. 13

33 U.S.C. § 2215 ................................................................................................. 15

33 U.S.C. § 2215(d)(2) ....................................................................................... 12

33 U.S.C. § 2281 ................................................................................................. 17

33 U.S.C. § 2282 ................................................................................................. 15

33 U.S.C. § 2282(a)(2) ....................................................................................... 12

33 U.S.C. § 2282a ............................................................................................... 15

33 U.S.C. § 2282a(f) ........................................................................................... 12

33 U.S.C. § 2282a(f)(2) ...................................................................................... 12

33 U.S.C. § 2282a(g) .......................................................................................... 12

33 U.S.C. § 2282a(g)(1) ..................................................................................... 12

33 U.S.C. § 2282a(g)(1)(A) ............................................................................... 12

33 U.S.C. § 2282a(g)(1)(B) ............................................................................... 12

33 U.S.C. § 2282b ............................................................................................... 17

33 U.S.C. § 2282c(g) .......................................................................................... 18

33 U.S.C. § 2282d ............................................................................................... 18

33 U.S.C. § 2283a ............................................................................................... 18

33 U.S.C. § 701-1 ............................................................................................... 17

33 U.S.C. § 701-1(a) ........................................................................................... 12

42 U.S.C. § 1962-1(a) ......................................................................................... 24

<u>FEDERAL REGULATIONS</u>                                                        <u>PAGE</u>

33 C.F.R. § 230.14 ...................................................................................................12

40 C.F.R. § 1505.2 ..................................................................................................12

50 C.F.R. § 402.02 ............................................................................................ 3, 27

51 Fed. Reg. 19926 (June 3, 1986) .........................................................................25

64 Fed. Reg. 14308 (Mar. 24, 1999) ........................................................................4

64 Fed. Reg. 14517 (Mar. 25, 1999) ........................................................................4

<u>ACRONYMS</u>

| | |
|---|---|
| AI | Agricultural Irrigation |
| ESA | Endangered Species Act |
| F&W | Fish and Wildlife |
| FWS | Fish and Wildlife Service |
| M&I | Municipal and Industrial |
| NMFS | National Marine Fisheries Service |
| OWRD | Oregon Water Resources Department |
| RPA | Reasonable and Prudent Alternative |
| UWR | Upper Willamette River |
| WVP | Willamette Valley Project |

## INTRODUCTION

At Congress' request, the U.S. Army Corps of Engineers studied ways to improve storage and reservoir operations for the 13 dams and reservoirs that comprise the Willamette Valley Project. The Corps concluded that reallocation of reservoir storage would facilitate Congress' objectives in authorizing the projects for multiple purposes, including water supply, while also ensuring the protection of fish and wildlife resources. The Corps, acting through the Chief of Engineers, provided its report to Congress on December 20, 2019. The Corps recommended that Congress authorize the proposed reallocation of reservoir storage space. *See* Coleman Decl., Attach. 1.[1] The Assistant Secretary of the Army for Civil Works is now reviewing the Corps' report and recommendation. After the review, the Assistant Secretary may provide an additional recommendation to Congress on the proposed reallocation.

Three plaintiff groups disagree with the Corps' report and recommendation. They ask this Court to intervene by ordering the Corps to retract the report and recommendation it provided to Congress and prohibit the Corps and the Assistant Secretary from communicating further with Congress on this matter.

Every motion for a preliminary injunction seeks extraordinary relief. Plaintiffs' demand for relief here sits on an even higher plane. They challenge the Corps' submission of a report and recommendation to Congress, even though a report and recommendation has no legal consequences and can result in no harm to Plaintiffs. Worse, Plaintiffs want the Court to issue an injunction that it lacks the power to award. They ask the Court to enjoin the Executive Branch, acting through the Corps and the Assistant Secretary, from communicating with

---

[1] Federal Defendants are filing the Wesley E. Coleman, Jr. (Coleman Decl.) and Kathryn L. Warner (Warner Decl.) declarations. Additional exhibits are attached to the Declaration of Michael R. Eitel and referred to as "U.S. Ex."

Congress. This unprecedented judicial directive would contravene the Executive's explicit constitutional authority to provide any recommendations to Congress it considers "necessary and expedient." U.S. Const., Art. II, § 3. The judicial directive also would hinder Congress' ability to obtain information on Corps projects and impede Congress' performance of its legislative functions when managing water resources and development legislation. And, while Plaintiffs would have the Court serve as a censor that polices communications between the political branches, Article III does not confer that authority on the judiciary.

For these reasons, the Ninth Circuit has held that courts may not police the timing or contents of Executive reports and recommendations sent to Congress. *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998); *see also Renee v. Duncan*, 686 F.3d 1002, 1017 (9th Cir. 2012); *United States v. Martinez-Cortez*, 924 F.2d 921, 924-25 (9th Cir. 1991) (per curiam). This case is not different. The Court lacks authority to grant Plaintiffs' requested relief, which precludes Article III standing. *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). On that basis alone the Court should deny Plaintiffs' motion and dismiss this case.

## BACKGROUND

### I.    The Endangered Species Act

Section 7(a)(2) of the Endangered Species Act (ESA) requires each federal agency to ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize listed species or result in the destruction or adverse modification of designated "critical habitat." 16 U.S.C. § 1536(a)(2). The agency taking the action must fulfill this duty "in consultation with" the National Marine Fisheries Service (NMFS) and the U.S. Fish and Wildlife Service (FWS), as appropriate. *Id.* A Section 7(a)(2) consultation culminates in NMFS's or FWS's opinion on the likely effects of the agency action and an incidental take statement exempting the agency from

liability for any "take" occurring incidental to the action. 16 U.S.C. § 1536(b)(3), (b)(4); 50 C.F.R. § 402.02 (defining "take").

If NMFS or FWS determines that an agency's action is likely to jeopardize a species, the ESA requires them to identify a "reasonable and prudent alternative" (RPA) action that will avoid that jeopardy. 16 U.S.C. § 1536(b)(3)(A). An RPA constitutes an alternative action the agency can implement within its existing authorities and that would avoid jeopardizing listed species or destroying and adversely modifying critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.02 (defining "Reasonable and prudent alternative").

While an ESA consultation is ongoing, Section 7(d) prohibits a certain category of agency actions. 16 U.S.C. § 1536(d). The "Federal agency … shall not make any irreversible or irretrievable commitment of resources with respect to the agency action" that "has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." *Id.*; *see Defs. of Wildlife v. Bureau of Ocean Energy Mgmt., Regulation, Enf't,* 871 F. Supp. 2d 1312, 1326 (S.D. Ala. 2012) ("So, under § 7(d), an agency is not forbidden from taking *all* action while consultation is underway, but is simply barred from irreversibly or irretrievably committing resources during that interval.").[2]

## II.    The Willamette Valley Project (WVP)

### A.    The Corps' ongoing operation of the WVP

The WVP consists of 13 dam and reservoir projects located across the 11,200 square-mile Willamette River Basin. *See* ECF 7-4 at i, 1-3. Congress authorized the Corps to construct,

---

[2] Plaintiffs err in arguing that Section 7(d) requires an agency to maintain the status quo during a consultation. ECF 7 at 18, 21. In some cases, the effect of Section 7(d)'s prohibition might be to require the agency to maintain the status quo. But the plain language of the statutory prohibition allows some actions to proceed during a consultation process.

maintain, and operate the WVP for multiple purposes, including "flood risk management, hydropower, irrigation, municipal and industrial water supply, flow augmentation for pollution abatement and improved conditions for fish and wildlife, and recreation." *Id.* at 1. While operations at individual dams may vary, the Corps generally operates the WVP as a single unified system. Warner Decl. ¶¶ 4-6.

The main storage space within a WVP reservoir is called the "conservation pool," which is the portion of the reservoir storage available for multiple project uses including "water quality, fish and wildlife, water supply, irrigation, recreation, and power production."[3] Warner Decl. ¶ 5. Across the WVP, the Corps' reservoirs have 1,590,000 acre-feet of conservation storage space. *Id.* ¶ 6; *see also* ECF 7-4 at viii, 18-19.  The Corps generally manages the reservoirs for flood risk protection in the fall and winter, where it draws down the reservoir elevations to the minimum conservation pool. ECF 7-4 at 18-19 & Fig. 2-1. The operation opens reservoir storage space to catch inflow and precipitation events in order to reduce and prevent downstream flooding. *Id.* In the spring the Corps refills the reservoirs if possible and releases stored water in the summer and fall to meet multiple project purposes, including flow augmentation for fish and wildlife. *Id.*

In 1999, NMFS listed Upper Willamette River (UWR) Chinook salmon and steelhead as threatened species under the ESA. 64 Fed. Reg. 14308 (Mar. 24, 1999); 64 Fed. Reg. 14517 (Mar. 25, 1999).[4] The Corps thereafter initiated consultation to evaluate the effects of WVP operations

---

[3]  Lying below the conservation pool in some of the WVP reservoirs is the power pool (for dams with power generation) and also an inactive storage zone. The Corps generates power at eight of the thirteen dams and the Bonneville Power Administration markets that power. ECF 7-4 at 30-31. Congress required the Corps to operate the projects substantially in accordance with House Document 531, ECF 7-4 at 1, which reserved the power pool "exclusively for power generation" during the critical power production period of October to March. Warner Decl., Attach. 3 at 2239.

[4]  Other listed species that fall under FWS's jurisdiction are present in the Willamette River Basin, and the Corps has consulted with FWS over the WVP's effects on these species. *See* ECF 7-4 at iv. These consultations are not at issue here, and we do not address them further.

on ESA-listed species. In 2008, NMFS issued a biological opinion that found the Corps' action, as originally proposed, was likely to jeopardize UWR Chinook and steelhead. *See* ECF 7-5 at 1.11-1.12. In the opinion, NMFS identified an RPA that included actions ranging from construction projects to operational adjustments aimed at improving downstream conditions for salmonids. *Id.* at 9.1-9.118.

Some of the 2008 RPA's operational measures involve the Corps working with Federal and state partners to provide a balanced flow management regime, one that meets authorized project purposes while also improving in-river conditions for juvenile and adult salmon and steelhead. *See* ECF 7-5 at 9.10-9.26. The Corps, for example, provides storage releases to meet monthly mainstem and tributary flow objectives. ECF 7-4 at 41-43 & Table 3-2, 3-3. These releases draw on water availability and reservoir refill to provide higher flows for juvenile and adult salmonids, while taking into account flood damage reduction, human safety, water quality, and other considerations. ECF 7-4 at 19-20.[5]

In 2018, the Corps reinitiated consultation with NMFS to consider new information and changes to RPA implementation. ECF 7-12. The Corps is engaged in environmental reviews and exploring ways to adjust or revise WVP operations for the benefit of ESA-listed salmonids. *See, e.g.*, U.S. Ex. 1 ¶¶ 4-5. While the consultation is pending, the Corps continues to operate consistent with the 2008 biological opinion and incidental take statement. *See id.* ¶ 5; U.S. Ex. 2; ECF 7-12. The Corps also coordinated with NMFS to ensure that continued operation of the WVP during the reinitiated consultation does not violate Section 7(d). U.S. Ex. 1 ¶ 4; U.S. Ex. 2;

---

[5] The RPA describes the flow objectives as "objectives" for a reason: the Corps' ability to influence downstream conditions depends on many factors, including water availability. ECF 7-4 at 19-20. In fact, even when the Corps can satisfy flow objectives, NMFS often requests that the Corps refrain from doing so in order to meet different objectives. *See, e.g.*, U.S. Ex. 3 (NMFS requesting that the Corps *not* meet flow objectives to benefit salmonids later in the season).

*see also* ECF 7-2 at 98 n.15 (NMFS explaining that the 2008 RPA "remains in effect" and that the "Corps is continuing to implement RPA measures from the 2008 biological opinion").

In 2018, two of the Plaintiffs here—Northwest Environmental Defense Center and Wildearth Guardians—along with the Native Fish Society filed suit to challenge the Corps' WVP operations under the ESA. *NEDC*, 3:18-cv-437-HZ (D. Or.). They alleged the Corps and NMFS failed to reinitiate consultation, the Corps failed to timely implement many RPA measures, and the Corps failed to adhere to terms and conditions in NMFS's incidental take statement. *Id.* (ECF 1 ¶¶ 81-95). Plaintiffs moved for a preliminary injunction that asked the Court to affirmatively alter the status quo, which the Court denied. *Id.* (ECF 36, 84). The parties submitted cross-motions for summary judgment, which are pending.

## B.    The Corps' Willamette basin review and feasibility study

In 1988, Congress "requested" that the Corps study whether any modifications to the WVP "are warranted and to determine the need for further improvements within the Willamette River Basin in the interest of water resources improvements." Coleman Decl., Attach. 2. This case concerns the Corps' response—the 2019 Basin Review Feasibility Study (ECF 7-4) and the Chief of Engineers' report and recommendation to Congress (Coleman Decl., Attach. 1).

### 1.    WVP reservoir storage addressed by the Corps' feasibility study

The State of Oregon, acting through the Oregon Water Resources Department (OWRD), administers water rights within the Willamette River Basin. ECF 7-4 at 10. Under Oregon water law, the right to divert water for storage conveys ownership of that water and is considered a primary right. *Id.* at 11-12. A secondary water right allows downstream users to put the storage water to use, through diversions or by protecting the water instream. *Id.* at 12-13. The U.S. Bureau of Reclamation holds water storage certificates on behalf of the United States,

which convey under State law primary rights for the storage of water at the Corps' projects. *Id.* at 11-12. Reclamation's water storage certificates designate the conservation storage in the WVP as available only for agricultural irrigation (AI) use. *Id.*; *see* Warner Decl. ¶ 7 & Attach. 1.[6] In authorizing the WVP, however, Congress designated the WVP's conservation storage space as joint use, which means storage space is not assigned to specific uses like fish and wildlife (F&W), agricultural irrigation, or municipal and industrial (M&I). ECF 7-4 at 7.

This situation has two effects. First, because the water storage certificates designate the storage for AI use only, OWRD cannot issue secondary water rights to the Oregon Department of Fish and Wildlife for F&W uses. Warner Decl. ¶¶ 11, 24-28. Without the secondary water right permits, OWRD cannot ensure that, when the Corps releases water to meet downstream flow objectives for ESA-listed salmonids, downstream users do not divert and remove that water from the tributaries and mainstem. *Id.*; *see also* ECF 7-4 at 12-13.

Second, the current WVP joint use allocation prevents the Corps from entering into agreements with downstream communities to provide for M&I uses. ECF 7-4 at 9, 12. In Oregon about 70% of residents reside in the Willamette Basin, and Oregon has identified WVP reservoirs as a potential source to meet future M&I peak season water supply needs. ECF 7-4 at i, vii; Warner Decl. ¶ 16.  But M&I users cannot enter into agreements with the Corps and plan for WVP releases because of the current storage allocations, and the United States Treasury is not being reimbursed when M&I users divert storage releases, as Congress intended when authorizing the WVP. *See* ECF 7-4 at 10; Warner Decl., Attach. 3 at 1736 (House Document

---

[6] Reclamation consulted with NMFS over contracting for amounts up to 95,000 acre-feet. ECF 7-4 at 1, 9, 31. Because the storage certificates classify all 1.59 million acre-feet as AI, Reclamation could contract up to the full storage amount of the reservoirs (subject, of course, to compliance with its ESA obligations). *Id.* Reclamation therefore does not require a reallocation to execute or implement AI contracts, and Plaintiffs do not challenge any Reclamation action in this case.

531, providing: "Ample storage in individual reservoirs, therefore, would be available at relatively low cost for domestic use when current facilities can no longer meet the demand").

### 2. NMFS's 2008 RPA addressing conservation storage and instream flow rights

NMFS addressed the WVP conservation storage and Oregon's ability to protect instream flows within the 2008 ESA consultation, RPA measure 2.9. ECF 7-5 at 9.24-9.25. NMFS provided that the Corps "will facilitate conversion of stored water to an instream flow water right" and "identify stored water in addition to the minimum perennial streamflows that could be allocated from reservoirs to enhance salmon and steelhead survival." *Id.* at 9.24. RPA measure 2.9 further specified that the Corps "will proceed with necessary actions to allocate and protect water for this purpose," which "may require approval from Congress." *Id.* at 9.24-9.25.

### 3. The Corps' 2019 feasibility study

When the Corps resumed the feasibility study in 2015,[7] the Corps focused both on responding to Congress' 1988 request and meeting the 2008 RPA measure 2.9's objectives. The Corps did so by (1) recommending congressional reallocation of conservation storage space in the WVP, and (2) addressing water management if Congress reallocates conservation storage to specific uses. Warner Decl. ¶¶ 15-16.

The Corps first calculated future demand for AI, F&W, and M&I uses over a 50-year analysis period, where modeling showed that total demand for the uses exceeds the total available conservation storage space. ECF 7-4 at ix, x (future peak seasonal demand of 1.59 million acre-feet for F&W, 159,750 acre-feet for M&I, and 327,650 acre-feet for AI). The Corps

---

[7] The Corps began a feasibility study in 1996 but deferred the study while it addressed WVP operations in the 2008 ESA consultation. Once the flow objectives were addressed and funding provided by Congress, the Corps resumed the feasibility study in 2015. *See* Warner Decl. ¶¶ 13-15.

used demand projections and specified planning criteria to identify and evaluate alternative storage allocations. ECF 7-4 at 75-84. A primary planning criteria and consideration for each alternative was the Corps' ability to meet 2008 RPA flow objectives to the maximum extent possible. *Id.* at 92; *see also id.* at 8 (planning consideration 2: "Maintain operational ability to meet [] required flow targets to support ESA listed fish species"). The Corps also modeled the likelihood of meeting flow objectives under specific alternatives. *Id.* at 100. The data produced mixed results, with overall minor differences between the alternatives. *Id.* at 114-15, Table 6-1.[8]

The Corps further considered adaptive management approaches, or "guidelines," for implementing alternative allocations when overall water supplies cannot satisfy all uses. ECF 7-4 at xiii, 85. These approaches ranged from reducing all allocated uses (F&W, M&I, AI) to prioritizing either F&W or the consumptive uses (M&I and AI). *Id.* at 93-94. Under all adaptive approaches, the Corps consistently explained three key points: (1) water availability cannot satisfy all project purposes; (2) M&I storage agreements and AI contracts incorporate flexibility regarding the yields to be expected from the contracted-for volumes; and (3) the Corps retains discretion to manage reservoirs consistent with the "BiOp flow objectives." *Id.* at 93; *see also id.* at vi (Corps retains "operational ability to meet BiOp required flow targets to support ESA listed fish species"); *id.* at 99 ("Operation of WVP reservoirs has released stored water to meet flow objectives to benefit ESA-listed fish for more than 15 years and would continue under the" recommended plan); *id.* at 107 (future changes in flow objectives in a future ESA consultation

---

[8] The Corps also analyzed other environmental impacts of different alternatives. The Corps' analysis of M&I releases is illustrative. About 92% of M&I diversions would occur in the mainstem Willamette River downstream of the projects, which means M&I releases would remain in the tributaries and mainstem and improve water quality for 345 miles, or over 92% of the Basin. ECF 7-4 at 110-11; *but see* ECF 7 at 12, 25 (Plaintiffs wrongly assuming that M&I releases are unavailable to contribute to meeting flow objectives and do not benefit in-river conditions downstream).

"would be factored into planning for future water supply").

Following extensive analysis, coordination with Federal, state, and tribal agencies, independent peer review, and solicitation of public comment, the Corps identified a recommended proposal for reallocating reservoir storage and initiated an ESA consultation with NMFS. *See* Warner Decl. ¶¶ 17-21; ECF 7-2 at 9-11 (proposed action).

### 4.    NMFS's 2019 biological opinion on the feasibility study

In June 2019, NMFS issued its biological opinion on the Corps' proposed reallocation of reservoir storage space and possible execution of water storage agreements. NMFS concluded that the Corps' proposal was likely to jeopardize UWR Chinook and steelhead and adversely modify critical habitat. ECF 7-2 at 1. NMFS thus identified an RPA that it concluded "will offset the effects of the proposed action such that the effects are not likely to jeopardize" the species. *Id.* NMFS's first RPA measure relates to the reallocation recommendation:

> RPA measure 1—the Portland District of the Corps should include in its recommendation to the Chief of Engineers NMFS's desire for Congress to cede its authority to allocate WVP reservoir storage to the Corps. ECF 7-2 at 97.

NMFS's remaining RPA measures relate to the Corps' execution and administration of M&I storage agreements, assuming Congress reallocates conservation water storage.

> RPA measure 2: The Corps should limit its M&I storage agreements to 11,000 acre-feet until OWRD is able to protect instream flows.[9] ECF 7-2 at 97.

> RPA measure 3:  The Corps' M&I storage agreements should include provisions consistent with the 2008 RPA's requirements for water use contracts, including provisions allowing the Corps to curtail releases to meet flow objectives. ECF 7-2 at 98.[10]

> RPA measure 4: The Corps' administration of storage agreements should allow it to meet

---

[9] The 11,000 acre-feet limitation corresponds to the water deficit forecast for 2025. ECF 7-2 at 97 n.13. If the Corps restricts M&I storage agreements to this cap, modeling predicts no reduced ability to meet project purposes, such as downstream flow objectives for ESA-listed salmonids. *Id.*

[10] *See also* Warner Decl., Attach. 5 (art. 1.c.) (Corps' model M&I agreements, which already provide the Corps with discretion over reservoir releases notwithstanding contracted-for M&I volumes).

flow objectives and it should use collaborative teams to manage releases. ECF 7-2 at 99.

RPA measure 5: The Corps should prepare an annual "Willamette Basin Year in Review Report" and collaborate with NMFS. ECF 7-2 at 100.

After identifying these RPA measures, NMFS issued its incidental take statement. The incidental take statement addressed take associated with the Corps' proposed actions—execution and administration of future storage agreements. ECF 7-2 at 103 (NMFS acknowledging that any actual effects, like take, are "due to effects of water contracting under the RPA").

### 5.    The Corps' final feasibility study, the Chief of Engineers' report and recommendation, and ongoing reviews

Following the consultation, the Corps' Portland District completed the feasibility study. Among other things, the feasibility study includes a proposed reallocation of storage in the WVP reservoirs to 1,102,600 acre-feet for F&W, 159,750 acre-feet for M&I, and 327,650 acre-feet for AI, where water available for all specific uses is reduced in years when the reservoirs do not fully fill. ECF 7-4 at 94-95.  The Portland District provided the feasibility study and recommendation to the Chief of Engineers' office, where it recommended "that storage in the [WVP] reservoirs be reallocated from existing Joint Use conservation storage to specific storage for agricultural irrigation, fish and wildlife, and municipal and industrial water supply storage." *Id.* at 152. In accordance with NMFS's RPA measure 1, the Portland District also recommended that the Chief of Engineers propose to Congress that Congress delegate authority to the Corps to reallocate water storage in the future. Coleman Decl. ¶¶ 26-27. The Chief adopted the District's proposal with one exception. The Chief concluded that it would not recommend that Congress abandon its traditional role of establishing policy through allocation decisions by delegating that authority to the Corps. Coleman Decl., Attach. 1; *see also* Coleman Decl. ¶¶ 28-32.

Congress set forth instructions for the Chief to follow once he finalized the report. The

Chief "shall …, on completion," send the report and recommendation to the Senate Committee on Environment and Public Works and the House of Representatives' Committee on Transportation and Infrastructure. 33 U.S.C. § 2282a(f)(2); *see also id.* §§ 2215(d)(2), 2282(a)(2). The Chief complied on December 20, 2019. Coleman Decl. ¶¶ 32-33. As Congress also instructed, the Chief transmitted the report and recommendation to the Assistant Secretary of Army for Civil Works.[11] *See* 33 U.S.C. § 2282a(g)(1)(A)-(B) (the Secretary "shall … review the report; and [] provide any recommendations of the [Assistant Secretary] regarding the water resources project to Congress" within 120 days). The Assistant Secretary's review involves obtaining the Office of Management and Budget's (OMB) comments "in relation to the programs of the President." 33 C.F.R. Pt. 230, App. A; Coleman Decl. ¶¶ 15-20, 35-36. Once the Assistant Secretary's and OMB's reviews are complete, the Assistant Secretary may reach a decision and transmit the recommendation to Congress.[12] Coleman Decl. ¶¶ 21, 36; *see also* 33 U.S.C. § 2282a(g)(1); 33 C.F.R. § 230.14; 40 C.F.R. § 1505.2.

The District has not completed its environmental review, Warner Decl. ¶¶ 21-22, and the Assistant Secretary has not completed his review of the Chief's Report, Coleman Decl. ¶¶ 35-36. Congress, moreover, has not enacted legislation on the Chief's report and recommendation.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary and drastic remedy." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). To obtain a preliminary injunction, the movant must

---

[11] The Assistant Secretary is the senior Army official with responsibility over the Corps and with delegated authority to address the Chief's recommendations. 10 U.S.C. § 7016(b)(3); *see also* Headquarters, Department of the Army, General Order 2020-01 (Mar. 6, 2020), available at https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN21322_AGO2020_01_FINAL.pdf.

[12] Congress thus provided for two recommendations on proposed water resources projects, one from the Chief and one from the Assistant Secretary. *See* 33 U.S.C. §§ 701-1(a), 2282a(f), (g). By statute, Congress requested the Secretary act within 120 days, or by April 16, 2020.

establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of injunctive relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). A movant may satisfy this standard by showing "serious questions" on the merits, but only if it demonstrates a likelihood of irreparable harm and that the balance of harms "tips sharply" in its favor. *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). In either case, because an injunction is "never awarded as of right," *Winter*, 555 U.S. at 24 (citation omitted), the moving party must make a "clear showing" that it has met all four requirements, *id.* at 22; *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

## ARGUMENT

### I.    The Court lacks jurisdiction over Plaintiffs' claim for injunctive relief.

This case constitutes a suit for injunctive relief. ECF 1 ¶¶ 6-9 (invoking the ESA citizen-suit provision); 16 U.S.C. § 1540(g)(1)(A) (allowing suits only to "enjoin" alleged violators). Plaintiffs therefore must establish Article III standing to obtain injunctive relief. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (a "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought") (citation omitted). To do so, Plaintiffs must prove that they have suffered an injury-in-fact—"an invasion of a legally protected interest which is (a) concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation omitted). And they must show that the injury is fairly traceable to the defendants' challenged action and that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*

Plaintiffs want the Court to compel the Corps to retract a report and recommendation

sent to Congress and enjoin the Corps and the Department of Army from communicating with Congress on the proposed reallocation. ECF 7 at 2. They also would have the Court enjoin the Corps from complying with a future Act of Congress, if Congress enacts legislation reallocating water storage in the WVP. *Id.* Plaintiffs lack Article III standing to seek this injunction because the relief lies outside the power of the Court to award and because Plaintiffs can satisfy none of the other Article III standing requirements.

### A.     Plaintiffs' injunctive relief violates the Constitution's separation of powers.

To establish standing, Plaintiff must prove that the injunctive relief lies within "the district court's power to award." *Juliana*, 947 F.3d at 1170. This requirement is rooted in the Constitution's separation of powers; it prevents "the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted). Plaintiffs cannot make this showing for two independent reasons: the injunction falls outside the judiciary's role of deciding cases or controversies, and no identifiable legal standards guide the Court's exercise of its equitable powers.

### 1.     Plaintiffs' requested relief intrudes on areas the Constitution commits to the political branches.

Political discussions between the political branches are reserved to those branches, not the courts. The Recommendations Clause in Article II of the Constitution grants the Executive the exclusive role of recommending to Congress for "Consideration such Measures as he shall judge necessary and expedient." U.S. Const., art. II, § 3. This is the power to "initiate and influence legislative proposals." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). By assigning this power to the Executive and allowing any proposals the Executive considers "necessary and expedient," the Constitution instructs that this Executive power must remain free from interference. *Cf. Webster v. Doe*, 486 U.S. 596, 600 (1988) ("necessary or advisable"

standard "fairly exudes deference" to the Executive "and appears to us to foreclose the application of any meaningful judicial standard of review").

The Executive's role of providing recommendations also facilitates Congress' exercise of its Article I legislative powers. The Recommendations Clause contemplates that the Executive "possess[es] more extensive sources of information … than can belong to [C]ongress." Joseph Story, *Commentaries on the Constitution of the United States* § 1561, at 356 (2d ed.). "There is great wisdom, therefore, in not merely allowing, but in requiring the president to lay before congress all facts and information which may assist their deliberations." *Id.* As the Ninth Circuit has explained, "congressional reporting requirements," like those relating to water resource and development projects, "are, and heretofore have been, a management tool employed by Congress for its own purposes." *Guerrero*, 157 F.3d at 1196 (quoting *Nat. Res. Def. Council v. Hodel*, 865 F.2d 288, 319 (D.C. Cir. 1988)). Removing Congress' ability to obtain information can impede Congress' performance of core Article I functions. *Id.*

The Corps and the Department of the Army exercise these constitutional roles on water resource and development projects, like the proposed reallocation. Coleman Decl. ¶ 33 (providing the Chief's report and recommendation to Congress). Congress likewise avails itself of the benefits served by the Recommendations Clause; it specifically requested information from the Corps and Army on ways to improve the operation of the WVP, specified the contents of a feasibility study and the procedures for submitting reports and recommendations to Congress, and inquired on the proposed reallocation after the Chief's submittal. *Id.* ¶¶ 7, 37; *see, e.g.*, 33 U.S.C. §§ 2215, 2282, 2282a.

Plaintiffs' proposed injunction encroaches on these core constitutional functions delegated to and reserved exclusively for the political branches. Plaintiffs want the Court to

order the Corps to retract a report and recommendation provided to Congress, prohibit the

Assistant Secretary from addressing the Chief's report and recommendation with Congress, and

otherwise prohibit under threat of contempt any further communications between the political

branches on this topic. ECF 7 at 2. Article III does not confer this authority on the judiciary.

The Constitution addresses the interactions between the political branches, but it does not

confer a role upon the judiciary to police these communications. *See, e.g.*, U.S. Const., art. II, § 3

(Executive may provide recommendations to Congress, with no role provided for the courts); *id.*

art. I, § 7, cl. 2 (Congress required to present bills for Executive review, with no judicial role).

Without constitutional authority, the Court "may not intrude upon the central prerogatives of"

the political branches in Plaintiffs' proposed way. *Loving v. United States*, 517 U.S. 748, 757 (1996).

Plaintiffs' request to enjoin the Corps from complying with future reallocation legislation

suffers from similar problems. ECF 7 at 2 (asking for a court order to enjoin the Corps "from

taking any other steps to implement … the reallocation plan," which can occur only if Congress

authorizes it). Congress has the power to enact legislation reallocating reservoir storage in the

WVP, and whether a statute is necessary or should apply prospectively are "questions for the

Congress not the courts." *Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 527

(1941); A*rizona v. California*, 283 U.S. 423, 455-56 (1931) (federal dam operations "are clearly

within the powers conferred upon Congress" and present issues for Congress, not the courts).

Plaintiffs may respond that the constitutional role of the courts is to "say what the law

is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), so the Court should be permitted to

address an alleged ESA violation. That argument goes only so far. In passing on Plaintiffs'

request for injunctive relief, the Court must ensure that it does not exceed its constitutional role,

for instance, by issuing advisory opinions or granting injunctions that usurp constitutional

functions delegated to the political braches. There "simply are certain things that courts, in order to remain courts, cannot and should not do." *Missouri v. Jenkins*, 515 U.S. 70, 132 (1995) (Thomas, J., concurring). One of those things is "running Executive Branch agencies" by, as Plaintiffs request, dictating under threat of contempt whether, when, or how they may communicate with Congress. *Id.*

> ### 2.    Neither the Constitution nor any statute contemplates review of communications between the political branches.

To grant injunctive relief, a "'constitutional directive or legal standard' must guide the courts' exercise of equitable power." *Juliana*, 947 F.3d at 1173 (quoting *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506-09 (2019)). This is because "federal courts 'have no commission to allocate political power and influence' without standards to guide in the exercise of such authority." *Id.* No constitutional directive allows or contemplates judicial regulation of the communications between the political branches at issue here. *Supra* at 14-17. Nor does any statute.

In various Flood Control Acts and Water Resource and Development Acts, Congress addressed the process the Corps uses to study potential water development projects and issue reports and recommendations to Congress. Congress first requests and, through funding, authorizes the Corps to study a topic. Coleman Decl. ¶¶ 7, 12. Congress also has specified the contents and procedures the Corps uses in preparing feasibility reports and submitting those reports for public, administrative, and congressional review. 33 U.S.C. §§ 701-1, 2281-2282b. In establishing this framework, Congress quite explicitly did not provide a judicial role in overseeing the timing or contents of the Corps' reports and recommendations. It instead fashioned *congressional* monitoring, reporting, and review provisions to "provide oversight of and policy direction to the Administration and the Corps." H.R. Rep. No. 113-246, at 45 (2013); *see, e.g.*, 33 U.S.C. §§ 2282c(g), 2282d, 2283a.

Under this statutory framework, the "Corps serves an advisory role to Congress," where "Congress use[s] the information provided by the Corps to determine whether legislation is needed." *Taylor Bay Protective Ass'n v. EPA*, 884 F.2d 1073, 1080 (8th Cir. 1989). "Having requested the report, Congress, not the judiciary, is in the best position to decide whether it's gotten what it wants." *Guerrero*, 157 F.3d at 1195. Thus, as the Ninth Circuit has held, the "merits or timeliness of reports intended solely for the benefit of Congress" are not matters the judiciary can resolve because courts "have no standards with which to judge such a question." *Martinez-Cortez*, 924 F.2d at 925 (quoting *United States v. White*, 869 F.2d 822, 829 (5th Cir. 1989) (per curiam)). That "determination is for Congress and is essentially a political question outside the province of the judiciary." *Id.*; *see also Hodel*, 865 F.2d at 319 ("[W]e despair at formulating judicially manageable standards by which to gauge the fidelity of the Secretary's response" to a congressional request).[13]

Plaintiffs' ESA Section 7(d) claim does not provide legal standards that could guide the Court's review of the timing or contents of the Corps' report and recommendation, for two reasons. First, the ESA does not apply to the Corps' report and recommendation. The ESA, including Section 7(d), applies to underlying activities that the "federal agency affirmatively authorized, funded, or carried out." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012) (en banc); *Or. Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 1007 (D. Or. 2010) (scope of an "agency action" does not differ between Section 7(d) and other provisions of the

---

[13] Circuit courts agree that the timing and contents of Executive reports and recommendations to Congress are beyond the purview of the courts to oversee and enforce. *White*, 869 F.2d at 829; *Derryberry v. TVA*, 182 F.3d 916 (6th Cir. 1999) (unpublished); *Cty. of Vernon v. United States*, 933 F.2d 532, 535 (7th Cir. 1991); *Taylor Bay Protective Ass'n*, 884 F.2d 1073; *Martinez-Cortez*, 924 F.2d at 924-25; *Guerrero*, 157 F.3d at 1195; *Chem. Weapons Working Grp. v. U.S. Dep't of Army*, 111 F.3d 1485, 1495 (10th Cir. 1997); *United States v. Erves*, 880 F.2d 376, 379-80 (11th Cir. 1989); *Hodel*, 865 F.2d at 318; *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 356-58 (D.C. Cir. 1981).

ESA). As Plaintiffs note, a timber sale is a prototypical example of agency action, ECF 7 at 28, because the agency authorizes third-party conduct, *see Karuk Tribe*, 681 F.3d at 1021. But non-binding agency advice neither authorizes nor prohibits any action and therefore does not constitute "agency action" under Section 7 of the ESA. *Id.* ("[W]here no federal authorization is required for private-party activities, an agency's informal proffer of advice to the private party is not 'agency action'") (discussing *Murrelet v. Babbitt*, 83 F.3d 1068, 1074 (9th Cir. 1996), and *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995)).

The Corps' report and recommendation falls into the latter category. It presents a nonbinding recommendation to an independent branch of the United States government that has plenary authority to accept, reject, or modify Executive Branch recommendations. "No matter what [the report] says or how much it says, the report is simply a document submitted to Congress that Congress has no obligation to consider, let alone act upon." *Guerrero*, 157 F.3d at 1194. Because the Corps' report and recommendation obviously does not authorize Congress to act, the Corps has not taken "agency action" that is subject to the ESA's prohibitions.

Second, even if the ESA applied (which it does not), Ninth Circuit law holding that courts may not assume a judicial role in overseeing Executive reports and recommendations rested on the nature of the reports, not the laws they implicated. In *Renee v. Duncan*, the plaintiffs sought to enjoin the Secretary of Education from including interns in its count of "highly qualified teachers" in an annual congressional report under the No Child Left Behind Act. 686 F.3d at 1016. In *Guerrero v. Clinton*, the plaintiffs challenged whether the President had adequately reported the financial impact of a compact between the State of Hawaii and the United States territories under the Compact of Free Association Act of 1985. 157 F.3d at 1192-93. The plaintiffs in both cases grounded their objections in a statute or law. Yet the Ninth Circuit

rejected a judicial role because the reports constituted a "management tool employed by Congress for its own purposes," where Congress must "measure[] the fidelity of the Executive Branch actor to legislatively mandated requirements." *Guerrero*, 157 F.3d at 1196, 1195; *Renee*, 686 F.3d at 1017. The Ninth Circuit focused on the lack of legal standards governing the Court's review, not the substantive laws implicated by the agency's report and recommendation.

The Ninth Circuit's reasoning applies with full force in this case. Congress requested the feasibility reports and recommendations from the Corps, Coleman Decl., Attach. 2, and Congress knows about the ESA when enacting legislation, *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). Congress therefore is in the best position to determine whether the Corps' reports and recommendations provided to it, at its request, are consonant with Congress' own judgments expressed in the ESA. If Congress identifies a conflict with the ESA, Congress also can easily make an independent judgment on how best to proceed. "It scarcely bears more than passing mention that the most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives." *Guerrero*, 157 F.3d at 1196 (citation omitted).

Finally, Plaintiffs insinuate that Congress abdicates its legislative functions by rubber-stamping the Corps' recommendations, such that the Court must block Congress from even considering the Corps' report and recommendation. ECF 7 at 2, 19-20, 33. Plaintiffs are uninformed. Coleman Decl. ¶¶ 22-23 (identifying over 30 years of examples in which Congress has exercised independent judgment to supplement, modify, or reject the Corps' recommendations). But, even if Congress rubber-stamped every single Corps recommendation, that is Congress' choice. It is not an invitation for "non-congressional parties to carry on as an ersatz-proxy for Congress itself." *Guerrero*, 157 F.3d at 1195 (quoting *Hodel*, 865 F.2d at 318).

* * *

Just as the judiciary cannot enjoin the President from presenting the State of the Union in accordance with Article II because one individual disagrees with the timing of the President's message, neither can this Court enjoin the Corps or Army from providing a report and recommendation to Congress under Article II because three plaintiff groups believe it should be delayed. Plaintiffs' contrary arguments disregard the Constitution and Circuit precedent and also turn a blind eye to the "chaos which will result if the courts interfere with injunctive or other relief" in Congress' ability to consider Executive reports and recommendations when enacting legislation. *Taylor Bay Protective Ass'n*, 884 F.2d at 1080. Because the Court lacks the power to grant the relief Plaintiffs believe is necessary to redress the harms to them, Plaintiffs lack standing. *Juliana*, 947 F.3d at 1170. And, without standing, the Court should deny the motion and dismiss this case. Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action").

### B.    Plaintiffs cannot establish the other Article III standing requirements.

Even if the Court had the power to grant Plaintiffs' injunction, Plaintiffs cannot establish any of the other three Article III standing requirements.

As to injury-in-fact, Plaintiffs assert they are injured because (1) the Corps or the Assistant Secretary's recommendations could lead to (2) a congressional reallocation of reservoir storage, which could lead to (3) Reclamation and OWRD agreeing to modify the existing storage certifications, which could lead to (4) third parties expressing an interest in entering into agreements for M&I storage water, which could lead to (5) the State of Oregon issuing secondary water right permits authorizing diversion of storage water downstream for M&I uses, which could lead to (6) the Corps issuing M&I storage agreements, which could limit or preclude (7) future RPA measures in ways that cause (8) worse outcomes for ESA-listed

salmonids than would otherwise occur without the congressional reallocation, which could (9) injure Plaintiffs' members' interests in those ESA-listed salmonids. *See, e.g.*, ECF 7 at 32-35 (complaining of harms caused by water management arising after a congressional reallocation); ECF 7-4 at 11-13, 137-141 (identifying conditions precedent before the Corps may issue water storage agreements); Warner Decl. ¶¶ 24-30 (same).

The links in this chain are contingent and uncertain, which renders the harms arising at the end of the chain speculative and conjectural. At the outset, Plaintiffs assume that Congress will adopt the reallocation without modification or change. ECF 7 at 2, 31.[14] But whether, when, or how Congress enacts legislation is inherently speculative and uncertain. *Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 147 (D.C. Cir. 2012) (per curiam) ("We have serious doubts as to whether, for standing purposes, it is ever 'likely' that Congress will enact legislation at all."), *aff'd in part, rev'd in part sub nom. Util. Air Regulatory Grp. v. EPA,* 573 U.S. 302 (2014); *Cramer v. Brown*, CV-12-3130-JFW (JEMx), 2012 WL 13059699, at *3 n.2 (C.D. Cal. Sept. 12, 2012) ("sheer speculation" to assume Congress will enact legislation). Nor do the facts support Plaintiffs' assumption that Congress uniformly adopts the Corps' recommendations. Coleman Decl. ¶¶ 21-22.  And current events like the COVID-19 pandemic stack additional layers of uncertainty on top of an already uncertain proposition.

The remaining links are equally speculative and conjectural. Plaintiffs acknowledge that any future effects arise, if at all, through water storage agreements. ECF 7 at 10. They proceed to argue that the Corps' execution and administration of water storage agreements will limit "the

---

[14] As further addressed below, Plaintiffs' argument that Congress adopts recommendations without change does not help their case. That argument, if accepted, would simply prove that Plaintiffs' claims are not redressable, as Congress already has the report and recommendation and is under no obligation to return or refrain from acting on it.

range of fish-protection options" available. *Id.* at 18. But, in arguing that the Corps' future

storage agreements *legally* mandate lower protections for fish, Plaintiffs rely on a biologist's

opinion. ECF 7 at 10 (citing ECF 8 ¶¶ 13-15). The biologist is wrong.

The Corps' report and recommendation does not ask Congress to mandate that the

Corps immediately issue M&I storage agreements up to the full allocated amounts.  When the

Corps executes storage agreements, the Corps' report and recommendation also does not ask

Congress to mandate that the Corps ensure the delivery of contracted-for water notwithstanding

any other legal requirement. To the contrary. The Corps' report and recommendation identifies

"guidelines" on administering storage agreements and is explicit that water availability is limited,

storage amounts specified in water storage agreements cannot be delivered uniformly, and the

Corps should retain discretion to comply with the ESA, including meeting "flow objectives."

ECF 7-4 at 85, 93, 95, 107.[15] Thus, while Plaintiffs speculate on the consequences arising after a

future reallocation, they fail to identify the legal mechanism that would preclude the Corps or

NMFS from considering actions that address the protection of ESA-listed species.[16]

Even if Plaintiffs adequately alleged cognizable injuries-in-fact, they cannot establish that

the Corps' report and recommendation causes those injuries. Plaintiffs are concerned with the

consequences flowing from a *congressional* reallocation. *See* ECF 7 at 2 (arguing that *Congress* will

rubber stamp the proposal, lock in the reallocation, "enshrine[]" the report and recommendation

---

[15] The Corps also has the tools to satisfy the ESA's requirements when executing and administering water storage agreements. The Corps' model M&I storage agreements, for example, provide the Corps with discretion to control storage releases to meet existing legal requirements. Warner Decl., Attach. 5. And the Corps intends to modify the model agreements to more explicitly ensure its ability to control releases to comply with the ESA. *Id.*, Attach. 7.

[16] If the reallocation did compel the Corps to take future actions, those actions would not be unlawful. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 671-72 (2007) (ESA Section 7 does not apply to actions the agency is required by law to undertake).

in a statute, authorize actions, and so on); *id.* at 30-31 (same). If Congress acts through legislation, then Congress and not the Corps is legally responsible for the consequences that flow from that action. *Miccosukee Tribe of Indians v. U.S. Army Corps of Eng'rs*, 619 F.3d 1289, 1302-03 (11th Cir. 2010) (Congress' "adoption of the administrative findings as a legislative finding bars judicial review of agency action" because the decision is now a legislative one). Because any injury flows, if at all, from Congress' reallocation and thus "the independent action of some third party not before the court," Plaintiffs lack standing. *Defs. of Wildlife,* 504 U.S. at 560 (citation omitted); *see also Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1142 (9th Cir. 2013) ("[W]here the causal chain involves numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries, ... the causal chain is too weak to support standing.") (citation omitted)

Finally, even if Plaintiffs could somehow establish injury-in-fact and causation, they cannot establish that an injunction is likely to redress the asserted injuries. To establish redressability, "the plaintiffs must show that the relief they seek is … substantially likely to redress their injuries." *Juliana*, 947 F.3d at 1170 (emphasis added). Plaintiffs request that the Court order the Corps to retract a report and recommendation. The Corps lacks authority to do so. Congress specified procedures for the Corps to submit recommendations, and it did not confer the Corps with authority to "retract" them. Nor can any judicially identified deficiency with the Corps' report and recommendation stop Congress from enacting legislation, particularly because Congress already has the report and recommendation and is under no obligation to return it. *See Guerrero*, 157 F.3d at 1194; 42 U.S.C. § 1962-1(a) (no deficiency with the Corps' planning process can "limit the authority of Congress to authorize and fund projects"). Plaintiffs thus rest on speculation that judicial action could in some way influence

Congress, but a "quest for ill-defined 'better odds' is not close to what is required to satisfy the redressability prong of Article III." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,* 366 F.3d 930, 939 (D.C. Cir. 2004).

In apparent recognition that Congress controls any reallocation decision, Plaintiffs ask the Court to relax redressability concerns because they raise a "procedural" claim. ECF 7 at 34-35. The nature of the claim is irrelevant. Plaintiffs complain about the harms caused by Congress, not the Corps, and the Court cannot redress those harms even when using a relaxed redressability standard. In any event, Section 7(d) imposes a substantive prohibition, not a procedure. 16 U.S.C. § 1536(d); Preamble to 1986 ESA regulations, 51 Fed. Reg. 19926, 19940 (June 3, 1986) ("section 7(d) is strictly prohibitory in nature and not consultative"). At times, Plaintiffs agree. ECF 7 at 21 (arguing Section 7(d) imposes a "prohibition"). In changing course to circumvent Article III's requirements, Plaintiffs merely conflate the temporal component of the prohibition (during a consultation) with a procedural right or claim. *Id.* at 34 n.12 (relying on *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1128 (9th Cir. 1998), which found the agency could not act in the challenged way during the consultation).

At bottom, Plaintiffs advance vague notions of possible future injuries that could arise at the end of a long chain of events. But they cannot show that the harms are imminent, much less concrete and particularized to Plaintiffs or their members. *See, e.g.,* ECF 9 ¶¶ 13-14 (expressing "disappoint[ment]" over the Corps' actions, not particularized injuries to him); ECF 10-13 (same). And Plaintiffs all but concede that any harm occurs only if Congress passes legislation that reallocates reservoir storage in the WVP. ECF 7 at 31-33. Under these facts, Plaintiffs at best raise generalized grievances against government (or congressional) action, which does not establish standing. *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 125 (1940) (plaintiffs lack standing

because they failed to show injury to "a particular right of their own, as distinguished from the public's interest in the administration of the law").

## II.    Plaintiffs have no likelihood of success on their ESA Section 7(d) claim.

Not only does the Court lack jurisdiction under Article III, but Plaintiffs cannot show that they have raised a cognizable ESA citizen-suit claim. Plaintiffs argue that the Corps' report and recommendation constitutes an action that irreversibly and irretrievably commits resources. ECF 7 at 2 (arguing the Corps "proceeded to propose its plan to Congress," thereby violating Section 7(d) of the ESA).[17] But a report and recommendation causes no effects to either ESA-listed species or WVP operations. A document transmitted to Congress that contains mere advice and recommendations does not compel Congress to act and does not itself result in any legal consequences or effects. *Cf. Dalton v. Specter*, 511 U.S. 462, 469-70 (1994) (informational report containing an adverse recommendation does not have legal consequences or effects). Plaintiffs, in fact, admit that any legal consequences flow, if at all, from the act or actions of Congress and not the Corps. ECF 7 at 30 ("If the reallocation plan is authorized" by Congress, "it will cause irreparable harm to UWR salmon and steelhead"). Because the report and recommendation is not an action that commits any resources to WVP operations, it cannot be an action that irreversibly and irretrievably commits resources in violation of Section 7(d).

The ESA's structure confirms that the Act's prohibitions, including those within Section 7(d), do not apply to the Corps' report and recommendation. Congress applied the ESA's

---

[17] Plaintiffs cannot challenge the Assistant Secretary's recommendation to Congress as violating Section 7(d), as the Assistant Secretary has not acted. Nor do Plaintiffs challenge the Corps' or Reclamation's execution or implementation of water storage agreements or AI contracts, as those actions likewise have not occurred. Plaintiffs' alleged legal violation therefore addresses only the Corps' report and recommendation sent to Congress. ECF 1 ¶ 66 (alleging the "Corps' decision to move forward with its reallocation plan violates section 7(d).").

prohibitions to "agency action," which is defined broadly as those actions "authorized, funded, or carried out" by the agency. 16 U.S.C. § 1536(a)(2); *id.* § 1536(d) (requiring a commitment of resources "with respect to the agency action" under consultation). While "agency action" is broadly defined, the definition plainly does not encompass every action taken by a federal agency. As the Ninth Circuit has held on multiple occasions, an agency's advice or recommendations to other entities does not constitute "agency action" because the agency is not affirmatively causing effects to ESA-listed species. *Karuk Tribe*, 681 F.3d at 1021; *Murrelet v. Babbitt*, 83 F.3d 1068; *Sierra Club v. Babbitt*, 65 F.3d 1502. The Corps' report and recommendation to Congress is not different. Congress and not the agency is the actor, and any effects to ESA-listed species flow from the actions of Congress and not from those of a federal agency. Because the Corps is not taking agency action through a report and recommendation, Section 7(d)'s prohibition does not apply.

Nor would it make sense to graft Section 7(d)'s prohibition onto the Corps' report and recommendation.  Congress is not bound by the ESA or forbidden from enacting new legislation that, in Plaintiffs' estimation, fails to carry out Congress' intent expressed in the ESA. Congress has plenary authority over the ESA and the discretion to prospectively revise the agency's legal authorities. *Consejo de Desarrollo Economico, Mexicali v. United States*, 482 F.3d 1157, 1169-70 (9th Cir. 2007) (Congress may alter "substantive law," like the ESA, when enacting new legislation governing particular agency actions or projects). Because Congress is not limited by existing laws in passing legislation, neither must the Corps' recommendations to Congress be limited by existing laws.[18]

---

[18] Plaintiffs' argument that reallocation legislation "will preclude" future RPA measures is illustrative. ECF 7 at 22. An RPA is defined by the agency's existing legal authorities and discretion. 16 U.S.C. § 1536(b)(3)(A) (RPA is an action the agency can take); 50 C.F.R. § 402.02 (RPA measures are those

Plaintiffs may argue that NMFS addressed the Corps' report and recommendation in an ESA consultation, which shows that the ESA applies to the report and recommendation. *See, e.g.*, ECF 7 at 25-28 (relying on NMFS's 2019 biological opinion). The Supreme Court has rejected this argument. In *National Association of Home Builders v. Defenders of Wildlife*, the Environmental Protection Agency consulted with the wildlife agencies on its transfer of permitting authority to a state. 551 U.S. at 654-55. Even with a completed consultation, the Supreme Court affirmed the lack of "agency action" under the ESA because, in that case, the agency's action was non-discretionary. *Id.* at 658-59. The Supreme Court thus reaffirmed that the nature of the action, not the existence of an ESA consultation, determines whether the ESA's requirements apply. *Id.* Likewise here. NMFS's decision to address the Corps' report and recommendation in RPA measure 1 cannot transform the Corps' report and recommendation into agency action that is subject to the ESA or that otherwise could violate the ESA. *Id.*[19]

The structure of NMFS's consultation, moreover, confirms that NMFS's review centered on the Corps' *implementation* of a potential reallocation and not on the reallocation recommendation itself. While RPA measure 1 addressed the Portland District's report and recommendation to the Chief of Engineers, NMFS understood that neither the District nor the

---

actions within the scope of the agency's "legal authority and jurisdiction"). Congress' legislation therefore cannot preclude an RPA; it *defines* what may constitute an RPA. Thus, when Plaintiffs argue that the Corps' report and recommendation impermissibly induces Congress to enact legislation that precludes RPA measures, they really are arguing that the ESA should prohibit Congress from redefining an agency's obligations. Yet Congress is not limited by the ESA when addressing the Corps' authorities and discretion in operating the WVP. And, if Congress is not limited, it makes no sense to impose that limitation on the Corps when proposing legislation.

[19] Plaintiffs' arguments that the Corps has violated RPA measure 1 fail for the same reason. ECF 7 at 26-27. When the ESA does not apply to the action, the Corps cannot violate the ESA by failing to implement an "alternative" to that action. In any event, the Corps complied with RPA measure 1 when the Portland District included the proposal in the recommendation to the Chief of Engineers. Coleman Decl. ¶¶ 26-31. Plaintiffs' argument that NMFS disagrees ignores NMFS's explicit findings that the Corps has complied with the RPA. *Id.*, Attach. 7.

Chief constitute the decision-makers on a reallocation. ECF 7-2 at 97 (providing that the District need only make a proposal, not ensure that the Corps or Congress accepts it). And NMFS developed four other RPA measures that assume Congress reallocates storage without also conferring the Corps with unlimited discretion to later reallocate storage. *Id.* at 97-100. NMFS's incidental take statement likewise shows that the effects NMFS considered stem from the Corps' potential execution and administration of water storage agreements and not a reallocation recommendation to Congress. *Id.* at 103 (exempting take associated with future contracting actions).

Rather than identify a legal violation, the ESA consultation proves the Corps has complied with its ESA obligations. As noted, the Corps consulted over potential future discretionary actions—the execution and administration of agreements following a congressional reallocation of storage space. Those agency actions have not occurred and therefore cannot violate either Section 7(a)(2) or Section 7(d). And, if the Corps later takes these actions and does so in compliance with the ESA, it will ensure that all of the Corps' ESA obligations—including those in Section 7(d)—are satisfied. *See Wildlands Def. v. Seesholtz*, 755 F. App'x 640, 643 (9th Cir. 2018) (when a larger consultation is pending, holding that Section 7(d) does not preclude site-specific actions that have undergone a separate ESA consultation).

Likely for this reason, Plaintiffs argue that the Corps has violated RPA measure 4 and cannot take refuge behind the completed consultation. *See, e.g.*, ECF 7 at 11, 16. This argument is nonsensical. RPA measure 4 addresses administration of water storage agreements. The Corps has taken no such actions. The Corps has not even completed its environmental analysis and the

Assistant Secretary has not even issued a decision on how to proceed.[20] Coleman Decl. ¶¶ 21, 36. Plaintiffs cannot raise an ESA claim or succeed in obtaining an injunction by pointing to future, unchallenged agency actions and decisions. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 164 (2010) ("Until such time as the agency decides whether and how to exercise its regulatory authority, however, the courts have no cause to intervene.").

As a final maneuver, Plaintiffs argue that *Houston*, 146 F.3d 1118, which identified a Section 7(d) violation, is "strikingly similar" to this case. ECF 7 at 27. This argument reveals the weaknesses in Plaintiffs' case. The Ninth Circuit found a Section 7(d) violation because the agency executed water contracts before completing an ESA consultation. *Houston*, 146 F.3d at 1128. The contracts, moreover, did not provide the agency with discretion to reduce contract deliveries. *Id.* The Corps here completed an ESA consultation before executing any water storage agreements, and the Corps' model water storage agreements provide it with complete discretion to manage reservoir releases. ECF 7-2; Warner Decl., Attach 5.  Each factor the Ninth Circuit identified as relevant to a Section 7(d) violation is absent here, which shows why Plaintiffs have no chance of success on the ESA claim.

## III.   Plaintiffs' allegations of irreparable harm are legally and factually unfounded.

Plaintiffs admit that their motion is not really concerned with avoiding imminent, irreparable harm to ESA-listed salmonids. ECF 7 at 29. They contend the Court should grant final relief now or else be precluded from granting relief later (because Congress will act to produce the alleged harms). *Id.* at 29-31. Plaintiffs are entitled to no relief in this case, and so this theory of irreparable harm fails from the outset. *See* Section I, II, *supra*. In any event, Plaintiffs

---

[20] Plaintiffs' allegations of noncompliance with RPA measure 4 also inexplicably ignore evidence provided to them in response to their notice of intent, which establishes that the Corps has the discretion to and intends to fully comply with NMFS's RPA measure 4. Warner Decl., Attach. 7.

cannot show that they are likely to suffer irreparable harm from the Corps' actions, such that the Court should enter an injunction directed at either the Corps or the Army.

First, Plaintiffs wrongly graft harms onto the Corps' report and recommendation. The Corps' report and recommendation itself causes no harms to either Plaintiffs or ESA-listed species. Plaintiffs admit this is the case. They repeatedly argue that the motion seeks to stop Congress from acting, not the Corps. ECF 7 at 30 ("If the reallocation plan is authorized" by Congress, "it will cause irreparable harm to UWR Chinook salmon and steelhead"). But Congress is not and cannot be a party to this case, and the Corps is not the legally relevant cause of congressional action such that it must be held liable for how Congress chooses to act. And it "would make little sense" to find irreparable harm where the harms stem from congressional action and thus "may well proceed with or without the relief" requested. *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011). Plaintiffs' concession that congressional action causes any harms to them is fatal to their motion. *Garcia v. Google Inc.*, 786 F.3d 733, 744-47 (9th Cir. 2015) (en banc) (injunctions may not issue based on complaints of harm caused by unchallenged actions); *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981-82 (9th Cir. 2011) (causal connection must exist between the alleged injury and the conduct the plaintiff seeks to enjoin).

Second, even if the harms stemming from a congressional action were relevant, Plaintiffs cannot establish that these harms are either imminent or likely to occur. Congress has not acted and may never act on the Corps' report and recommendation. Even if Congress does act, Plaintiffs cannot know *how* Congress will act or what consequences may flow from future legislation. This is particularly true here, where Congress routinely exercises independent judgment in passing on water resource and development projects. Coleman Decl. ¶¶ 22-23, 37. Plaintiffs' "speculation on future harm" does not establish irreparable harm. *Herb Reed Enters.,*

*LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1250-51 (9th Cir. 2013).

Third, to the extent that Plaintiffs argue that the Corps' implementation of a reallocation decision will cause irreparable harm, they do not challenge those actions. Plaintiffs sued to stop the Corps' report and recommendation; they do not challenge the Corps' compliance with NMFS's 2019 biological opinion or contend that the Corps unlawfully executed and administered water storage agreements. ECF 1 ¶¶ 66-69. Plaintiffs cannot piggyback on potential harms stemming from unchallenged agency actions to enjoin the Corps' report and recommendation. *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction."); *see also McKart v. United States*, 395 U.S. 185, 194 (1969) ("The courts ordinarily should not interfere with an agency until it has completed its action, or else has clearly exceeded its jurisdiction.").

In the end, Plaintiffs cannot point to harms caused by the Corps' submission of a report and recommendation to Congress. They instead complain of harms that may, or may not, arise from other actors (Congress) or other actions (potential future water storage agreements). Nor can Plaintiffs support their conjectural fears that future actions stemming from a possible congressional reallocation of reservoir storage space will injure ESA-listed salmonids or Plaintiffs. The facts show otherwise. NMFS's 2019 RPA addresses the Corps' execution and implementation of water storage agreements, and this RPA provides the Corps with one possible pathway to ensuring that the ESA's requirements are satisfied if it takes those future agency actions. *See* Warner Decl., Attach. 7. The facts show that Plaintiffs seek a preliminary injunction "simply to prevent the possibility of some remote future injury," which cannot justify the proposed injunctive relief. *Winter*, 555 U.S. at 22 (citation omitted).

IV.    **The balance of harms and the public interest favor denial of Plaintiffs' proposed injunction.**

Plaintiffs wrongly presume that the equities and public interest automatically justify injunctive relief because they present an ESA claim. ECF 7 at 17. "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (citation omitted). Even in ESA cases, courts only "presume[]" that "the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction." *Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803, 817 (9th Cir. 2018). They do not circumvent the inquiry entirely.

As relevant here, the "public interest in ensuring protection of [the Constitution's] separation of powers is foundational and requires little elaboration." *Sierra Club v. Trump*, 929 F.3d 670, 707 (9th Cir. 2019). Plaintiffs' proposed injunction disserves that public interest. They would have the Court prevent the Executive from providing reports and recommendations to Congress, and they would prohibit Congress from accessing that information when performing its legislative functions. No harms to Plaintiffs' recreational or aesthetic interests in salmonids can justify that constitutional transgression.

Apart from Plaintiffs' proposed intrusion into the affairs of the political branches, Plaintiffs are entitled to no deference on their assertions that the reallocation itself contravenes the ESA's objectives. *All. for the Wild Rockies v. Krueger*, 35 F. Supp. 3d 1259, 1266–67 (D. Mont. 2014) ("The law is clear that threatened and endangered species are the beneficiaries …, rather than plaintiffs professing to act on their behalf."). As explained above, a congressional reallocation of reservoir storage space does not necessarily cause added harm to ESA-listed species. NMFS's 2019 RPA illustrates this point. If Congress reallocates reservoir storage space,

and if the Corps acts in the future, the 2019 RPA provides a pathway for the Corps to ensure its compliance with the ESA. ECF 7-2 at 96-103; Warner Decl., Attach. 7.

On the other hand, Plaintiffs' proposal that the agencies maintain the status quo would prevent the State of Oregon from improving the plight of ESA-listed salmonids. The proposed reallocation constitutes a mechanism that, if authorized by Congress, allows the State of Oregon to take actions that ensure fish augmentation flows stay instream to protect listed salmonids. Abandoning the current reallocation proposal and mandating no change to the status quo simply ensures that downstream users will continue to withdraw water the Corps releases for the benefit of ESA-listed salmonids. ECF 7-4 at 107, 108-09 (addressing the no action alternative).

Thus, a congressional reallocation can facilitate measures to increase protections to ESA-listed salmonids, while Plaintiffs' proposal to maintain the status quo prevents actions that can benefit salmonids. The equities do not tip in favor of judicial action aimed at influencing Congress to stay its hand. NMFS recognized that this status quo does not benefit salmonids, which is why it crafted an RPA in 2008 to address instream flow protections. ECF 7-5 at 9.24-9.25. And the Corps heeded this RPA by adopting a report and recommendation to allocate almost 70% of the Willamette's conservation storage capacity to F&W uses. Warner Decl., Attach. 7 at 1-2. By seeking judicial action that could only impede realization of NMFS's 2008 RPA measure 2.9, Plaintiffs' proposed injunction does not advance the public interest. *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1266–67 (W.D. Wash. 2015) (an "injunction that hinders full implementation of" measures identified by the expert wildlife agency in a biological opinion "is not in the public interest").

In short, Plaintiffs would trade certain benefits of a reallocation—facilitating the protection of instream flows—based on a misguided fear that future water storage agreements

executed in accordance with the ESA might decrease protections for salmonids. This position makes little sense, a fact reinforced by Plaintiffs' contradictory litigation positions. In related litigation, Plaintiffs argue the Corps has failed to implement the 2008 RPA, and they moved the Court to immediately alter the status quo operations of the WVP during the agencies' ongoing ESA consultation. *NEDC*, 3:18-cv-437-HZ (D. Or.), ECF 36 at 1, 11-21. But here Plaintiffs want to enjoin the Corps from taking actions that implement the 2008 RPA, and they argue that the ESA affirmatively forbids the Corps from altering the status quo during an ESA consultation process. *See* ECF 7 at 9, 18, 21. Plaintiffs' irreconcilable positions underscore why the balance of harms and public interest do not tip in favor of granting relief.

## CONCLUSION

The Corps has followed Congress' instructions set forth in the ESA. It proposed actions associated with future implementation of a potential congressional reallocation and consulted with NMFS on the proposed action. The outcome of the consultation—the 2019 Biological Opinion and RPA—is unchallenged. Nor has the Corps acted on the RPA measures relating to implementation of a proposed reallocation, much less acted in a way that could violate the ESA. Under these facts, the Court has no cause to intercede, particularly where doing so would impermissibly interfere with ongoing discussions between the political branches on matters delegated to them by the Constitution.

DATED: April 14, 2020          JEAN E. WILLIAMS
                               Deputy Assistant Attorney General
                               SETH M. BARSKY, Chief
                               S. JAY GOVINDAN, Assistant Chief

                               */s/ Michael R. Eitel*
                               MICHAEL R. EITEL, Senior Trial Attorney
                               KAITLYN POIRIER, Trial Attorney

U.S. Department of Justice
Environment & Natural Resources Division

Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 307-6623
Facsimile: (202) 305-0275
Email: kaitlyn.poirier@usdoj.gov; michael.eitel@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that the foregoing was electronically filed through the Court's electronic filing

system, which will generate automatic service upon on all Parties enrolled to receive that notice.

*/s/ Michael R. Eitel*
Michael R. Eitel, Trial Attorney
U.S. Department of Justice