**LAWRENCE B. BURKE, OSB #892082**
larryburke@dwt.com
**RICHARD M. GLICK, OSB #792384**
rickglick@dwt.com
**OLIVIER JAMIN, OSB #173805**
olivierjamin@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
Telephone:  (503) 778-5239
Facsimile:  (503) 778-5299

Attorneys for Intervenor-Defendant
Oregon Water Utility Council

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **WATERWATCH OF OREGON, NORTHWEST ENVIRONMENTAL DEFENSE CENTER, and WILDEARTH GUARDIANS,**<br><br>　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>**U.S. ARMY CORPS OF ENGINEERS** and **R.D. JAMES, in his official capacity as Assistant Secretary of the Army (Civil Works),**<br><br>　　　　　　　　　Defendants. | **Case No. 3:20-cv-00413-HZ**<br><br>**Proposed Intervenor-Defendant Oregon Water Utility Council's (OWUC)**<br><br>**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:  May 26, 2020<br>Time:  2:00 p.m.<br>(via telephone conference)<br>Judge:  Hon. Marco A. Hernandez |

4834-1746-5274v.2 0090524-000012
DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

# <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................................ 1

II.  SUMMARY ....................................................................................................... 2

III.  BACKGROUND ............................................................................................... 4

    A.  History.................................................................................................... 4

    B.  Preliminary Injunction Standard ........................................................... 6

IV.  ARGUMENT .................................................................................................... 7

    A.  It Is Not Appropriate for Courts to Intervene in a Process Reserved
        for Congress. ........................................................................................... 7

    B.  Plaintiffs Have Not Demonstrated They Are Likely To Succeed
        on the Merits. .......................................................................................... 9

    C.  Plaintiffs Have Not Demonstrated They Are Likely To Suffer
        Irreparable Harm. ................................................................................. 15

    D.  Injunctive Relief Is Not in the Public Interest/Balance of Equities. ..................... 16

V.  CONCLUSION ................................................................................................ 18

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

4834-1746-5274v.2 0090524-000012

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ...........................................................................9, 15

*Audubon Soc. of Portland v. National Marine Fisheries Services*,
   849 F.Supp.2d 1017 (2011) ....................................................................................15

*Baker v. Carr*,
   369 U.S. 186 (1962).........................................................................................1, 2, 7, 8

*Juliana v. United States*,
   947 F.3d 1159 (9th Cir. 2020) ...................................................................................1

*Klamath Tribes v. United States Bureau of Reclamation*,
   No. 18-CV-03078-WHO, 2018 WL 3570865 (N.D. Cal. July 25, 2018).........................17, 18

*Lopez v. Brewer*,
   680 F.3d 1068 (9th Cir. 2012) ...................................................................................6

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997)...............................................................................................6, 16

*Nat. Res. Def. Council v. Kempthorne*,
   No. 1:05-CV-1207 OWW, 2007 WL 4462395 (E.D. Cal. Dec. 14, 2007)..........................16

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   886 F.3d 803 (9th Cir. 2018) .................................................................................7, 16

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   No. 3:01-CV-0640-SI, 2017 WL 1829588 (D. Or. Apr. 3, 2017) ..................................16

*NEDC v. U.S. Army Corps of Eng'rs*,
   2019 WL 2372591 .................................................................................................3, 15

*Rep. of the Philippines v. Marcos*,
   862 F.2d 1355 (9th Cir. 1988) ..................................................................................11

*Rucho v. Common Cause*,
   139 S.Ct. 2484 (2019).............................................................................................1, 7

*Vieth v. Jubelirer*,
   541 U.S. 267 (2004)................................................................................................1, 8

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

4834-1746-5274v.2 0090524-000012

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................7, 16

**Federal Statutes**

16 U.S.C. § 1536(d) ................................................................................... *passim*

**State Statutes**

ORS 197.296 ........................................................................................................4

ORS 537.099 ......................................................................................................14

ORS 537.346 ......................................................................................................14

DAVIS WRIGHT TREMAINE LLP
4834-1746-5274v.2 0090524-000012          1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

## I.    INTRODUCTION

Oregon Water Utility Council ("OWUC") has moved to intervene in this case to protect the interests of public water providers, large and small, from across Oregon. OWUC is a committee of the Pacific Northwest Section of the American Water Works Association ("PNWS-AWWA"), the largest non-profit scientific and educational association dedicated to managing and treating water for municipal and industrial use.  As part of its mission, OWUC promotes public policies, legislation, and regulations to ensure that Oregon's communities have adequate supplies of high quality water at the lowest economic and environmental costs.

Plaintiffs ask the Court to issue a preliminary injunction to prevent the Chief of Engineers of Defendant U. S. Army Corps of Engineers ("USACE") from submitting a report to Congress ("Chief's Report") and to "disavow and/or rescind" the Chief's Report. Plaintiffs' Motion at 2. The Chief's Report recommends enactment in the next Water Resources Development Act ("WRDA") of the plan resulting from the Willamette River Basin Reallocation Study ("Study"). At the outset, it seems a peculiar request of this Court to block a high official in the Government from making a recommendation to Congress, which Congress is free to accept, reject or modify as it sees fit. The recommendation is not self-actuating, and no doubt, other parties will make their concerns known in the legislative process. Courts have a long-standing reluctance to insert themselves in political matters, which this Court should likewise decline to do. *Baker v. Carr*, 369 U.S. 186 (1962); *Vieth v. Jubelirer*, 541 U.S. 267 (2004); *Rucho v. Common Cause*, 588 U.S. ____; 139 S.Ct. 2484 (2019); *Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020).

The Study was a multi-year effort to examine the feasibility of reallocating the storage space within the Willamette Valley Project ("WVP") reservoirs, operated by the USACE, and was developed with input from a wide range of stakeholders, including Plaintiffs.  The proposed reallocation is a recognition that there are many legitimate competing needs for a limited resource.  Intervenor OWUC was most concerned with securing safe and reliable water supplies to serve Willamette Valley communities, but understood that its share would always be much

Page 1 – OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

less than that needed to meet the needs of fisheries, and irrigated agriculture. Nevertheless, the certainty of this small share is critical to the long-term planning required by water providers to meet their duties. The recommended plan under the Study reallocates storage space as follows: 1,102,600 acre-feet (69%) to fish and wildlife protection, 327,650 acre-feet (21%) to agriculture and irrigation uses, and 159,750 acre-feet (10%) to municipal and industrial uses. Allowing Plaintiffs to block the process through a preliminary injunction would negate the rights of other stakeholders, who have spent significant resources in this process, and delay the determination of availability of water resources necessary to the well-being of Willamette Valley communities.

Further, following consultation with the National Marine Fisheries Service ("NMFS") over the Study, the Chief's Report adopted all of the Reasonable and Prudent Alternatives ("RPAs) in the resulting Biological Opinion ("2019 Bi-Op") with one exception.[1] The Chief of Engineers rejected the RPA that he recommend to Congress that the USACE retain local authority to modify the plan in the Study without additional congressional approval. The Chief concluded that this would be an inappropriate limitation on Congressional discretion and would create unacceptable uncertainty. Dkt. No. 7-16 (Chief's Report), at 2.

## II.    SUMMARY

The Court should deny Plaintiffs' request for a preliminary injunction because any other outcome would necessarily require the Court to review political questions that involve "a lack of judicially discoverable and manageable standards" to resolve those questions; "or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due [to] coordinate branches of government." *Baker*, 369 U.S. at 217. It is for Congress to review the Chief's Report and then decide whether to adopt, reject, or

---

[1] Plaintiffs also argue that the Chief's Report rejected RPA 4 in the Bi-OP, which is incorrect, as explained below. *See* Section IV.B.

Page 2 – OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

modify its recommendations as part of the WRDA, and the judiciary branch should not interfere with this prerogative.

Additionally, Plaintiffs have not carried their burden of establishing the elements necessary to justify the extraordinary remedy of a preliminary injunction.

First, Plaintiffs have failed to demonstrate they are likely to ultimately succeed on the merits of their claims.  Consistent with the 2019 Bi-Op, the recommended plan allocates a substantial amount of the previously unallocated stored water to fish and wildlife protection, about 1,102,600 acre-feet, or 69% of the storage space. Plaintiffs argue that the USACE ignored NFMS' RPAs when adopting the reallocation plan.  However, as noted, USACE adopted all RPAs, with the exception of the first on retaining local authority. Further, many of the premises underlying some of the NMFS RPAs are incorrect, leading to unduly conservative RPAs.  This in part is the result of Plaintiff WaterWatch's undisclosed and extensive influence in the development of the 2019 Bi-Op, which is problematic in and of itself. OWUC disagrees with much of WaterWatch's legal advice that informed the 2019 Bi-Op.  A full consideration of the facts, studies, and laws that led to the adoption of the reallocation plan would show that USACE did not violate Section 7(d) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(d), and as such, Plaintiffs are not likely to eventually succeed on the merits of their claim.

Second, Plaintiffs are not likely to suffer irreparable harm without preliminary injunctive relief. Plaintiffs' assertion that the condition of Upper Willamette River ("UWR") Chinook and steelhead is deteriorating is not enough to show likelihood of irreparable harm.  *NEDC v. U.S. Army Corps of Eng'rs*, 2019 WL 2372591, at *11.  Additionally, Plaintiffs' assertion that Congress' approval of the reallocation plan would deprive them of any means to challenge the reallocation is unsupported.  The Chief's Report is not self-actuating. While the Chief of Engineers' recommendations certainly influence Congress in drafting elements of the WRDA, they do not bind Congress in any sense. Even if Congress approves the recommendations

Page 3 – OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

without change, the USACE is not then free to ignore the myriad environmental laws that govern its operations, including the ESA.

Third, the balance of equities between the parties and the public interest do not favor Plaintiffs. Protection of listed fish is front and center in the Study, and all substantive NMFS-recommended RPAs were adopted. The uncertainty resulting from the USACE retaining local authority to make changes to the reallocation plan without having to go back to Congress would render the Study plan unreliable. The inability of water providers to rely on a set portion of storage space deprives them of the ability to plan future water development. The planning uncertainty and potential waste of public funds will harm communities that depend on streams downstream of the WVP to meet future water supply demand in a way that overcomes the presumption in favor of threatened and endangered species.

Accordingly, the Court should deny the preliminary injunction requested by Plaintiffs.

### III.   BACKGROUND

**A.   History**

Willamette Valley municipal water providers serve one of the fastest growing areas in the country. They have a legal duty to secure adequate water supplies to meet anticipated population growth and economic development over a very long time horizon. Most local governments must plan infrastructure needs at least 20 years ahead, ORS 197.296, and water providers must plan even farther ahead, as evidenced by the "Oregon's 100-Year Water Vision: A Call to Action," adopted by the State to "ensure we have enough clean water for our people, our economy, and our environment, now and for future generations." *See* Oregon's 100-Year Water Vision: A Call to Action at 1. Planning is challenging because new sources of surface or groundwater are extremely limited. As a result, a key strategy for water providers to achieve that goal has been to pursue access to some of the storage space in the WVP.

The WVP was authorized by the Flood Control Acts of 1938 and 1950. The reservoirs in the WVP have "conservation storage" of 1.64 million acre-feet. The originally authorized

Page 4 – OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

purposes for the reservoirs were flood control, navigation, hydroelectric power, irrigation, potable water supply, and reduction of stream pollution. To date, the water stored in the WVP has been used for all of the authorized purposes, except for potable water supply.

Beginning in June 1996, the USACE began working cooperatively with the State of Oregon and stakeholders as part of the Willamette Basin Reservoir Study. The study was intended to evaluate whether changes in the operation, storage and allocation of water in the existing Willamette Basin reservoirs would better serve current and future water resource needs.

Work on the Reservoir Study was paused in 2000 following listing of UWR Chinook salmon and steelhead as threatened under the ESA. The USACE then engaged in formal consultations with the NMFS concerning continued WVP operations as a whole. The resulting biological opinion was issued in 2008 ("2008 Bi-Op").

In 2013, the USACE reinitiated the study to examine the potential for reallocation of a portion of WVP storage space for municipal and industrial use. OWUC and its members contributed and actively participated in what became known as the Willamette Basin Review Feasibility Study ("Study"). The recommended plan under the Study was to reallocate storage space as follows: 1,102,600 acre-feet (69%) to fish and wildlife protection, 327,650 acre-feet (21%) to agriculture and irrigation uses, and 159,750 acre-feet (10%) to municipal and industrial uses.

As part of the reallocation process, USACE consulted with NMFS on the effect of the reallocation plan on the ESA-listed species resulting in a biological opinion specific to the Study's reallocation plan, the 2019 Bi-Op. The 2019 Bi-Op concluded that although the proposed action under the plan might jeopardize the continued existence of UWR Chinook and steelhead, jeopardy could be avoided with adoption of several RPAs. The first RPA would have the USACE recommend to Congress that the USACE retain local authority of the reallocation plan so that adjustments could be made without the need for additional congressional approval. The District Engineer included this RPA in his report to the USACE Chief of Engineers (2019).

DAVIS WRIGHT TREMAINE LLP
4834-1746-5274v.2 0090524-000012                    1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

On December 18, 2019, the Chief of Engineers issued his report on the Study ("Chief's Report") to the Secretary of the Army for transmission to Congress. The Chief's Report recommends the reallocation plan described above, and adopts all RPAs but the first. The RPA to retain local authority was rejected because it would inappropriately limit congressional discretion, and it would "add unacceptable risk for the reliability of the new storage levels once authorized by Congress." *See* Dkt. No. 7-16 at 2.

The reliability of the reallocated storage space in the WVP is of the utmost importance to OWUC and its member water providers. Significant local public dollars will be expended in planning, seeking regulatory approvals, securing water rights, and constructing infrastructure in reliance on the amount of stored water recommended by the Study and Chief's Report. That public investment could be lost if the plan is later changed, which would cancel the value of decades of effort toward putting the WVP water to its best public use.

OWUC is also concerned that the premises underlying some of the NMFS RPAs are incorrect, leading to unduly conservative RPAs. In particular, OWUC has learned through a Freedom of Information Act Request that NMFS sought out and received extensive legal advice from Plaintiffs WaterWatch of Oregon on the administration of Oregon water law. NMFS failed to include the WaterWatch legal analysis and multiple contacts between NMFS and WaterWatch among the many references cited in the 2019 Bi-Op, although that legal analysis seems to have directly influenced the Bi-Op. (*See* Section IV.B.) OWUC disagrees with much of the WaterWatch legal opinion. Had NMFS felt the need for legal advice beyond its own legal counsel, it could have requested legal opinions from a range of stakeholders. Had it done so, it might have come to different conclusions in the 2019 Bi-Op.

### B.    Preliminary Injunction Standard

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (italics in original); *see also Lopez v. Brewer,* 680 F.3d

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

1068, 1072 (9th Cir. 2012).  To obtain a preliminary injunction, the moving party must show

"that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction

is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

"[T]here is no presumption of irreparable injury where there has been a procedural

violation in ESA cases."  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818

(9th Cir. 2018) ("*NWF*") (citations and quotations omitted).  Plaintiffs must demonstrate that

irreparable injury "is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22(emphasis in

original).  A "possibility" of irreparable harm cannot support an injunction.  *Id.*  There must be a

"sufficient causal connection" between the alleged irreparable harm and the activity to be

enjoined, and showing that "the requested injunction would forestall" the irreparable harm

qualifies as such a connection.  *NWF*, 886 F.3d at 818 (citation and quotations omitted).

## IV.    ARGUMENT

### A.    It Is Not Appropriate for Courts to Intervene in a Process Reserved for Congress.

It has been a long-standing principle that courts should not intervene in a process

explicitly reserved to other branches of government, under what is known as the "political

question" doctrine. Specifically, decades of Supreme Court jurisprudence dictate that courts

should not review questions that involve a "a textually demonstrable constitutional commitment

of the issue to a coordinate political department, or a lack of judicially discoverable and

manageable standards" to resolve those questions; "or the impossibility of deciding without an

initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a

court's undertaking independent resolution without expressing lack of the respect due [to]

coordinate branches of government."  *Baker*, 369 U.S. at 217; *Rucho*, 139 S.Ct. at 2494.

Sometimes, "the law is that the judicial department has no business entertaining the claim of

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Vieth,* 541 U.S. at 277 (2004).

By requesting a preliminary injunction requiring the Corps to "disavow or rescind" a duly promulgated Chief's Report at this stage of the process, Plaintiffs are asking the Court to put itself in a position that *Baker* cautioned against. Plaintiffs argue that the preliminary injunction is necessary to prevent the Chief's Report being "rubber-stamped by Congress" when adopting the WRDA. Plaintiffs' Motion at 31. By granting the preliminary injunction, the Court would tacitly accept the proposition that Congress is not capable of making an independent determination regarding the Chief's Report, including his rejection of the RPA maintaining local control. Such a dramatic approach necessarily involves making an "initial policy determination of a kind clearly for nonjudicial discretion" and is impossible to take without "expressing lack of the respect due [to] coordinate branches of government." *Baker*, 369 U.S. at 217. Additionally, there is no judicial standard or manageable standard to make this decision, and Plaintiffs do not offer any. A preliminary injunction in this case would mean that courts can decide for themselves and predict whether Congress is about to make a decision that would violate the law, engaging in speculations that have no place in a court of law.

Projects such as the reallocation plan at issue in this case are the result of a long, expensive, and detailed process in which Congress retains ultimate authority. Once a water resource problem is first identified, stakeholders may ask Congress to grant the authority to perform a feasibility study. A preliminary analysis is conducted before the full-blown feasibility study takes place, including various economic and environmental analyses, leading to the development of a final feasibility report reviewed by USACE headquarters and state and other federal agencies. Based on the study and reports from the various agencies, the Chief of Engineers then writes a report making recommendations to Congress, which has the authority to approve the recommendations made in the report, or not. Plaintiffs' request for a preliminary

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

injunction comes after years of efforts from all the agencies[2] and stakeholders who have an interest in the WVP, and demands that the Court block an agency from fulfilling its duty to communicate with Congress and send over the Chief's Report for consideration.

Courts are and should be reluctant to insert themselves in a process reserved to other branches of the government. Plaintiffs' labelling of congressional review of the Chief's Report as a "rubber stamp" simply because Congress has in the past accepted USACE's recommendations without changes is unduly cynical and misleading. Even if Congress adopts the recommendations in the Chief's Report in their entirety in the next WRDA, that does not excuse the USACE from adhering to its myriad other legal requirements, including ESA-required consultations.  Thus, there is nothing in the Chief's Report that violates the ESA Section 7(d) stricture against an agency making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d). In fact, the Chief's Report makes no commitment of any kind. In this context, it is for the USACE to advise and for Congress to make the commitment of resources.

The legislative branch is free to decide whether to accept, reject or modify recommendations in the Chief's Report. Preventing Congress from accessing a report it is entitled to receive would be unprecedented and contrary to the long-standing principle of judicial restraint in matters involving political questions or otherwise reserved to Congress.

### B.     Plaintiffs Have Not Demonstrated They Are Likely To Succeed on the Merits.

To demonstrate a likelihood of success on the merits, Plaintiffs must at least demonstrate "serious questions going to the merits" of their claims. *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011). Plaintiffs argue that the reallocation plan will prejudice the

---

[2] By letter of May 14, 2018 (attached as Exhibit B to the Decl. Glick), the Oregon Water Resources Department informed the USACE of its support for the reallocation plan resulting from the Study.

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax
4834-1746-5274v.2 0090524-000012

ongoing consultation over the Willamette Project by precluding several RPA measures, and that NMFS stated that the reallocation plan will "limit the Corps' flexibility to comply with . . . ESA Section 7(d) requirements in relation to the" agencies' current consultation over the Willamette Project as a whole.  Plaintiffs' Motion at 22.  Plaintiffs assume that a court would find that the Corps has violated ESA Section 7(d) requirements by adopting the reallocation plan and that as such, they have demonstrated serious questions going to the merits of their claims.  There are serious problems with Plaintiffs' assumptions.

First, Plaintiffs' arguments are derived from the Chief of Engineers declining to adopt one RPA that would have the USACE recommend to Congress that the USACE retain local authority of the reallocation plan so that adjustments could be made without the need for additional congressional approval.  The Chief of Engineers rejected that RPA because it would inappropriately limit congressional discretion and "add unacceptable risk for the reliability of the new storage levels once authorized by Congress."  Dkt. No. 7-16 at 2.  There were important policy considerations justifying this decision. Significant resources will be expended in planning, developing and implementing a program to contract for storage space,  seeking regulatory approvals, securing water rights, and constructing infrastructure in reliance on the reallocation plan.  The "local authority" RPA would put all this at risk of being wasted due to adjustments to the reallocation plans.  Without some certainty regarding the availability of water resources for the future, it would simply be impossible for water providers to undertake necessary infrastructure improvements to meet anticipated new water demand from population growth and economic development.  Accordingly, USACE's decision to reject this RPA was justified and necessary to preserve the integrity of the reallocation process.

The Chief's Report otherwise adopted all other recommended RPAs, which offer ample protection for fish and wildlife, and noted that "Congress, not the Army nor NMFS, should continue to determine how best the public good is served by this project."  Dkt. No. 7-16 at 2.

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

The Chief's decision to reject the "local authority" RPA does not raise "serious questions" as to the validity of the reallocation plan simply because Plaintiffs disagree with the outcome.

Plaintiffs also argue that "the Corps refused to adopt RPA Measure 4." Plaintiffs' Motion at 20. RPA 4 recommends adopting an "adaptive management process for making adjustments to reservoir operations and flow releases through proportional reduction of storage volumes among authorized project purposes," to ensure operation of the WVP to meet minimum flow objectives. Dkt. No. 7-2 (2019 Biological Opinion), at 99. The Chief's Report adopted the recommendations of the Final Feasibility Report and Environmental Assessment, which adopted an adapative water management plan. Dkt. No. 7-4 (Final Feasibility Report), p. 93-96. Under the plan, the allocation of stored water in drought years would be reduced equally for fish and wildlife, agricultural, and municipal and industrial uses under a "share the pain" approach. However, the plan also provides that the Flow Mangement Water Quality Team ("FMWQT") will meet regularly to adaptively manage WVP stored water as conditions change to "respond proactively so that drought-related impacts to authorized purposes can be minimized," which includes minimum stream flows. *Id.* at 96. The Corps adopted an adaptive approach that allows for fish to be considered a higher priority if the circumstances warrant doing so, but also allows flexibility based on changing circumstances during the 30-year period that the Chief's Report will be effective for. Accordingly, Plaintiffs' assertion that the Corps refused to adopt RPA 4 is misleading. The Chief's Report does in fact adopted RPA 4 as described in the final feasibility report. Dkt. No. 7-16 at 3.

Plaintiffs' argument that failure by the Chief of Engineers to adopt one of the RPAs in his report, no matter how good the reasons, raises serious questions to the merits of their claims. Plaintiffs have failed to show even "a fair chance of success on the merits." *Rep. of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988). Accordingly, a prelimary injunction based on the Chief of Engineers rejection of the "local authority" RPA is unwarranted.

Page 11 – OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Second, Plaintiffs' arguments are largely based on NMFS's conclusions regarding the reallocation plan. As noted above, NMFS's conclusions are flawed and reflect the back-channel advice and lobbying that Plaintiffs engaged in during the consultation process. NMFS failed to include the WaterWatch legal analysis and multiple contacts among the many references cited in the 2019 Bi-Op, although that legal analysis seems to have directly influenced the Bi-Op.

The 2019 Bi-Op contains a number of incorrect and misleading statements regarding Oregon water law and state administration of water policy, which generally influenced its conclusions. It appears that at least some of the incorrect and misleading statements were the result of improper communications between Marc Liverman, the NMFS Willamette Branch Chief, who oversees the Feasibility Study, and Brian Posewitz, a staff attorney at WaterWatch of Oregon. None of these communications, including written legal analyses provided by Mr. Posewitz, are included among the references relied upon by NMFS in the Bi-Op.

OWUC submitted a Freedom of Information ("FOIA") request to obtain copies of the exchanges between Mr. Liverman and Mr. Posewitz. NMFS responded by providing 89 documents, some of which highlight a concerning involvement of WaterWatch in the consultation process. *See* OWUC's Exhibit A attached to the Declaration of Richard Glick filed concurrently herewith ("Decl. of Glick"). For example, Mr. Liverman directly solicited feedback from Mr. Posewitz on an outline for the State's "instream flow protection process," and asked Mr. Posewitz out for lunch to discuss any comments Mr. Posewitz may have. *Id.* at 2. As a result, Mr. Posewitz provided at least fifteen detailed comments on a two-page outline expressing his views and concerns on the proposed action. *Id.* at 4-5. Numerous times, Mr. Posewitz warned that the steps considered to implement the proposed action would be "subject to legal challenges" and could take "many years to resolve." *Id.*

Mr. Posewitz also seemed to undermine the state agencies and expressed doubt that the Oregon Water Resources Department's ("OWRD") and Oregon Department of Fish and Wildlife's ("ODFW") can be trusted to follow Oregon law and adequately protect instream

Page 12 – OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

flows. As shown below, this lack of regard for Oregon agencies' implementation of state law is embraced by NMFS in the RPAs, showing that WaterWatch benefited from a preferential channel to influence the crafting of the RPAs.

In addition to providing comments on the outline, Mr. Posewitz submitted an eight-page legal memorandum (including another 21 pages of attachments), dated June 25, 2019. The memorandum amplified Mr. Posewitz's doubts and concerns about the Corps' proposed actions: "[i]n our view [...] the steps necessary to protect stored water released for fish, and the impact of doing that, are so speculative that the potential protection should be given little value in assessing the impacts of the Corps' reallocation proposal on fish." *Id.* at 7. The memorandum goes on to describe seven additional necessary actions that, in Mr. Posewitz's view, would need to be completed to protect water released for fish and wildlife from downstream diversions. The following are a few examples of incorrect or misleading statements in the 2019 Bi-Op that derive from WaterWatch's advice.

First, the Bi-Op incorrectly asserts that "[t]here are currently no successful examples of enforceable secondary water rights granted to ODFW for stored water consistent with the amounts and conditions requested." Dkt. No. 7-2 at 16-17; OWUC's Ex. A at 4, 9. ODFW actually holds a number of secondary water rights for the use of stored water. Examples include Certificate 54021 for the use of water stored in Lost Creek Reservoir, Certificate 63278 for the use of water stored in Applegate Reservoir, and Certificate 62227 for the use of stored water from Willow Creek Reservoir. In each case the water right granted is for the same amount of water originally applied for. *See* Exhibit C attached to the Decl. of Glick.

The 2019 Bi-Op also incorrectly asserts that "when ODFW has applied for water rights in the past they have been contested." Dkt. No. 7-2 at 16; OWUC's Ex. A at 13. This statement seems directly influenced by WaterWatch's repeated warning that any application would result in litigation and would take years to resolve. This is a gross exaggeration that suggests that all or most of ODFW's applications are contested. In reality, of the 946 instream water right

Page 13 – OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

applications and 506 minimum perennial streamflow ("MPSF") conversions requested between 1988 and 1993, approximately 140 of them were protested, less than 10 percent.  Dkt. No. 7-2 at 16.

WaterWatch's influence over the 2019 Bi-Op is also reflected in the assertion that "[i]t is also unclear at this time whether ODFW has the necessary resources to develop applications for all of the instream water rights and MPSF conversions expected to result from the proposed action."  Dkt. No. 7-2 at p. 17; OWUC's Ex. A at 4, 11.  This again reflects misleading comments made by WaterWatch about the availability of resources to implement instream protection measures. First, MPSF conversions do not require an application.  ORS 537.346. Second, in March 2018 alone, ODFW filed approximately 70 instream water right applications, suggesting that the availability of resources was not an issue for developing these requests. Finally, the Bi-Op asserts that "M&I users that obtain stored water rights would need to monitor and report use levels, which is not currently required."  Dkt. No. 7-2 at 17; OWUC's Ex. A at 4, 13.  This is incorrect: all municipal water providers are required to measure and report their water use. ORS 537.099.  Also, new industrial use water rights generally require measurement and reporting, or have conditions requiring measurement and indicating that reporting may be required in the future.

NMFS' Final 2019 BiOp was undoubtedly influenced by the incorrect and misleading statements provided by Plaintiff WaterWatch.  A close look at Plaintiffs' argument reveals that the only assertion relevant to the Court's decision is that the Chief's Report accepted all but one RPA from NMFS' recommendations, a decision that Plaintiffs disagree with.  However, Plaintiffs' disappointment is not for a court to cure, and especially not with the type of extraordinary remedy requested here.  Plaintiffs have failed to show serious questions going to the merits of their claims, and the Court should deny the motion for preliminary injunction.

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

### C.      Plaintiffs Have Not Demonstrated They Are Likely To Suffer Irreparable Harm.

Even if Plaintiffs can show there are serious questions as to merits of their claims, they fall far short of demonstrating a likelihood of irreparable harm.  Plaintiffs argue that the irreparable harm is evidenced by the fact that the condition of UWR Chinook and steelhead continue deteriorating.  Plaintiffs' Motion at 36. But Plaintiffs must demonstrate a "definitive threat of future harm" to those species during the course of these proceedings to establish irreparable harm.  *NEDC*, 2019 WL 2372591, at *7 (*citing NFW*, 886 F.3d at 818).  Plaintiffs have failed to establish that the species will suffer irreparable harm during the pendency of these proceedings if this court were not to issue this affirmative injunction. Even if Plaintiffs demonstrate that the condition of the UWR Chinook and steelhead is deteriorating, partly because of operation of the Willamette Valley Project, such a showing is not enough to establish irreparable injury.  *NEDC*, 2019 WL 2372591, at *11.  In *NEDC*, the evidence Plaintiffs relied on stopped short of showing that the decline in the condition of the species is "such that the species will suffer irreparable harm before the conclusion of these proceedings unless the Court grants preliminary relief," and that distinction was "dispositive in the context of a preliminary injunction." *Id.*; *Alliance for the Wild Rockies,* 632 F.3d at 1135 (9th Cir. 2011). The failure to meet the standard is more obvious in the context of the affirmative action that is the goal of Plaintiffs' motion.  The Chief's Report adopted all but one RPA recommended by NMFS, and provided more than adequate justification for rejection of the one RPA. In doing so, the Chief's Report ensured that all interests at stake, including fish and wildlife, would be fairly and adequately protected by the reallocation.  Plaintiffs have offered no more than speculation that irreparable harm will occur if an injunction is not issued, which is inconsistent with the Courts' characterization of "injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Audubon Soc. of Portland v. National Marine Fisheries Services*, 849 F.Supp.2d 1017, 1048-49 (2011) (*citing Winter*, 555 U.S. at 22).

Page 15 – OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs make much of the fact that, in their opinion, a preliminary injunction is needed before Congress has a chance to approve the reallocation plan, which would constitute an "irreversible or irretrievable commitment of resources." Plaintiffs' Motion at 34. As discussed above, Congress is not subject to the section 7(d) stricture and it, not the USACE, would be making the commitment of resources. Even if Congress were to pass a WRDA bill, the USACE would need to be compliant with other relevant laws, including the ESA. A preliminary injunction is inappropriate at this time since Plaintiffs could very well challenge implementation of the WRDA later.

Despite Plaintiffs' attempt at creating a false sense of urgency for this Court to issue a preliminary injunction, the facts of this case do not support issuing this type of extraordinary, drastic remedy. *Mazurek,* 520 U.S. at 972. Plaintiffs have failed to demonstrate a likelihood of irreparable harm that would justify injunctive relief.

### D.    Injunctive Relief Is Not in the Public Interest/Balance of Equities.

To obtain a preliminary injunction, the moving party must show "that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter,* 555 U.S. at 20. While these factors tend to favor the endangered species in ESA cases, they are not dispositive here. Plaintiffs ignore situations such as the one at issue here where competing interests include public safety and the well-being of communities needing safe and reliable water supplies. These interests have been recognized as countervailing to perceived impacts to threatened and endangered species. *See NWF*, 886 F.3d at (proposed injunction accommodated "power emergencies, health and safety, or other issues"); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-CV-0640-SI, 2017 WL 1829588, at *10 (D. Or. Apr. 3, 2017), *aff'd in part, appeal dismissed in part,* 886 F.3d 803 (9th Cir. 2018) ("The Court . . . consider[s] Defendants' arguments relating to the potential harm to the listed species and to human life versus the benefits asserted by the [] Plaintiffs in evaluating the appropriate injunctive relief."); *Nat. Res. Def. Council v. Kempthorne*, No. 1:05-CV-1207 OWW, 2007 WL 4462395, at *13 (E.D. Cal.

Page 16 – OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Dec. 14, 2007) ("Although the ESA does not expressly recognize an exception for human health and safety, Plaintiffs have offered and it is prudent to apply . . . .").

Plaintiffs' goal in securing an injunction is to force a reconsideration of the reallocation plan to increase fish and wildlife's share of the reallocated storage space, at the expense of municipal and agricultural users.  While the balance of equities generally tips in favor of the threatened and endangered species in ESA cases, this does not mean that other interests cannot overcome this presumption in the context of injunctive relief.  In a recent ESA case, intervenors argued that an "injunction would not only reduce water available for crops but prompt a mid-season shutoff that would financially ruin farmer families."  *Klamath Tribes v. United States Bureau of Reclamation*, No. 18-CV-03078-WHO, 2018 WL 3570865, at *16 (N.D. Cal. July 25, 2018).  The court recognized that, while courts generally are "not permitted to favor economic interests over potential harm to endangered species," a "mandatory preliminary injunction is an *extraordinary remedy* and I need to be *certain* that the remedy requested is likely to be effective. In that respect, I consider the intervenors' concerns and I recognize the complex interests that would be affected by preliminary relief." *Id.* (emphasis added).  The court noted there were "competing expert opinions on the effectiveness of the remedy, which is concerning in light of the magnitude of interests that would be affected by the preliminary injunction." *Id.* at *17.  As a result, the Court denied the request for injunctive relief. *Id.*  Similarly, this Court can, and should, recognize that its ruling has the potential to threaten the well-being of Willamette Valley communities.

As noted, the availability of new sources of groundwater or surface water is extremely limited.  Many streams are over-appropriated, making it unlikely that a water provider could easily secure additional water supplies.  *See* "Oregon's 100-Year Water Vision: A Call to Action." In this context, water providers face an uphill challenge to meet their duty to provide adequate municipal and industrial water supplies to meet anticipated population growth and economic development for the next decades.  With this long-term goal in mind, OWUC members

Page 17 – OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

4834-1746-5274v.2 0090524-000012

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

identified the unallocated water of the WVP as a fundamental resource for meeting their planning responsibilities, and invested significant resources to conclude a fair reallocation feasibility study process that would be protective of fish and wildlife while ensuring that our communities would benefit from the water they need to thrive.  The Chief's Report adopted all but one RPA recommended by NMFS, further ensuring that fish and wildlife would be protected. The circumstances of this case make clear that issuing a preliminary injunction would not be in the public interest.

Faced with a request for an "extraordinary remedy," a court must be *certain* that the remedy requested is likely to be effective, and consider and recognize the complex interests that would be affected by preliminary relief.  *Klamath Tribes*, 2018 WL 3570865, at \*16.  Here the Court is asked to insert itself in a political process for which there is no judicial standard to apply, and to make a decision that would directly interfere with communications between an agency and Congress.  It is clear that Congress should be given the opportunity to consider action on the Chief's Report.

## V.    CONCLUSION

For the foregoing reasons, OWUC respectfully requests that the Court denies Plaintiffs' motion for preliminary injunction.

DATED this 14th day of April, 2020.

**DAVIS WRIGHT TREMAINE LLP**

By */s/ Lawrence Burke*
**LAWRENCE B. BURKE, OSB #892082**
larryburke@dwt.com
**RICHARD M. GLICK, OSB #792384**
rickglick@dwt.com
**OLIVIER JAMIN, OSB #173805**
olivierjamin@dwt.com
Telephone:  (503) 778-5239
Facsimile:  (503) 778-5299

Attorneys for [Proposed] Intervenor-Defendant
Oregon Water Utility Council

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served a copy of the foregoing **PROPOSED INTERVENOR-DEFENDANT OREGON WATER UTILITY COUNCIL'S (OWUC) OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** and **DECLARATION OF RICHARD M. GLICK IN SUPPORT OF INTERVENOR-DEFENDANT OREGON WATER UTILITY COUNCIL'S (OWUC) OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** was electronically filed with the Clerk of the Court using CM/ECF. Copies of this document will be served upon interested counsel via the Notices of Electronic Filing that are generated by CM/ECF.

Dated this 14th day of April, 2020.

**DAVIS WRIGHT TREMAINE LLP**


By */s/ Lawrence Burke*
    LAWRENCE B. BURKE, OSB #892082
    larryburke@dwt.com
    RICHARD M. GLICK, OSB #792384
    rickglick@dwt.com
    OLIVIER JAMIN, OSB #173805
    olivierjamin@dwt.com
    Telephone: (503) 778-5239
    Facsimile: (503) 778-5299

    Attorneys for [Proposed] Intervenor-Defendant
    Oregon Water Utility Council

4834-1746-5274v.2 0090524-000012

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610
(503) 241-2300 main · (503) 778-5299 fax