Kirk B. Maag, OSB No. 105507
kirk.maag@stoel.com
Crystal S. Chase, OSB No. 093104
crystal.chase@stoel.com
STOEL RIVES LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97204
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

　　　　Attorneys for Proposed Intervenor-Defendant Oregon Farm Bureau Federation

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| WATERWATCH OF OREGON, NORTHWEST ENVIRONMENTAL DEFENSE CENTER, and WILDEARTH GUARDIANS, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ARMY CORPS OF ENGINEERS and R.D. JAMES, in his official capacity as Assistant Secretary of the Army (Civil Works), <br><br> Defendants. | Case No.: 3:20-CV-00413-HZ <br><br> OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION <br><br> Telephonic Oral Argument: Scheduled for May 26, 2020 at 2:00 p.m.[1] |

---

[1] Oregon Farm Bureau Federation requests that it be allowed to participate in the telephonic oral argument scheduled for this date and time.

OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND ................................................................................................... 2

     A.     The Willamette Project ............................................................................ 2

     B.     The Listing of Species Under the ESA Spurs Consultation with NMFS ............. 3

     C.     The Corps Reinitiates the Feasibility Study to Identify the Appropriate Reallocation of Water Stored by the Willamette Project ....................................... 4

     D.     Implementation of the Reallocation Plan Requires Congressional Action ........... 5

     E.     Congress Must Decide Whether to Proceed with Reallocation of the Waters Stored by the Project ........................................................................... 6

     F.     The Pending Action ................................................................................. 7

III.    ARGUMENT ........................................................................................................ 8

     A.     Applicable Legal Standard for a Preliminary Injunction ...................................... 9

     B.     Plaintiffs Show Neither a Likelihood of Success nor Serious Question as to the Merits of Their Claim .................................................................... 10

          1.     Any Reallocation of Water Stored by the Willamette Project Will Be Authorized by Congress, Not the Corps ............................................. 11

          2.     The Preliminary Injunction That Plaintiffs Request Is Inconsistent With the Framework of Section 7 of the ESA ......................................... 14

          3.     Plaintiffs' Lack of Standing Poses a Further Barrier to Plaintiffs' Ability to Present Serious Questions on the Merits ................................. 15

     C.     Plaintiffs Have Provided No Factual or Legal Basis to Demonstrate Irreparable Harm Absent an Injunction ............................................................. 17

     D.     Neither the Balance of Equities nor the Public Interest Would Be Served by the Requested Injunction .................................................................. 22

IV.    CONCLUSION .................................................................................................... 26

Page i  -  OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page**

**Cases**

*All. for Wild Rockies v. Cottrell*,
 632 F.3d 1127 (9th Cir. 2011) ....................................................................... passim

*All. for Wild Rockies v. Kruger*,
 35 F. Supp. 3d 1259 (D. Mont. 2014) ....................................................................24

*Caribbean Marine Servs. Co. v. Baldridge*,
 844 F.2d 668 (9th Cir. 1988) ....................................................................................21

*Cetacean Cmty. v. Bush*,
 386 F.3d 1169 (9th Cir. 2004) ..................................................................................22

*City of S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency (S. Lake)*,
 625 F.2d 231 (9th Cir. 1980), *cert. denied*, 449 U.S. 1039 (1980).........................21

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013)..................................................................................................15

*Conner v. Burford*,
 848 F.2d 1441 (9th Cir. 1988) ..................................................................................15

*Conservation Cong. v. United States Forest Serv.*,
 No. 2:13-cv-01922-TLN-CMK, 2016 WL 6524860 (E.D. Cal. Nov. 3, 2016)......................23

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
 789 F.3d 1075 (9th Cir. 2015) ..................................................................................17

*Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
 No. 6:15-CV-02358-JR, No. 6:16-cv-00035-JR, 2016 WL 9226390 (D. Or.
 Apr. 6, 2016)........................................................................................................23, 24

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
 528 U.S. 167 (2000)............................................................................................15, 16

*Gallatin Wildlife Ass'n v. United States Forest Serv.*,
 No. CV-15-27-BU-BMM, 2018 WL 1796216 (D. Mont. Apr. 16, 2018).............................22

*Garcia v. Google, Inc.*,
 786 F.3d 733 (9th Cir. 2015) ....................................................................................23

# TABLE OF AUTHORITIES

**Page**

*Goldie's Bookstore, Inc. v. Super. Ct. of State of Cal.*,
 739 F.2d 466 (9th Cir. 1984) ................................................................19

*Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*,
 230 F. Supp. 3d 1106 (N.D. Cal. 2017) ........................................10, 14

*Lane Cty. Audubon Soc'y v. Jamison*,
 958 F.2d 290 (9th Cir. 1992) ...............................................................12

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992)......................................................................15, 16

*N. Slope Borough v. Andrus*,
 642 F.2d 589 (D.C. Cir. 1980)......................................................11, 14

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
 551 U.S. 644 (2007)..............................................................................11

*Nat'l Wilderness Inst. v. U.S. Army Corps of Eng'rs*,
 No. Civ. 010273 (TFH), 2005 WL 691775 (D.D.C. Mar. 23, 2005).......................................15

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*,
 23 F.3d 1508 (9th Cir. 1994) ...............................................................19

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
 886 F.3d 803 (9th Cir. 2018) ...............................................9, 17, 18, 23

*Native Ecosystems Council v. Krueger*,
 40 F. Supp. 3d 1344 (D. Mont. 2014)............................................23, 25

*Natural Resources Defense Council v. Houston*,
 146 F.3d 1118 (9th Cir. 1998) .............................................................12

*NEDC v. U.S. Army Corps of Eng'rs*,
 2019 WL 2372591 (D. Or. June 5, 2019) .................................17, 21, 22

*NEDC v. U.S. Army Corps of Engin'rs*,
 No. 3:18-cv-00437-HZ (D. Or., filed Mar. 13, 2018)........................4, 21

*O'Shea v. Littleton*,
 414 U.S. 488 (1974)..............................................................................21

# TABLE OF AUTHORITIES

**Page**

*Pac. Rivers Council v. Thomas*,
30 F.3d 1050 (9th Cir. 1994) ..................................................................................14

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
No. 2:13-cv-00059-MCE, No. 2:13-cv-00042-MCE, 2013 WL 4094777
(E.D. Cal. Aug. 13, 2013) ........................................................................................20

*Safer Chems., Healthy Families v. U.S. EPA*,
943 F.3d 397 (9th Cir. 2019) ..................................................................................16

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976) ..................................................................................................16

*Stanley v. Univ. of S. Cal.*,
13 F.3d 1313 (9th Cir. 1994) ....................................................................................9

*Tribe v. NMFS*,
No. 16-CV-04294-WHO, 2018 WL 2010980 (N.D. Cal. Apr. 30, 2018) ..............11

*Tribe v. U.S. Bureau of Reclamation*,
No. 3:16-CV-04294-WHO, 2017 WL 6055456 (N.D. Cal. Mar. 24, 2017)............11

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) ................................................................................................15

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ............................................................................................ passim

**Statutes**

16 U.S.C. § 1536(d) ..................................................................................10, 11, 14

33 U.S.C. § 36 ................................................................................................................5

33 U.S.C. § 701b-8 ..................................................................................................6, 12

33 U.S.C. § 2215(d)(2) ..................................................................................................5

33 U.S.C. § 2282(a)(1) ..................................................................................................6

33 U.S.C. § 2282(a)(2) ..................................................................................................6

Page iv  -   OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page**

33 U.S.C. § 2282a(f)(2)(B) .................................................................6

33 U.S.C. § 2282a(g) ........................................................................6

33 U.S.C. § 2282a(g)(1)(b) ...............................................................6

33 U.S.C. § 2282b ............................................................................6

Arizona Water Settlements Act, Pub. L. No. 108-451, 118 Stat. 3478 .........................................19

Crooked River Collaborative Water Security and Jobs Act of 2014, Pub. L. No. 113-244, 128 Stat. 2864 ...........................................................19

Endangered Species Act, § 7 ..............................................3, 11, 12, 14

Endangered Species Act § 7(a) .........................................1, 3, 10, 15

Endangered Species Act, § 7(a)(2) ....................................................10, 14

Endangered Species Act, § 7(d) ............................................. passim

Pub. L. No. 114-322, 130 Stat. 1628 (2016) ........................................12

Pub. L. No. 115-141, 132 Stat. 348 (2018) ..........................................12

Water Resources Development Act of 1999, Pub. L. No. 106-53, 113 Stat. 269 .............13, 18, 19

Water Resources Development Act of 2007, Pub. L. No. 110-114, 121 Stat. 1041 .....................18

Water Resources Reform and Development Act of 2014, Pub. L. No. 113-121, 128 Stat. 1193 .............................................................18

**Regulations**

33 C.F.R. pt. 230 app. A ..................................................................6

50 C.F.R. § 402.02 .....................................................................3, 11

**Constitutional Provisions**

U.S. Constitution, Article III ......................................................8, 15, 16, 26

## TABLE OF AUTHORITIES

**Page**

**Other Authorities**

159 Cong. Rec. H6716 (daily ed. Oct. 23, 2013) (statement of Rep. Shuster)..............................13

*Army Corps of Engineers: Water Resource Authorization and Project Delivery Processes*,  Congressional Research Service (updated April 19, 2019) ...................................13

Or. S.B. 51 (2019).....................................................................................................................20

Or. S.B. 946 (2019)...................................................................................................................21

11A Wright & Miller, *Federal Practice and Procedure* § 2948.1, Westlaw (3d ed. database updated Aug. 2019)..................................................................................................17

## I.    INTRODUCTION

In this action, plaintiffs WaterWatch of Oregon, Northwest Environmental Defense Center, and WildEarth Guardians (collectively, "Plaintiffs") allege a single violation of Section 7(d) of the Endangered Species Act ("ESA") against the U.S. Army Corps of Engineers ("Corps") and R.D. James, Assistant Secretary of the Army (Civil Works) (collectively, "Defendants").  Plaintiffs seek preliminary injunctive relief requiring Defendants to "disavow and/or rescind" a document known as the "Chief's Report," which encloses the Corps' recommended reallocation plan for the approximately 1.6 million acre-feet of stored water in a reservoir system on the Willamette River and its tributaries—the Willamette Valley Basin Flood Control Project ("Willamette Project" or "Project").  Plaintiffs further seek to enjoin the Corps from submitting any new or revised recommended reallocation plan to Congress pending either (1) resolution of this lawsuit or (2) completion of ESA Section 7(a) consultation with the National Marine Fisheries Service ("NMFS") over the Corps' management of the entire Project.

The Willamette Valley contains some of Oregon's most productive agricultural lands. Oregon Farm Bureau Federation ("OFBF") intervened in this lawsuit to protect the interests of its agricultural members—some of whom receive stored water from the Project under U.S. Bureau of Reclamation contracts, and some of whom hold individual water rights authorizing diversion of live flow downstream from the Project—to secure a stable and sustainable water future.  The relief sought by Plaintiffs in the pending preliminary injunction motion will undermine those interests by delaying, or interfering with, certainty of stored water supplies for Willamette Valley farmers.

Plaintiffs are not entitled to preliminary injunctive relief on their novel and inherently flawed theory of relief under ESA Section 7(d).  Section 7(d) prohibits "[f]ederal agenc[ies]"

from making "any irreversible or irretrievable commitment of resources" with respect to an agency action under consultation. Here, the Corps already satisfied the ESA's consultation requirement. Moreover, the Chief's Report makes *no commitment of resources* because it is not self-executing. The Chief's Report merely submits the Corps' recommended reallocation plan to Congress. No reallocation of water from the Project will occur without authorization from Congress. As a result, the submission of the Chief's Report does not "irreversibl[y] or irretrievabl[y]" commit Corps resources. This fundamental flaw not only proves fatal to the merits of Plaintiffs' Section 7(d) claim, it also precludes Plaintiffs from making a showing of a likelihood of irreparable harm, that a balance of equities tips in Plaintiffs' favor, or that the public interest favors an injunction. As further discussed below, Plaintiffs' motion for a preliminary injunction should be denied.

## II.    BACKGROUND

### A.    The Willamette Project.

The Willamette River Basin stretches from south of Eugene to the Oregon-Washington border. *See* Ex. 4 at i.[2] Within the Willamette River Basin, the Corps operates the Willamette Project pursuant to authority delegated to it by Congress. *Id.* As required by Congress, the Corps manages the Project to meet its multiple responsibilities, including flood risk management, power production, pollution abatement, recreation, irrigation, and navigation, in addition to fish and wildlife benefits. Ex. 4 at 19.

Today, the Willamette Project includes thirteen dams, reservoirs, and associated infrastructure with a combined storage capacity of approximately 1,590,000 acre-feet. *Id.* Of

---

[2] Unless otherwise noted, citations to "Ex." in this motion refer to the exhibits attached to Plaintiffs' Motion for Preliminary Injunction, ECF. No. 7.

that storage capacity, approximately 75,000 acre-feet of stored water is currently contracted for irrigation through the United States Bureau of Reclamation. *Id.* at 31. Some OFBF members receive stored water delivered under those contracts. Dillon Decl. ¶ 7.[3] OFBF members also hold individual water rights that authorize diversion of live flow downstream from one or more of the Project's reservoirs. *Id.*

Beginning in 1996, the Corps commenced the Willamette Basin Review Feasibility Study ("Feasibility Study") to investigate future Willamette River Basin water demand. Ex. 4 at 14.

### B.   The Listing of Species Under the ESA Spurs Consultation with NMFS.

In 1999, both the Upper Willamette River ("UWR") spring Chinook salmon and the UWR winter-run steelhead were listed as threatened species under the ESA. Ex. 4 at 25. That listing prompted the need for the Corps and other agencies to initiate consultation under Section 7(a) of ESA with NMFS to evaluate the effects on those newly listed species of the continued operation and maintenance of the Willamette Project. *See* Ex. 4 at 5, 15; Ex. 5 at 1-3. During consultation, the Corps put the Feasibility Study on hold. Ex. 4 at i, 14.

In 2008, NMFS issued a Biological Opinion for the Project as a whole (the "2008 Project BiOp"). *See* Ex. 5. The 2008 Project BiOp concluded that the continued operation of the Project as then proposed would jeopardize the continued existence of the UWR Chinook salmon evolutionarily significant unit and UWR winter-run steelhead distinct population segment and provided 96 Reasonable and Prudent Alternative ("RPA")[4] measures for the Corps and other

---

[3] Citations to "Dillon Decl." are to the Declaration of Dave Dillon, OFBF's Executive Vice President, which was submitted in support of OFBF's Motion to Intervene.

[4] An RPA is an alternative action that the consulting agency believes will not violate Section 7 of the ESA, can be implemented in a manner consistent with both the intended purpose of the action and the scope of the action agencies' legal authority and jurisdiction, and is economically and technologically feasible. 50 C.F.R. § 402.02.

agencies[5] to implement to avoid jeopardy. *Id.* at 9-5 to 9-90. As of late 2019, the Corps

considered 82 of the 96 RPA measures recommended in the 2008 Project BiOp to be completed,

implemented, or on-going. *See Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs* ("*NEDC*"),

No. 3:18-cv-00437-HZ (D. Or., filed Mar. 13, 2018), ECF No. 81-2 (Implementation

Spreadsheet).

###### C.    The Corps Reinitiates the Feasibility Study to Identify the Appropriate Reallocation of Water Stored by the Willamette Project.

As the Corps worked to implement the 2008 BiOp RPA measures, it became clear the

Feasibility Study could not be delayed indefinitely. Ex. 4 at vi. To "fulfill the multi-purpose

goals of the [Project]," the Corps needed to reallocate the existing 1,590,000 acre-feet of Project

conservation storage. *Id.; see also* 41-63 (detailing the competing demands for Willamette

Project stored water). That, in turn, required the Corps to "analyze [the] current water uses in the

basin for [fish and wildlife], [municipal and industrial water supply], and [agricultural irrigation],

provide[] projections of water needs for these three project purposes, and develop[] a combined

conservation storage reallocation and water management plan that would provide the most public

benefit within [state and federal] policies and regulations . . . ." *Id.* at i. With this information,

the Corps could accomplish its goals of:

(1) "Reallocating a portion of [Project] conservation storage specifically for [fish and wildlife] benefits [to] facilitate the legal protection of [Project] stored water released for instream purposes, as described in [the 2008 BiOp's] RPA Measure 2.9";

(2) Providing water to satisfy agricultural needs through irrigation contracts issued by the Bureau of Reclamation; and

(3) Allowing water stored by the Project to be allocated, for the first time, to provide water for future municipal and industrial supply.

---

[5] The Corps is the lead federal action agency for the BiOp and its RPA measures, but other agencies are responsible for implementing those RPA measures within their respective discretion and control.

Page 4    -    OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

*Id.* at v-vii; *see also id.* at 9.  Overall, the Corps' goal was to develop "a combined conservation reallocation and water management plan that would provide the most public benefit within the policies and regulations of the Corps and the state of Oregon."  *Id.* at i.

For more than a decade, OFBF and other stakeholders participated in the Corps' development of a reallocation plan.  (Dillon Decl. ¶ 8.)  In December 2019, the Corps issued its final feasibility study ("Feasibility Study").[6]  *See* Ex. 4.  The Feasibility Study recommended reallocating the stored water as follows: 159,750 acre-feet to municipal and industrial uses; 327,650 acre-feet to agricultural irrigation; and 1,102,600 acre-feet to fish and wildlife protection.  Ex. 4 at xi; 94-96.  In years with inadequate conservation storage, when minimum flow requirements and contracted water needs cannot be met in full, "all authorized project purposes would be reduced."  *Id.* at 96.  The recommended reallocation scheme contained in the Feasibility Study is hereafter referred to as the "Reallocation Plan."

### D.    Implementation of the Reallocation Plan Requires Congressional Action.

The Reallocation Plan is subject to the processes outlined in the federal water resources development framework codified in Title 33, Section 36 of the U.S. Code.  When evaluating a potential water resources project—such as reallocation of the water stored in the Willamette Project—the Corps first conducts a "feasibility study," along with any associated environmental review or mitigation planning.  33 U.S.C. § 2215(d)(2).  The Corps then submits the results and recommendations of the study to Congress in the form of a report approved by the Chief of Engineers (often termed a "chief's report"), which includes a preliminary analysis of the "costs,

---

[6] The Feasibility Study was accompanied by an environmental assessment to satisfy the Corps' obligations under NEPA.

Page 5    -    OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS'
                MOTION FOR PRELIMINARY INJUNCTION

benefits, and environmental impacts" of the project.  33 U.S.C. § 701b-8; 33 U.S.C. § 2282(a)(1), (2); Ex. 17 at 2.

The signed chief's report is sent to (1) the appropriate congressional committee and (2) the Secretary of the Army (Civil Works) and Office of Management and Budget for "Administration review."  33 U.S.C. § 2282a(f)(2)(B); 33 C.F.R. pt. 230 app. A.  Following Administration review, the Secretary of the Army sends another copy of the report to Congress, along with "any recommendations . . . regarding the water resources project."  33 U.S.C. § 2282b; 33 U.S.C. § 2282a(g)(1)(b).  Congress then considers the report, as well as any recommendations submitted by the Secretary of the Army pursuant to 33 U.S.C. § 2282a(g), and has ultimate authority to authorize the project.

E.    **Congress Must Decide Whether to Proceed with Reallocation of the Waters Stored by the Project.**

As explained *supra*, without Congressional authorization and funding, the Corps cannot implement the Reallocation Plan for the water stored in the Willamette Project.  On December 18, 2019, the Corps' Chief of Engineers issued a chief's report on the Feasibility Study (the "Chief's Report").  Ex. 16.  The Chief's Report recommends the same Reallocation Plan proposed in the Feasibility Study, explaining that the "recommended plan represents a compromise among various interests and sectors throughout the basin."  *Id.* at 1.  According to the Chief's Report, the compromise reflects the "strong interest and desire among agencies, basin stakeholders, and others to contribute to a longer-term water management plan and the finer points of implementation."  *Id.*

The Chief's Report did not include certain measures recommended by NMFS in a BiOp that NMFS completed for the Feasibility Study in June 2019 ("2019 Reallocation BiOp"). NMFS had recommended that the Feasibility Study include a measure known as RPA 1 to

Page 6    -    OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

"avoid jeopardizing the continued existence of UWR Chinook salmon and UWR steelhead."
Ex. 5 at 9-3 to 9-9.  Had the Corps incorporated RPA 1, the Reallocation Plan would have
included a recommendation that "the Corps will retain sufficient local authority to modify [any
Congressionally authorized] reallocation without further Congressional action."  Ex. 2 at 95, 100.

RPA 1 was not included in the Final Feasibility Study.  As the Chief's Report explained,
inclusion of RPA 1 "would add unacceptable risk for the reliability of the new storage levels
once authorized by Congress"; "would be inconsistent with the Corps' historically limited
discretion for water supply reallocation at its reservoirs[;] and would undermine Congressional
prerogatives to define the public benefits to be derived from a project."  Ex. 16 at 2.

The Chief's Report has been transmitted to the House Committee on Transportation and
Infrastructure and to the Secretary of the Army (Civil Works) and Office of Management and
Budget for "Administration review" as contemplated under federal law.  Ex. 17 at 3.  It is now
up to Congress to decide whether to deliberate on or enact legislation related to the Chief's
Report or the Reallocation Plan.  *See* Dillon Decl. ¶ 12.[7]

F.      **The Pending Action.**

Plaintiffs brought this action, alleging that the Corps and the Assistant Secretary of the
Army "are violating and will violate section 7(d) of the ESA by proposing and implementing"
the Reallocation Plan until the Corps completes consultation with NMFS over the operation of
the entire Willamette Project.  *See* Dkt. #1 (Compl., Prayer).  The Corps' consultation with
NMFS over the entire Willamette Project is not anticipated to conclude until sometime in 2023.

---

[7] OFBF believes Congress should take additional steps beyond the measures currently
reflected in the Chief's Report to protect and provide certainty to agricultural water users as
Congress considers legislation that would allow the reallocation to move forward.  Dillon
Decl. ¶ 12.

Page 7    -    OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS'
                  MOTION FOR PRELIMINARY INJUNCTION

Ex. 2 at 15.  On that basis, Plaintiffs seek a preliminary injunction ordering Defendants to

"disavow and/or rescind" the Chief's Report, "to refrain from signing or submitting to Congress

any new or revised Chief's Report concerning Willamette reallocation," and to "enjoin the Corps

from taking any other steps to implement or further the reallocation plan" until this lawsuit is

resolved.  Dkt. #7 (PI Mot. at 2).

## III.    ARGUMENT

To justify the extraordinary remedy that is a preliminary injunction, Plaintiffs must

satisfy the four factors set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S.

7, 22 (2008), regardless of whether their injunction motion is evaluated under the "traditional" or

alternative "sliding scale" standard.  Plaintiffs have not—and cannot—meet that burden.

As to ***success on the merits***, Plaintiffs' claim fails as a matter of law because the issuance

of the Chief's Report does not commit *any* resources of the Corps, let alone make an irreversible

or irretrievable commitment of resources.  Rather, Congress must authorize any reallocation of

Project water, and Section 7(d) is not a limitation on Congressional power.  As a result, Plaintiffs

also cannot demonstrate they have Article III standing because the injuries they allege are not

"fairly traceable" to the Chief's Report.  Additionally, Plaintiffs have not made the required

merits showing because Section 7(d) does not apply when consultation with the service agency

has been completed, as is the case with the Feasibility Study.

Plaintiffs fare no better as to the equitable elements of the preliminary injunction

standard.  Plaintiffs have not demonstrated any ***irreparable harm*** because the Chief's Report is

not self-executing—the Report neither reallocates stored water nor changes how the Project is

managed.  As to the ***balance of equities***, this is not a typical ESA case where the relief sought

would have some direct impact on listed species.  Rather, issuance of the injunction that

Page 8    -   OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS'
               MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs seek would serve only to interfere with the Corps' ability to fulfill its obligation to Congress to report on a reallocation plan after a decades-long process involving multiple stakeholders.  It is unclear if such an injunction would have any practical effect because the Chief's Report is already under consideration by a Congressional committee, Ex. 17 at 3, and Congress is not a party to this case.  For that same reason, and because delay in Congress's evaluation of the Reallocation Plan undermines certainty to existing and future water users, the *public interest* does not favor an injunction.[8]

### A.    Applicable Legal Standard for a Preliminary Injunction.

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.  Accordingly, courts are "extremely cautious" about issuing such relief. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994) (internal quotation marks and citation omitted).  A party seeking a preliminary injunction in an ESA case generally must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.

Plaintiffs ignore the clear test set forth in *Winter* and suggest a far more lenient standard applies.  Plaintiffs contend they must demonstrate only that there are (1) "'serious questions going to the merits'" of their Section 7(d) claim and that (2) "irreparable injury 'is likely in the absence of an injunction.'"  PI Mot. at 17-18 (citing *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011), and *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d

---

[8] OFBF believes any legislation enacted by Congress related to the Chief's Report or reallocation should include additional provisions that would protect and provide certainty to agricultural water users. *See* Dillon Decl. ¶ 12.

Page 9    -    OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

803, 817 (9th Cir. 2018) ("*NWF v. NMFS*")).  This is not the applicable standard.  Rather, the Ninth Circuit has confirmed that, when courts evaluate the likelihood of success on a "sliding scale" standard, plaintiffs must demonstrate "'that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff[s'] favor,'" provided that "plaintiffs must also satisfy the other *Winter* factors" including the likelihood of irreparable harm and that an injunction is in the public interest.  *All. for Wild Rockies v. Cottrell*, 632 F.3d at 1134-35 (citation omitted).

Thus, under either the *Winter* or the *Alliance for the Wild Rockies* standard, Plaintiffs must demonstrate that all four *Winter* criteria are satisfied.  Regardless of which legal standard applies, Plaintiffs have not demonstrated that they are entitled to preliminary injunctive relief on their ESA Section 7(d) claim as further explained below.

### B. Plaintiffs Show Neither a Likelihood of Success nor Serious Question as to the Merits of Their Claim.

Plaintiffs fail to satisfy the first preliminary injunction criterion because they show neither a likelihood of success nor serious question as to the merits of their ESA Section 7(d) claim.

By its plain terms, Section 7(d) prohibits a "[f]ederal agency" engaged in ESA Section 7(a) consultation from making

> any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate [ESA Section 7(a)(2)].

16 U.S.C. § 1536(d).  Section 7(d) was intended to "preclude[] agencies from moving forward with a project when the impact to endangered species has not been made clear." *Hoopa Valley*

*Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106, 1135 (N.D. Cal. 2017).[9]  Under the applicable statutory framework, the Chief's Report, including the enclosed Reallocation Plan, does not constitute an irreversible or irretrievable commitment of resources under Section 7(d) as a matter of law.

### 1.    Any Reallocation of Water Stored by the Willamette Project Will Be Authorized by Congress, Not the Corps.

The commitment of resources at issue here—the reallocation of water stored in the Willamette Project among various uses—is effectuated by Congress, not the Corps.  But by its express terms, Section 7(d) prohibits only the consulting "[f]ederal agency"[10] from irreversibly or irretrievably committing resources with respect to an "agency action."  *See also* 50 C.F.R. § 402.02 (defining "action" as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States").  Section 7(d) has no applicability to Congress and does not restrict *Congress* from making any such commitment or taking any particular action.  *Cf. Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666-70 (2007) (holding Section 7 did not apply to EPA's consideration of state's NPDES program transfer because EPA was congressionally mandated to approve the transfer); *N. Slope Borough v. Andrus*, 642 F.2d 589, 611 (D.C. Cir. 1980) (oil and gas lease sale was not barred by 7(d) in part because Congress, by passing the Outer Continental Shelf Lands Act, had signaled a "'willingness to accept some of the risks of oil and gas production'" (citation omitted)).  Because

---

[9] *Modified sub nom. Tribe v. U.S. Bureau of Reclamation*, No. 3:16-CV-04294-WHO, 2017 WL 6055456 (N.D. Cal. Mar. 24, 2017), *and order clarified sub nom. Tribe v. NMFS,* No. 16-CV-04294-WHO, 2018 WL 2010980 (N.D. Cal. Apr. 30, 2018).

[10] In the case of privately developed projects, Section 7(d) similarly restricts the actions of the "permit or license applicant."  16 U.S.C. § 1536(d).

Page 11   -   OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

the ESA itself is a product of Congressional action, Congress may, and routinely does, pass specific legislation that limits or even contravenes the ESA.  *See* Pub. L. No. 115-141, § 208, 132 Stat. 348 (2018) (exempting Section 7 consultations for certain federal land management plans); Pub. L. No. 114-322, § 4001, 130 Stat. 1628 (2016) (mandating that maximum amount of water is to be drawn from Sacramento and San Joaquin rivers and overriding certain Section 7 consultation requirements).  Because the Chief's Report commits no agency resources, and because Section 7(d) is not a limitation on congressional power, Plaintiffs' claim fails.

The Section 7(d) cases that Plaintiffs cite confirm that Section 7(d) is limited to commitments of resources that result from "agency action."  In *Natural Resources Defense Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998), the court confirmed that Section 7(d) applies to commitment of resources resulting from an "agency action" and applied that provision to bar the U.S. Bureau of Reclamation from "negotiating and executing" certain water delivery contracts.  The holding in *Houston* was premised on the fact that Congress, through "federal reclamation laws," had granted the Bureau "discretion . . . during the negotiation process" and to "renew the contracts" without any congressional oversight over those negotiations or renewals. *Id*. at 1126; *see also Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 293, 295 (9th Cir. 1992) (applying Section 7(d) to action of Bureau of Land Management).  The same cannot be said of the Chief's Report.

Plaintiffs recognize—as they must—that, pursuant to 33 U.S.C. § 701b-8, the Reallocation Plan will not move forward unless and until it is "authorized by the Congress."  *See* PI Mot. at 8, 10.  The fact that the Chief's Report may form the underlying "*substance* of that legislation," PI Mot. at 19, does not change the fact that the Reallocation Plan is of no effect

unless Congress authorizes it.[11]  Although Congress often authorizes projects as outlined in a related chief's report, no law requires it to do so.  *See* discussion *infra* Section III.C. (discussing alternatives paths available to Congress).  Rather, Congress's "development and deliberations" of authorizing legislation (typically titled as a Water Resources Development Act) may be "shaped by many factors," of which the Chief's Report is only one.  Ex. 7 at 5 (*Army Corps of Engineers: Water Resource Authorization and Project Delivery Processes*,  Congressional Research Service (updated April 19, 2019)).  No commitment of resources by the Corps— including implementation of any reallocation of stored water in the Project—can occur until authorized by Congress.  Because Section 7(d) does not apply to Congressional action, and because only Congressional action can authorize reallocation of stored water at the Project (which may or may not leave the Corps with discretion), Plaintiffs' argument that *the Corps* has irreversibly or irretrievably committed resources fails as a matter of law.

---

[11] In fact, in 2014, Congress amended certain aspects of its water resources development review processes, including making WRDAs more frequent, to increase its oversight of the Corps' preparation of Chief's Reports and maintain its authority to authorize the nations water resources development projects. 159 Cong. Rec. H6716 (daily ed. Oct. 23, 2013) (statement of Rep. Shuster) ("One of the key principles in developing [the WRDA amendments] was increasing transparency, accountability and congressional oversight without ceding constitutional congressional responsibility to the executive branch. . . . In order to maintain our constitutional congressional authority, Congress must review the Chief's Reports and specifically authorize them. We cannot hand over our authority to the administration and the Corps of Engineers to self-authorize."); *id*. at H6709 (statement of Rep. Gibbs) (explaining amendments were necessary to prevent Corps from "review[ing] far too many alternatives and then send[ing] to Congress a project request that far exceeds, in scope and costs, what was initially intended"); *id*. at H6712 (statement of Rep. Garamendi) (amendments "bring[] back to this Congress the power that the Constitution gives it").

Page 13  -   OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

2.      **The Preliminary Injunction That Plaintiffs Request Is Inconsistent With the Framework of Section 7 of the ESA.**

Even if the Court concludes that submission of a written report to Congress constitutes an action by a "[f]ederal agency" that involves an "irreversible or irretrievable commitment of resources," Section 7(d) nonetheless does not apply.  Section 7(d) prohibits a federal agency engaging in ongoing consultation with the applicable service agency from making an irreversible or irretrievable commitment of resources "with respect to the agency action" that is under ongoing consultation—here, the Project operation as a whole.  16 U.S.C. § 1536(d).  It has no application where—as here—the action agency has already completed Section 7(a)(2) consultation with the service agency for the alleged resource-committing action.

The purpose of Section 7(d) is to prevent any resource-committing action that "may affect" listed species while consultation under Section 7(a)(2) is underway.  *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1056 (9th Cir. 1994).  In other words, Section 7(d) serves as a safeguard that "preclude[s] agencies from moving forward with a project *when the impact to endangered species has not been made clear*."  *Hoopa Valley*, 230 F. Supp. 3d at 1135 (emphasis added); *N. Slope Borough*, 486 F. Supp. at 356 (Congress passed Section 7(d) to prevent federal agencies from pursuing interim activities "regardless of their impact on endangered species").  Section 7(d) is therefore intended to prevent resource-committing actions from which the impacts to listed species are unknown.

Here, the Reallocation Plan's potential impact to listed species and their habitat has already been fully evaluated by NMFS as part of a Section 7(a)(2) consultation on the Feasibility Study.  *See* Ex. 2 at 1, 71-73, 96 (2019 NMFS BiOp).  Plaintiffs do not cite, and OFBF did not identify any case establishing or even suggesting, that an action can be an irreversible or irretrievable commitment of resources where that action itself has undergone ESA consultation.

Page 14   -   OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

*See Conner v. Burford*, 848 F.2d 1441, 1455 n.34 (9th Cir. 1988) (observing that "section 7(d) clarifies the requirements of section 7(a), ensuring that the status quo will be maintained *during* the consultation process" (emphasis added)).  Actions that have completed consultation simply "do[] not fit into what Congress intended" to be covered under Section 7(d).  *Cf. Nat'l Wilderness Inst. v. U.S. Army Corps of Eng'rs*, No. Civ. 010273 (TFH), 2005 WL 691775, at *16 (D.D.C. Mar. 23, 2005) (Section 7(d) did not apply to NPDES permit issuance because that is an agency action that "does not fit into what Congress intended as an 'irreversible or irretrievable commitment of resources'" (citation omitted)).

### 3.    Plaintiffs' Lack of Standing Poses a Further Barrier to Plaintiffs' Ability to Present Serious Questions on the Merits.

To satisfy the constitutional standing requirements of Article III, a plaintiff must show, among other things, that it has suffered a sufficiently concrete and actual or imminent "injury in fact" that is "fairly traceable to the challenged action of the defendant."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).  "'Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 565 n.2 (1992)).  The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient."  *Id.* (emphases and brackets in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  Thus, even an "objectively reasonable likelihood that" the injury will occur from a challenged action is not enough to show the injury is "fairly traceable."  *Id.* at 410.  Further, a plaintiff must also show

this injury is redressable, *i.e.*, a likelihood that a ruling in its favor would remedy the alleged

injury. *Laidlaw*, 529 U.S. at 180-81.

Here, Plaintiffs can neither show that the injuries they complain of are fairly traceable to

the Chief's Report nor that rescission of the Chief's Report would redress those purported

injuries. *Contra id.* at 181. As discussed *supra* Section III.B.1 and *infra* Section III.C,

submission of the Chief's Report does not itself authorize or effectuate the Reallocation Plan. As

such, while Plaintiffs may be concerned about future actions that Congress may take,

Defendants' actions do not cause any injury to Plaintiffs or to listed species. *See Lujan*, 504 U.S.

at 560 (explaining injury must be "be 'fairly . . . trace[able] to the challenged action of the

defendant, and not . . . th[e] result [of] the independent action of some third party not before the

court'" (brackets and ellipses in original; citation omitted)); *Simon v. E. Ky. Welfare Rights Org.*,

426 U.S. 26, 41-42 (1976) (Article III "requires that a federal court act only to redress injury that

fairly can be traced to the challenged action of the defendant, and not injury that results from the

independent action of some third party not before the court").

Nor may plaintiffs rely on any harm caused by Congress's future approval of the Chief's

Report because that "alleged injury is too speculative at this time." *Safer Chems., Healthy

Families v. U.S. EPA*, 943 F.3d 397, 415 (9th Cir. 2019) (plaintiffs lacked standing to bring suit

where their "theory of injury" was based on possible future EPA action and it was "very

uncertain whether EPA ever plans to do what [plaintiffs] fear"). For that same reason, any

alleged "injury" claimed by Plaintiffs is similarly not redressable by the injunction Plaintiffs

seek. A court cannot redress an injury that is so speculative it cannot confer standing at the

outset. Nor can a court redress an injury caused by a nonparty to the suit. *Lujan*, 504 U.S. at 568

(no redressability where court could not "accord relief" because "the agencies funding the [allegedly injurious] projects were not parties to the case").

**C.     Plaintiffs Have Provided No Factual or Legal Basis to Demonstrate Irreparable Harm Absent an Injunction.**

Irreparable harm remains "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." *See* 11A Wright & Miller, *Federal Practice and Procedure* § 2948.1, Westlaw (3d ed. database updated Aug. 2019).  The ESA in no way "restrict[s a court's] discretion to decide whether a plaintiff has suffered an irreparable injury." *NWF v. NMFS*, 886 F.3d at 818; *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015) (there can be "no presumption of irreparable injury" in environmental cases, including those alleging violations of the ESA).

To warrant equitable relief, plaintiffs must establish that irreparable harm is "not just possible," but "*likely*." *All. for Wild Rockies v. Cottrell*, 632 F.3d at 1131 (emphasis in original); *NWF v. NMFS*, 886 F.3d at 818 (a mere "'possibility' of irreparable harm" is not enough to support an injunction); *NEDC*, No. 3:18-CV-00437-HZ, 2019 WL 2372591, at *7, *11 (D. Or. June 5, 2019) (plaintiff seeking preliminary injunction must "show a '"definitive threat of future harm to protected species"' in order to establish irreparable harm" (citation omitted)).

For the same reasons that Plaintiffs cannot show serious questions to the merits as discussed *supra* Section III.B, Plaintiffs fail to show any "definitive threat of future harm to" UWR Chinook salmon or steelhead will occur absent rescission of the Chief's Report.  *NEDC*, 2019 WL 2372591, at *7 (citation and internal quotation marks omitted).  As discussed *supra*, the Reallocation Plan requires Congressional deliberation and approval before any reallocation can even begin to be implemented.  Plaintiffs cannot satisfy their burden of showing irreparable harm based on speculation about what Congress will or will not do—including speculation that

Congress will adopt the contents of the Reallocation Plan recommended in the Chief's Report. *NWF v. NMFS*, 886 F.3d at 818 (mere "'possibility'" of irreparable harm insufficient).

Plaintiffs suggest Congress will enact legislation to implement the recommendations in the Chief's Report, without modification. But Congress could decide to authorize reallocation of stored water in the Willamette Project in myriad other ways or not at all. Some examples of ways in which Congress might authorize reallocation are set forth below:

- Congress could adopt the Secretary of Army's recommendations developed during the yet-to-be-completed Administration review. *See, e.g.*, Water Resources Reform and Development Act of 2014, Pub. L. No. 113-121, §§ 7002, 7003, 128 Stat. 1193 (approving some water resources projects in accordance with a chief's report but others in accordance with modified recommendation developed during Administration review).

- Congress could adopt the Reallocation Plan in accordance with the Chief's Report but include additional instructions or exceptions within the implementing legislation. *See, e.g.*, Water Resources Development Act of 2007, Pub. L. No. 110-114, § 1001(12)(B)(ii), 121 Stat. 1041 (adopting project as stated in a chief's report but adding supplemental provisions, including ordering the Corps to construct a specific pipeline and "restore or enhance" specific ponds); *id.* § 1001(25) (adopting project as stated in a chief's report but specifying certain "except[ions]" to the report's mitigation elements); Water Resources Development Act of 1999, Pub. L. No. 106-53, § 101(a)(6)(B), 113 Stat. 269 (adopting plan as stated in a chief's report but adding supplemental provisions, including reallocating the "variable space" within a project reservoir).

Page 18  -  OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

- Congress could authorize the reallocation within a "miscellaneous provision" in the 2020 WRDA or a future WRDA, which would allow Congress to substantially alter the allocations as recommended in the Chief's Report.  *See, e.g*., Water Resources Development Act of 1999, Pub. L. No. 106-53, § 521, 113 Stat. 269 (directly reallocating additional acre-feet of water supply storage at Beaver Lake in Arkansas in miscellaneous provision in the 1999 WRDA).

- Congress could exclude the Willamette Project reallocation from the 2020 WRDA (or any future WRDA) and instead authorize reallocation directly through separate legislation.  *See, e.g.*, Crooked River Collaborative Water Security and Jobs Act of 2014, Pub. L. No. 113-244, 128 Stat. 2864 (authorizing water to be released from Bowman Dam on the Crooked River to various uses); Arizona Water Settlements Act, Pub. L. No. 108-451, § 104, 118 Stat. 3478 (reallocating water stored by the Central Arizona Project).

As a tacit acknowledgment of their flawed theory of harm that is premised on the assumption that Congress will necessarily implement the recommendations in the Chief's Report without modification, Plaintiffs argue that the Reallocation Plan, ***if authorized***, poses a risk of irreparable harm to the listed fish.  (PI Mot. at 30.)  But Plaintiffs' disagreement about the possible contents of future legislation by Congress is far too speculative to form the basis for requiring a federal agency to withdraw a recommendation it has made to Congress regarding the same.  *Goldie's Bookstore, Inc. v. Super. Ct. of State of Cal*., 739 F.2d 466, 472 (9th Cir. 1984) ("Speculative injury does not constitute irreparable injury."); *see, e.g.*, *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994) (Ninth Circuit requires "a definitive threat of future harm to protected species, not mere speculation").

Page 19  -   OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

Further, Plaintiffs have not shown that any of the harms about which they complain will occur "before a decision on the merits can be rendered." *Winter*, 555 U.S. at 7, 20, 22; *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, Nos. 2:13-cv-00059-MCE, 2:13-cv-00042-MCE, 2013 WL 4094777, at *7-8 (E.D. Cal. Aug. 13, 2013) (declining to grant injunction because plaintiffs had failed to show that the "requested relief is necessary to avoid irreparable harm *during the interim period* that the relief is to be provided" (emphasis in original)).  Even assuming Congress adopts authorizing legislation that incorporates the Chief's Report, additional interim steps are required for the Corps to implement those changes to management of water stored by the Willamette Project.  Congress must provide funding to the Corps to implement those changes.  Certain changes in how stored water is managed may require the Corps to submit water right applications to the Oregon Water Resources Department ("OWRD").  Water right applications take many months (or even years) to obtain final approval, and more time if any legal challenges are filed.  Depending on what water right actions are ultimately required, action by the Oregon legislature could be required.  For example, in the event it is determined that transfers (or changes) to existing storage water rights are required, OWRD has recently taken the position that existing law does not authorize OWRD to approve changes in the type of use for which water is stored.[12]  In 2019, bills were introduced before the Oregon legislature to address the purported lack of authority, but the session concluded without resolution of this issue.  *See, e.g.*, Or. S.B. 51 (2019) (proposing to establish a process under which the holder of a water right

---

[12] OFBF disagrees with OWRD's position regarding OWRD's statutory authority to approve transfers of stored water.  OWRD's recent position that it lacks such authority is a reversal of the position taken by OWRD in the past.

Page 20   -   OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

for storage could change the type of use for which the water is stored); Or. S.B. 946 (2019) (same).

In short, any causal chain between the action that Plaintiffs seek to enjoin and the resulting harms they claim is far too attenuated to constitute a "likelihood of irreparable harm." A mere "threat of injury from [an] alleged course of conduct" that has not yet completed is "simply too remote" to constitute irreparable harm. *O'Shea v. Littleton*, 414 U.S. 488, 489, 495, 498 (1974); *see also City of S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency (S. Lake)*, 625 F.2d 231, 238-39 (9th Cir. 1980) ("contingencies" before alleged injury could occur created a "threat of [injury that] is too attenuated and conjectural to" confer standing), *cert. denied*, 449 U.S. 1039 (1980); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988) (citing both *O'Shea* and *South Lake* to hold that where "multiple contingencies must occur before" plaintiffs' claimed injuries "would ripen into concrete harms," the claimed "injury is too speculative to constitute" even a basis for standing, much less "an irreparable harm justifying injunctive relief").

Nothing in the concurrent 2018 litigation[13] should be construed to support that the Chief's Report, or even Congressional approval thereof, will harm the listed fish species.  To the contrary, the Court's recent ruling in that case all but requires the opposite conclusion.  In the 2018 litigation, the plaintiffs sought a preliminary injunction directing the Corps to make various changes to Project operations at many of the dams.  *NEDC v. U.S. Army Corps of Eng'rs*, 2019 WL 2372591, at *7.  The court denied this request after the groups "f[e]ll short of establishing

---

[13] In the 2018 action, *NEDC v. U.S. Army Corps of Engineers*, several advocacy organizations, including two of the plaintiffs in this action, filed suit against the Corps, alleging that operation of the Willamette Project as a whole violates the ESA.  *See* Complaint, No. 3:18-cv-00437-HZ (D. Or., filed Mar. 13, 2018), ECF No. 1.

Page 21   -   OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS'
                MOTION FOR PRELIMINARY INJUNCTION

that [] irreparable species-level harm will occur" from the continued operation of the Willamette Project, even after the court found the Corps had "fail[ed] to implement [certain] RPA measures," including some of the very flow-related RPA measures Plaintiffs now argue are precluded by the Reallocation. *Id.* at *9, 11. That reasoning further supports that Plaintiffs cannot show that irreparable harm follows in this action, which involves a much narrower challenge under Section 7(d) involving some of the same flow-related RPA measures.

Finally, Plaintiffs also fail to meet their burden of demonstrating irreparable harm because they do not establish that the plaintiff organizations or their members will suffer irreparable harm in the absence of an injunction. *See Winter*, 555 U.S. at 20. (explaining that a party seeking injunctive relief must show that "*he* is likely to suffer irreparable harm" as a result of the alleged injury to the environment (emphasis added)); *see also Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004) (animals "do not have statutory standing to sue" under the Administrative Procedures Act or ESA). Plaintiffs' vague implication that the Reallocation Plan will "caus[e] harm to many generations of UWR Chinook and steelhead and the people—such as Plaintiffs—who derive pleasure from their existence," is wholly inadequate. PI Mot. at 33. *See Gallatin Wildlife Ass'n v. United States Forest Serv.*, No. CV-15-27-BU-BMM, 2018 WL 1796216, at *5 (D. Mont. Apr. 16, 2018) (rejecting irreparable harm to members based on their "conservation and recreation interests").

### D. Neither the Balance of Equities nor the Public Interest Would Be Served by the Requested Injunction.

Plaintiffs cite *Babbitt* to summarily conclude that "in an ESA case, the 'balance of [equities] always tips sharply in favor of endangered or threatened species.'" PI Mot. at 17.

Merely because a court may "presume" that the balance of interests weighs in favor of endangered and threatened species in ESA cases does not excuse it from considering the factor

entirely. *Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d at 817 (citation omitted); *All. for Wild Rockies v. Cottrell,* 632 F.3d at 1135; *see also Winter*, 555 U.S. at 26 (criticizing the district court for only considering the equities in a "cursory fashion"). Plaintiffs still must demonstrate—with facts and law clearly in their favor—that equitable considerations and public interest are best served by granting the injunction. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015); *Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, No. 6:15-CV-02358-JR, No. 6:16-cv-00035-JR, 2016 WL 9226390, at *4 (D. Or. Apr. 6, 2016) (preliminary injunction plaintiff must present "some basis" from which court can conclude that injunction would benefit protected species).

Species concerns are least likely to tip the scales where, like here, challenged projects involve multiple, conflicting purposes. *See Conservation Cong. v. United States Forest Serv*., No. 2:13-cv-01922-TLN-CMK, 2016 WL 6524860, at *6-7 (E.D. Cal. Nov. 3, 2016) (holding public interest factor weighed against preliminary injunction seeking to enjoin certain timber operations under the ESA based on need to manage forest in a "safe" and "access[ible]" way); *see also Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1351 (D. Mont. 2014) ("speculative harms to such species" outweighed by "strong public interest in protecting municipal water supplies from catastrophic wildfire").

As discussed *supra* Sections II.C and II.E, the Corps' goal in completing the Feasibility Study was to develop "a combined conservation reallocation and water management plan that would provide the most public benefit within the policies and regulations of the Corps and the state of Oregon." Ex. 4 at i. And as the Chief's Report acknowledges, the Reallocation Plan reflected in the Feasibility Study reflects a "compromise amongst various interests and sectors

throughout the basin" developed after two decades of analysis and consultation.[14]  Ex. 16 at 1.

It is now up to Congress to determine whether to adopt or modify the Reallocation Plan.

Because the injunction that Plaintiffs request would "disrupt [] ongoing, collaborative efforts . . .

to address long-term changes," it is unlikely to "assist [the ESA-listed species] in the long term

or benefit the public interest."  *Ctr. for Biological Diversity*, 2016 WL 9226390, at *10.

 Here, Plaintiffs simply assume that the balance of harms and public interest weigh in

their favor, making the common mistake of "conflat[ing] the interests of the plaintiff and the

interests of the endangered or threatened species."  *All. for Wild Rockies v. Kruger*, 35 F. Supp.

3d 1259, 1266 (D. Mont. 2014).  And Plaintiffs have not articulated *how* the specific injunction

requested—rescission or withdrawal of the Chief's Report—would in any way benefit the

protected species while this case is pending.  As discussed *supra*, the Chief's Report does not

authorize or effectuate any changes to the operations of the Willamette Project.

 If anything, rescission or withdrawal of the Chief's Report poses more long-term harm

than good to the public interest because it would derail years of work toward reallocation.  Ex. 4

at i (detailing the study's decades-long history and concurrent goals); *see Ctr. for Biological

Diversity*, 2016 WL 9226390, at *5 (denying preliminary injunction motion where the plaintiffs'

proposed injunction would have disrupted an ongoing effort by stakeholders to address long-term

changes in reservoir operations, created hardship for farmers and ranchers, increased flood risks,

and potentially affected other listed species).  The Chief's Report recommends Congress

allocating stored water to municipal and industrial uses, agricultural irrigation, and fish and

---

[14] Despite the Corps' description of the Reallocation Plan as a "compromise," OFBF has not walked back from its position that the amount of water allocation to agricultural irrigation is insufficient to meet future agricultural needs and that the Chief's Report fails to provide necessary certainty to existing users of stored water from the Project.  Dillon Decl. ¶¶ 9, 12.

Page 24  -  OREGON FARM BUREAU FEDERATION'S RESPONSE TO PLAINTIFFS'
   MOTION FOR PRELIMINARY INJUNCTION

wildlife protection.  Ex. 4 at xi; 94-96; Ex. 16 at 1.  It is now up to Congress to consider whether

the Chief's Report properly allocates the stored water among those uses to benefit the public.  As

explained in Section III.C *supra*, Congress could enact legislation to implement the reallocation

recommendations in the Chief's Report, authorize reallocation in myriad ways that differ from or

further refine the recommendations in the Chief's Report, or decline to authorize reallocation.

As a result, the balance of hardships does not "tip[ ]*sharply*" in Plaintiffs favor, as would be

required under the alternative "sliding scale" standard for a preliminary injunction.  *All. for Wild

Rockies v. Cottrell*, 632 F.3d at 1134-35 (emphasis added).

Moreover, there are many other important public interest factors in play here—most

notably, the public's "strong interest in protecting its []water supply."  *Native Ecosystems

Council*, 40 F. Supp. 3d at 1351.  The Feasibility Study details the "multiple, often conflicting,

uses," of the Willamette River and its tributaries—a "problem" the Reallocation project was

meant to solve.  Ex. 4. at 7.  Plaintiffs seek to use this litigation to derail that collaborative

process and to force the inclusion of RPA 1, which would have provided for delegation of broad

discretion to the Corps to manage water storage and allocation decisions, without regard to the

Congressionally authorized purposes of the Willamette Project.  *See* Dillon Decl. ¶ 11.  RPA 1, if

injected into the Chief's Report and adopted by Congress, would further jeopardize the stability

of irrigation water supplies for Willamette Valley farmers, including OFBF's members.  *See*

Dillon Decl. ¶ 11; *see also* Dkt #20 (Glick Decl. ¶ 11 (emphasizing reliability of reallocated

storage to Oregon Water Utility Council and its member water providers)).  As the Chief's

Report recognizes, "Congress, not the Army nor NMFS, should continue to determine how best

the public good is served by this project."  Ex. 16 at 2.  And even if RPA 1 had been

recommended in the Chief's Report, Congress would have no obligation to implement RPA 1 in any legislation it enacts related to the Chief's Report.

## IV.    CONCLUSION

Plaintiffs lack Article III standing and have not demonstrated that they satisfy any of the four criteria required for issuance of a preliminary injunction.  OFBF respectfully requests that the Court deny Plaintiffs' motion.

DATED:  April 14, 2020.

STOEL RIVES LLP


/s/ *Crystal S. Chase*
KIRK B. MAAG, OSB No. 105507
kirk.maag@stoel.com
CRYSTAL S. CHASE, OSB No. 093104
crystal.chase@stoel.com
Telephone:  503.224.3380

Attorneys for Oregon Farm Bureau
  Federation