Lauren M. Rule (OSB # 015174)
Elizabeth H. Potter (OSB # 105482)
Andrew R. Missel (OSB # 181793)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org
amissel@advocateswest.org

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **WATERWATCH OF OREGON, NORTHWEST ENVIRONMENTAL DEFENSE CENTER**, and **WILDEARTH GUARDIANS**, | Case No. 3:20-cv-00413-HZ |
| Plaintiffs, | |
| v. | **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| **U.S. ARMY CORPS OF ENGINEERS** and **R.D. JAMES, in his official capacity as Assistant Secretary of the Army (Civil Works)**, | |
| Defendants, | |
| and | |
| **OREGON WATER UTILITY COUNCIL**, | |
| Intervenor-Defendant. | |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

I.      DEFENDANTS HAVE MISCONSTRUED PLAINTIFFS' CLAIM ......................2

II.     PLAINTIFFS HAVE ARTICLE III STANDING ......................................5

        A.      Congress's Involvement Does Not Defeat Standing ...................................6

                1.      *There Is No Bright-Line Rule That a Future Injury Dependent On Congressional Action Cannot Support Standing* ...................................6

                2.      *It Is Not "Speculative" That Congress Will Authorize the Plan* ...........7

        B.      Plaintiffs Have Alleged a Procedural Violation and Satisfied the Relaxed Standards for Traceability and Redressability ..........................10

        C.      Even If an ESA Section 7(d) Violation Is Considered "Substantive," Plaintiffs Have Established Article III Standing ......................................13

III.    THERE IS NO OTHER JUSTICIABILITY BAR THAT PRECLUDES RELIEF ...............................................................15

        A.      The Requested Relief Will Not Interfere Unduly With Interbranch Communications or the Legislative Process .......................16

        B.      The ESA Provides a Judicially Manageable Standard for Reviewing Plaintiffs' Claim ...........................................................20

IV.     PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION ............23

        A.      The Balance of Equities and Public Interest "Tip Sharply" In Favor of Plaintiffs ...............................................................23

        B.      Plaintiffs Have Shown "Serious Questions" Going to the Merits ...........26

                1.      *The ESA Applies to the Corps' Actions* ................................27

                2.      *The Corps Is Violating Section 7(d)* ....................................29

        C.      Plaintiffs Have Shown a Likelihood of Irreparable Harm ......................33

CONCLUSION ....................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ........................................26

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
997 F.2d 898 (D.C. Cir. 1993) ...............................................................................................18

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
515 U.S. 687 (1995)...........................................................................................................29, 30

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................................13

*Cassady v. Owens*, Case No. CV408- 250, 2009 WL 2997909 (S.D. Ga. July 2, 2009),
*report and recommendation adopted as modified*, 2009 WL 2920879 (Sept. 11, 2009) .........34

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019)...................................................7, 10,

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)...............................................................12, 15

*Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*,
512 F.3d 1112 (9th Cir. 2008) ..........................................................................................33, 34

*Guerrero v. Clinton*, 157 F.3d 1190 (9th Cir. 1998)..........................................................20, 21

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) .............................................................................17

*Idaho Conservation League v. Mumma*,
956 F.2d 1508 (9th Cir. 1992) ........................................................................................*passim*

*In re U.S. Office of Personnel Mgmt. Data Sec. Breach Litig.*,
928 F.3d 42, 54 (D.C. Cir. 2019)............................................................................................14

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
681 F.3d 1006 (9th Cir. 2012) (en banc) ..........................................................................27, 28

*Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290 (9th Cir. 1992) ......................................29

*League of Wilderness Defs./Blue Mtns. Biodiversity Proj. v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ..................................................................................................25

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).......................................................................7

*Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996)..........................................24

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Doe*,
868 F. Supp. 532 (S.D.N.Y. 1994) ...................................................................17

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) ...................................................31

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
422 F.3d 782 (9th Cir. 2005) ..........................................................................24

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018) ..........................................................................24

*Navajo Nation v. Dep't of the Interior*
876 F.3d 1144 (9th Cir. 2017) .........................................................7, 8, 15, 17

*NRDC v. Houston*, 146 F.3d 1118 (9th Cir. 1998) ......................................12, 13, 29

*NEDC v. U.S. Army Corp of Eng'rs*,
Case No. 3:18-cv-00437-HZ, 2019 WL 2372591 (D. Or. June 5, 2019) ...........22, 26

*Novak v. United States*, 795 F.3d 1012, (9th Cir. 2015) ...........................................14

*Otay Mesa Property, L.P. v. U.S. Dep't of the Interior*,
646 F.3d 914 (D.C. Cir. 2011) ........................................................................15

*Pac. Rivers Council v. Shepard*,
Case No. 3:11-CV-442-HU, 2012 WL 950032 (D. Or. Mar. 20, 2012).............16, 17

*Republic of the Philippines v. Marcos*,
862 F.2d 1355 (9th Cir. 1988) (en banc) ..........................................................26

*Resources Ltd., Inc. v. Robertson*, 35 F.3d 1300 (9th Cir. 1993) ...............................7

*Ruiz v. City of Santa Maria*,
160 F.3d 543 (9th Cir. 1998) (per curiam).........................................................8

*Salmon Spawning & Recovery All. v. Gutierrez*,
545 F.3d 1220 (9th Cir. 2008) ..............................................................10, 11, 14,

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)......................................................22

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011) .......................................................31

*Strickler v. Greene*, 527 U.S. 263 (1999) .............................................................13

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978).....................................................20

*Trustees for Alaska v. Hodel*, 806 F.2d 1378 (9th Cir. 1986)..................................................19

*United States v. Jones*, 336 U.S. 641 (1949) ........................................................................17

*United States v. Martinez-Cortez*,
924 F.2d 921 (9th Cir. 1991) (per curiam)............................................................................21

*Utah v. Evans*, 536 U.S. 452 (2002) ..............................................................................12, 14

*W. Watersheds Project v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2011) .......................................................................................11, 32

*Weinberger v. Romero–Barcelo*, 456 U.S. 305 (1982)............................................................17

*Winter v. NRDC*, 555 U.S. 7 (2008) ...............................................................................24, 33

*Young v. Heckler*, 803 F.2d 963 (9th Cir. 1986) (per curiam)...............................................8, 9

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012) .................................................16

## Constitutional Provisions

U.S. Const. art. II, § 3 (Recommendations Clause) ............................................ 1, 15, 16, 17, 18

## Statutes

5 U.S.C. § 702 ......................................................................................................... 17

16 U.S.C. § 1536 ................................................................................................ *passim*

16 U.S.C. § 1540 ........................................................................................ 16, 17, 19

33 U.S.C. 701b-8 ................................................................................................ 7, 14

33 U.S.C. § 2215 ....................................................................................................... 18

33 U.S.C. § 2282 ....................................................................................................... 18

33 U.S.C. § 2282a ..................................................................................................... 18

Pub. L. No. 114-322, 130 Stat. 1628 ....................................................................... 9

Pub. L. No. 115-270, 132 Stat. 3765 ....................................................................... 9

## Regulations

50 C.F.R. § 402.02 ...................................................................................... 5, 27, 31

50 C.F.R. § 402.03 .................................................................................................... 27

## Other Authorities

Harold J. Krent, *From a Unitary to a Unilateral Presidency*,
88 B.U.L. Rev. 523 (Apr. 2008) ............................................................................. 18

## INTRODUCTION

Despite the many complicated and sometimes arcane legal issues that Defendants[1] have attempted to inject into the litigation—the long-neglected Recommendations Clause, for instance—this remains, at heart, a straightforward case: the U.S. Army Corps of Engineers ("Corps") has decided to move forward with its plan to divvy up the water stored in the Willamette Basin Flood Control Project despite being in the middle of a process to determine how much of that water is needed to protect fish listed under the Endangered Species Act ("ESA"), and that decision will predetermine and prejudice the outcome of that ongoing process. The ESA includes section 7(d), 16 U.S.C. § 1536(d), a provision intended to guard against precisely this type of short-circuiting of the statute's consultation process. Plaintiffs are asking this Court to award preliminary relief before it is too late—before the Corps succeeds in prejudicing the consultation process.

Unfortunately, Defendants appear to have misconstrued the nature of Plaintiffs' claim: they characterize it as an attack on the *merits* of the reallocation plan rather than an attack on its *timing* and its effects on the ongoing ESA consultation process over the Willamette Basin Flood Control Project ("Willamette Project") as a whole. That misunderstanding has led Defendants to waste many pixels describing the *implementation* of the reallocation plan, most of the details of which are irrelevant to Plaintiffs' claim. What matters for Plaintiffs' claim is that the Corps' reallocation plan is being advanced *now* and will influence the 2023 Biological Opinion ("BiOp") for the entire Willamette Project. The on-the-ground effects that form the basis of Plaintiffs' standing are not the effects flowing from the reallocation decades from now, but the much more immediate effects flowing from a substandard 2023 BiOp developed under the

---

[1] The term "Defendants" includes the U.S. Army Corps of Engineers, the Assistant Secretary of the Army (Civil Works), and the Oregon Water Utility Council, which has intervened.

prejudicial shadow of the reallocation plan. As this Court knows, a new biological opinion is necessary to halt the continued decline of Upper Willamette River Chinook salmon and steelhead and ensure the species' recovery, but the reallocation plan will prevent critical measures for protecting the species from being included in the 2023 BiOp.

Defendants do not dispute that the Corps' reallocation plan threatens to disrupt the ongoing consultation over the Willamette Project as a whole. Instead, they make a host of arguments to the effect that this Court does not have jurisdiction over this case due to Congress's role in the reallocation process. As explained below, all of their arguments are wrong, beside the point, or both. Under binding Ninth Circuit precedent, Plaintiffs have standing to bring this case, and Congress's role in rubber-stamping the Corps' plan does not divest this Court of jurisdiction or absolve the Corps of its duty under the ESA to avoid prejudicing the upcoming 2023 BiOp. Plaintiffs have demonstrated a likelihood of success on their ESA section 7(d) claim, a likelihood of irreparable harm due to a less protective 2023 BiOp caused by the reallocation plan, and that the balance of hardships and public interest tip sharply in their favor.

## ARGUMENT

## I.    DEFENDANTS HAVE MISCONSTRUED PLAINTIFFS' CLAIM

Defendants' responses evince a fundamental misunderstanding of the nature of Plaintiffs' claim. Plaintiffs are not challenging the substance of the Corps' reallocation plan, but are instead concerned about how that plan will prejudice the ongoing ESA consultation process that is occurring between the Corps and NMFS over the operation of the entire Willamette Project. Indeed, that is why Plaintiffs brought an ESA section 7(d) claim and not a substantive jeopardy claim. Defendants' briefs barely mention the ongoing consultation for the Project, but that consultation process is at the very heart of this case, because that process will determine the fate

of highly imperiled Upper Willamette River ("UWR") Chinook salmon and steelhead.

As this Court is well aware, these two species are listed as threatened under the ESA, and have continued to decline over the last decade, due in large part to the Willamette Project. Pls.' PI Memo. (ECF No. 7) at 2–5.[2] Because of the Corps' unwillingness to make significant changes to the operation of the Willamette Project that the National Marine Fisheries Service ("NMFS") determined in 2008 were necessary for the survival and recovery of these threatened fish, the two agencies have reinitiated ESA consultation over the operation of the Project. *Id.* at 11. This consultation will result in a new biological opinion from NMFS, expected in 2023, setting forth the actions that are needed to ensure the survival and recovery of UWR Chinook salmon and steelhead. *Id.* Given that the status of these fish is even worse than in 2008, ensuring their survival and recovery may require more aggressive measures and serious changes to the operation of the Willamette Project. But the Corps' plan to reallocate all of the storage water in the Willamette Project to various uses would constrain the ongoing consultation process by precluding NMFS from developing and including certain measures in its biological opinion. For instance, the new biological opinion would not be able to impose certain flow measures or objectives or require deep reservoir drawdowns to improve fish passage. Domingue Decl. (ECF No. 8) ¶¶ 24–35. Thus, the reallocation plan will lead to a new Willamette Project BiOp in 2023 that is worse for fish. That is the harm, and legal violation, at issue here.

Defendants' misunderstanding of Plaintiffs' claim has led them to make arguments that confuse the issues in this case and are simply irrelevant. For instance, Federal Defendants, in attacking Plaintiffs' Article III standing, lay out a long chain of "contingent and uncertain" events that they suppose stand between the Corps' actions and on-the-ground-harm to Plaintiffs.

---

[2] All references are to page numbers in the original document, *not* ECF-generated page numbers.

Fed. Defs.' Oppo. (ECF No. 23) at 21–23. But, as explained in Plaintiffs' initial memorandum, the effects that matter for purposes of this case are not those far-in-the-future effects, but the much more immediate effects flowing from the reallocation plan's influence on the ongoing ESA consultation over the entire Willamette Project. *See* Pls.' PI Memo at 33 ("[T]he reallocation plan will gravely prejudice the ongoing ESA consultation process and influence water management at Willamette Project dams for decades, causing harm to" fish.), 34–35 (discussing how relief could lead to a better future BiOp for the Project). This has been Plaintiffs' theory of harm from the very beginning of this case. *See* Complaint (ECF No. 1) ¶ 67 ("The agencies' inability to develop reasonable and prudent alternative measures to protect UWR Chinook and steelhead during the current consultation process for the Project will further jeopardize those species' survival, leading to lower numbers of fish and impaired critical habitat.").

Defendants' misapprehension of the nature of Plaintiffs' claim has also led Defendants to focus on the Chief's Report in a vacuum rather than as the culmination of the Corps' course of conduct with respect to Willamette reallocation. The Chief's Report is simply the endpoint of a long line of discretionary decisions made by the Corps with respect to Willamette reallocation. Those decisions include electing to push forward with reallocation following the reinitiation of consultation over the entire Willamette Project, Pls.' PI Memo at 11–12; deciding not to combine the reallocation consultation with the broader consultation over the entire Willamette Project, despite NMFS's desire to do so, Pls.' Ex. 10 at 5; Pls.' Ex. 24 at 3[3]; and rejecting RPA Measure 4 in the final feasibility report/environmental assessment, Pls.' PI Memo. at 14–16. The Chief's Report cements those decisions and makes the Corps liable for violating section 7(d).

Finally, Defendants' mistaken idea of what this case is about has led them to wrongly

---

[3] Exhibits 1 through 23 were included as exhibits to Plaintiffs' Motion for Preliminary Injunction and Memorandum in Support. Exhibit 24 is included as an exhibit to this Reply.

suggest that Plaintiffs' claim rests on the idea that the Corps has "violated" the 2019

Reallocation BiOp. Fed. Defs.' Oppo. 28–29; Oregon Water Utility Council ("OWUC") Oppo.

(ECF No. 31) at 10–14. The 2019 Reallocation BiOp is an important part of this case, but

Plaintiffs' claim does not rise and fall with the question of whether the Corps is "violating" that

BiOp.[4] The important point is that NMFS concluded in the 2019 Reallocation BiOp that the

reallocation plan "would limit the Corps' flexibility to comply with . . . ESA Section 7(d)

requirements in relation to the separate reinitiation of the 2008 BiOp now underway," Pls.' Ex. 2

at 95, and the Corps has nonetheless charged forward with that plan. That alone is sufficient to

show that the reallocation plan will prejudice the ongoing consultation process, but it is not the

only evidence Plaintiffs have introduced: Plaintiffs' expert, as well as the Corps' own past

statements concerning the interplay of reallocation and the overall operation of the Willamette

Project, confirm that the Corps is prejudicing the ongoing consultation. Pls.' PI Memo. at 22–25.

## II.    PLAINTIFFS HAVE ARTICLE III STANDING

Plaintiffs' opening memorandum set out a fairly straightforward case for Article III

standing: the Corps' actions will prejudice the ongoing consultation over the Willamette Project

as a whole; that will, in turn, lead to a BiOp in 2023 that is worse for fish than it would be

without reallocation; and a worse BiOp will lead to more on-the-ground harm to fish, which will

---

[4] OWUC claims that the Corps has not rejected RPA Measure 4. OWUC Oppo, at 11. That is incorrect, for the reasons explained in Plaintiffs' opening memorandum. Pls.' PI Memo. at 14–16. As for RPA Measure 1, Defendants can't agree on whether the Corps has complied with the measure. OWUC has correctly concluded that the Corps "rejected" RPA Measure 1. OWUC Oppo. at 10. But Federal Defendants insist that the Corps complied with Measure 1 because, even though it was rejected in the Chief's Report, the Corps' Portland Division *recommended* to the Chief that the measure be adopted. Fed. Defs.' Oppo. at 28 n.19. That is a specious argument. RPAs are alternative actions that an expert agency (such as NMFS) believes will cause less harm to endangered species than a proposed action. 50 C.F.R. § 402.02. Given that, it is absurd that a RPA would be nothing more than a suggestion for a lower-level agency official to make a recommendation that a superior could simply reject.

harm Plaintiffs. Pls.' PI Memo. at 33–35. Defendants' attacks on that straightforward showing rest on a misunderstanding of Plaintiffs' claim, the law, or both.

### A.    Congress's Involvement Does Not Defeat Standing

Defendants contend that Congress's involvement in the reallocation process defeats Article III standing. Fed. Defs.' Oppo. at 21–26. At times, Defendants argue that there is a bright-line rule that a future injury dependent on Congressional action cannot support standing. *Id.* at 24. At other times, the argument is that it is too speculative *in this case* that Congress will approve the reallocation plan to conclude that Plaintiffs' future injuries will likely happen. *Id.* at 21–23. Finally, Defendants argue that Plaintiffs' injuries cannot be prevented by this Court, again because of the involvement of Congress. *Id.* at 24–26. All of these arguments are wrong.

#### 1.    There Is No Bright-Line Rule That a Future Injury Dependent On Congressional Action Cannot Support Standing

In *Idaho Conservation League v. Mumma*, 956 F.2d 1508 (9th Cir. 1992), the Ninth Circuit explicitly rejected the argument that standing cannot rest on a future on-the-ground injury dependent on Congressional action. In *Mumma*, the plaintiffs challenged the U.S. Forest Service's decision to recommend to Congress that certain areas in the Idaho Panhandle Forest not be designated as wilderness areas. *Id.* at 1510. Much like Defendants in this case, the defendants argued that the plaintiffs lacked standing because (among other reasons) "the ultimate decision regarding wilderness designation lies in Congress', not the agency's, hands." *Id.* at 1515. The Ninth Circuit disagreed in no uncertain terms: "that Congress and other third parties would have to act before actual development could take place is not dispositive of [the plaintiffs'] claim." *Id.* The key for the court was that the agency's decision to *recommend* against wilderness designation was "the primary factor making possible subsequent development," making any future on-the-ground injury traceable to the agency's action. *Id.* at 1518. The court

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION    6

concluded that the plaintiffs had standing, notwithstanding Congress's role in the wilderness designation process.[5] *Id.*

In addition to being foreclosed by *Mumma*, Defendants' "bright-line" argument is inconsistent with the nature of Article III standing. The probabilities that enter into the standing analysis—the likelihood of future harm, the likelihood that that harm will be caused by the challenged action, etc.—are assessed as a real-world factual matter, making bright-line legal rules such as the one advanced by Defendants inappropriate. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (noting that "Article III requires no more than *de facto* causality" (internal quotation and citation omitted)); *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1161 (9th Cir. 2017) (noting that "standing inquiries are inherently fact-specific").

### 2.    It Is Not "Speculative" That Congress Will Authorize the Plan

As to their second argument, Defendants cite a few cases in which courts found a lack of standing due to the "speculative" nature of Congress's future actions. Fed. Defs.' Oppo. at 22. None of those cases is persuasive (let alone controlling), however, because none is anything like this case. First, none involved an agency recommendation for legislation made pursuant to a detailed statutory scheme that contemplates that no legislation can be passed without the recommendation. *See* 33 U.S.C. § 701b-8 ("It is declared to be the policy of the Congress that . . . [n]o project or any modification not authorized, of a project for flood control or rivers and harbors, shall be authorized by the Congress unless a report for such project or modification has been previously submitted by the Chief of Engineers . . . ."). Second, none involved a recent history in which every single agency proposal of the same type had been approved by Congress,

---

[5] *Mumma* remains good law on the subject of standing following the Supreme Court's subsequent decision in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). *Resources Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1303 (9th Cir. 1993).

almost all of them without any deviation from the agency recommendation. Pls.' PI Memo. at 18–20; *infra* pp. 9–10. Finally, in none of those cases did multiple federal agencies consider the passage of legislation approving the recommendation a "done deal." Pls.' Ex. 2 at 13–14; Pls.' Ex. 24 at 1. "[S]tanding inquiries are inherently fact-specific," *Navajo Nation*, 876 F.3d at 1161, and the facts here show that there is a high likelihood that Congress will approve the reallocation plan as is. Indeed, given the recent history of WRDAs, it is pure speculation to think that Congress will *not* approve the Corps' plan absent relief from this Court.

Defendants attempt to inject uncertainty into Congress's likely approval of the Corps' reallocation plan by citing instances in which Congress has "modif[ied] the recommendations made in a Chief's Report" or otherwise not approved the Corps' plans "as is."[6] Coleman Decl. (ECF No. 24) ¶¶ 22–23. But Defendants' attempt is deeply unconvincing. For one thing, most of the instances cited by Defendants are from before 2014, which is not surprising: in 2014, Congress amended the statutory scheme governing water resources development projects and reinitiated the practice of passing a new WRDA every two years. *See* Pls.' Ex. 7 at 4–5 (discussing some of the changes made in 2014). Given that change, it is the more recent practice of Congress that is most relevant to determining the likelihood of the Corps' plan being authorized. *Cf. Ruiz v. City of Santa Maria*, 160 F.3d 543, 555 (9th Cir. 1998) (per curiam) (noting that "[p]ast elections may be less probative of vote dilution than more recent elections"); *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (per curiam) (noting that "the most recent medical report is the most probative" of a Social Security claimant's condition when that

---

[6] Federal Defendants' litigation position that authorization of the Corps' plan as proposed is "speculative and uncertain," Fed. Defs.' Oppo. at 22, is quite striking given some of the Corps' past statements regarding Congressional authorization. For instance, the Chief of the Planning and Economics Section of the Corps' Portland District characterized authorization of the plan as proposed by the Chief as being "fairly automatic." Pls.' Ex. 24 at 1.

condition is changing). And the recent practice is that Congress always (or *almost* always, *see infra*) approves the Corps' recommendations for water resources development projects exactly as they are proposed in Chief's Reports. Pls.' PI Memo. at 18–20.

More importantly, Defendants do not say how many times Congress *has* authorized projects exactly as the Corps has proposed them. Without that information, the list of examples given by Defendants is meaningless, because it sheds no light on the percentage of the time that Congress has modified or not approved the Corps' plans. Rather than provide such information, Federal Defendants rely on a Corps official's averment that it is "not uncommon for Congress to modify the recommendations made in a Chief's Report," supported by a few supposed examples of modifications from the last two WRDAs. Coleman Decl. ¶¶ 22–23. Federal Defendants are being disingenuous. In WRDA 2018, Congress authorized, without modification, *twelve* Chief's Reports on water resources development projects and authorized, with modification, *one* Chief's Report.[7] (The other example given by Federal Defendants did not involve the authorization of a Chief's Report,[8] and so has no relevance to the question of whether Congress is likely to approve a Chief's Report as is.) Federal Defendants' citations to the WRDA passed in 2016 are even more misleading. In that piece of legislation, Congress authorized, without modification, *twenty-eight* Chief's Reports on water resources development projects and authorized, with modification, *two* Chief's Reports.[9] (The remaining two examples cited by Federal Defendants concerned project *deauthorizations*, not project *authorizations*.[10]) Federal Defendants apparently think that it is "not uncommon" for Congress to do something 7% of the time, and that it is

---

[7] America's Water Infrastructure Act of 2018, Pub. L. No. 115-270, §§ 1401–03, 132 Stat. 3765, 3835–40 (2018).
[8] 132 Stat. at 3839.
[9] Water Infrastructure Improvements for the Nation Act, Pub. L. No. 114-322, §§ 1401–02, 130 Stat. 1628, 1708–15 (2016).
[10] 130 Stat. at 1691, 1698–1700.

"speculative" to predict that Congress will do something that it does 93% of the time. The Court should not adopt their idiosyncratic view of the term "speculative."

Given the nature of the WRDA process and Congress's recent history of approving the Corps' plans exactly as proposed 93% of the time, it is not "speculative" to think that Congress will authorize the Willamette reallocation plan.[11] And the reallocation plan will gravely prejudice the ongoing consultation process over the entire Willamette Project, leading to on-the-ground harm to fish and Plaintiffs. *See* Pls.' PI Memo. at 22–35 (discussing harm from reallocation). Moreover, the Corps' and NMFS's own certainty that Congress will approve the reallocation plan—an assumption on which the new consultation will surely be based—demonstrates that such prejudice has already begun or is likely to occur before Congress ever acts. *See* Pls.' Ex. 2 at 14 (NMFS's characterization of Congressional approval as "sufficiently certain to occur . . . to include this assumption in [its] analysis"); Pls.' Ex. 24 at 1 (treating Congressional approval as a sure thing). Therefore, Plaintiffs have shown that "there is a substantial risk that the [threatened harm] will occur." *Dep't of Commerce*, 139 S. Ct. at 2565 (citation omitted).

**B.      Plaintiffs Have Alleged a Procedural Violation and Satisfied the Relaxed Standards for Traceability and Redressability**

Because there is a "substantial risk" that Plaintiffs will suffer an injury in the future, the standing inquiry becomes whether (1) that injury will be "fairly traceable" to the Corps' actions and whether (2) the injury can be prevented by this Court. *Id.* As explained in Plaintiffs' opening memorandum, an ESA section 7(d) violation is a procedural violation. Pls.' PI Memo. at 34 n.12. For that reason, the traceability and redressability requirements are "relaxed." *Salmon Spawning*

---

[11] Notably, Federal Defendants did not include *any* examples of Congress *rejecting* a water resources development project proposal submitted by the Corps. And there is no guarantee that Congress would change the Corps' plan in this case *to benefit fish* on the off chance that it were to modify the plan. Thus, the real question for standing purposes is whether the plan will be authorized at all. On that question, past practice suggests that the answer is 100% "yes."

*& Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008). For traceability, a plaintiff

need only demonstrate that adherence to the proper procedures *could* protect their concrete

interests. *Id.* at 1226. Similarly, a plaintiff shows redressability by demonstrating that the relief

requested "*may* redress their alleged injuries." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d

472, 485 (9th Cir. 2011) (citation omitted and emphasis added). "This is not a high bar to meet."

*Salmon Spawning & Recovery All.*, 545 F.3d at 1227.

Here, Plaintiffs meet the low traceability/redressability bar applicable to allegations of

procedural violations. As to traceability, there is no serious dispute as to whether the Corps'

violation of section 7(d) will be a key "but-for" cause-in-fact of the reallocation plan prejudicing

the consultation process over the Willamette Project as a whole, and Plaintiffs have introduced

largely unrebutted evidence that that prejudice will lead to Plaintiffs' harm. Pls.' PI Memo. at

22–35. The only real argument that Defendants make is that Congress will be the sole *legal*

*cause* of any harm experienced by Plaintiffs. Fed. Defs.' Oppo. at 23–24. But, as discussed

above, that argument is foreclosed by *Mumma*. As the court held in that case, an agency

recommendation to Congress can be the legal cause of future injury for standing purposes. *See*

956 F.2d at 1517–18 (concluding that the agency's "nonwilderness recommendation" to

Congress was "the primary factor making possible subsequent development" and therefore

sufficient to support standing).

As for redressability, Plaintiffs need not show that it is *certain* or even *likely* that the

requested relief will prevent the threatened harm; rather, they need only show that the requested

relief *could* prevent the threatened harm. *Salmon Spawning & Recovery All.*, 545 F.3d at 1228.

For that reason, Defendants' arguments to the effect that Congress could, in theory, authorize the

Corps' reallocation plan even if this Court were to declare the Corps' actions unlawful are beside

the point. Fed. Defs.' Oppo. at 24–25. In fact, it is likely that Congress would *not* authorize the

Corps' plan after a court ruling that the Corps had violated the ESA. *See Utah v. Evans*, 536 U.S.

452, 463–64 (2002) (holding that an injury was redressable by a declaratory judgment because it

was "substantially likely that . . . executive and congressional officials would abide by an

authoritative [judicial] interpretation of the . . . statute" at issue (quoting *Franklin v.*

*Massachusetts*, 505 U.S. 788, 803 (1992) (plurality opinion))). And if reallocation is put off until

after the completion of consultation over the entire Willamette Project, it is almost certain that

the 2023 BiOp will be more protective of UWR Chinook salmon and steelhead. Pls.' PI Memo.

at 22–35; Domingue Decl. ¶¶ 29–35; *see also NRDC v. Houston*, 146 F.3d 1118, 1129 (9th Cir.

1998) (discussing how, if the agency had not violated section 7(d) by executing water contracts

in the middle of consultation, USFWS "would have had more flexibility to make, and the [action

agency] to implement, suggested modifications to the proposed contracts").

Federal Defendants suggest that an ESA section 7(d) violation is a substantive rather than

a procedural violation, insisting that "[s]ection 7(d) imposes a substantive prohibition, not a

procedure." Fed. Defs.' Oppo. at 25. This is incorrect. In *Houston*, the Ninth Circuit clearly

indicated that a section 7(d) violation is a procedural violation. The court first held that the

defendant agency had violated section 7(d) by executing certain water contracts before the

completion of consultation with the U.S. Fish and Wildlife Service ("USFWS"), 146 F.3d at

1128 n.5, and then went on to reject the argument that the agency's 7(d) violations were rendered

moot by the USFWS's issuance of a BiOp:

> *Procedural violations* of the ESA are not necessarily mooted by a finding by
> [USFWS] that a substantive violation of the ESA had not occurred. The process,
> which was not observed here, itself offers valuable protections against the *risk* of
> a substantive violation and ensures that environmental concerns will be properly
> factored into the decision-making process as intended by Congress. Also, due to
> the *procedural violations* here, the Plaintiffs' ability to enjoin the agency action

while they challenged the validity of the Biological Opinion was negated.

*Id.* at 1128–29 (footnote omitted and some emphasis added).

As the court understood, the fact that section 7(d) *prohibits* some conduct does not necessarily make it a substantive provision. The section 7(d) prohibition exists to protect the ESA section 7 consultation *process* and, as such, is part and parcel of that process.[12] When the government fails to comply with that prohibition, the resultant violation is procedural in nature, because any injury flows from the prejudicial effect that the violation has on the consultation process. That is why the ESA states that a 7(d) violation occurs only if the defendant agency is making a commitment of resources "which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measure"—that is, only if the agency's act has the effect of prejudicing the consultation process. 16 U.S.C. § 1536(d).

Plaintiffs have met the "relaxed" standards for traceability and redressability applicable to procedural violations. For traceability, the threatened injuries are, as a factual matter, clearly traceable to the Corps' violation, and Congress's involvement does not break the causal chain. For redressability, the requested relief *could* prevent Plaintiffs' injuries.

### C. Even If an ESA Section 7(d) Violation Is Considered "Substantive," Plaintiffs Have Established Article III Standing

Even under the less relaxed standards for traceability and redressability applicable to non-procedural injuries, Plaintiffs have established those two prongs of Article III standing. First, as

---

[12] The law is filled with examples of such prohibitions on government conduct (and even affirmative obligations) that serve as protective ancillaries to processes. *See, e.g.*, *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (recognizing a prohibition on "suppression by the prosecution of evidence favorable to an accused upon request" in order to "avoid[] . . . an unfair trial to the accused"). When the government fails to comply with such a prohibition, it is a *procedural* violation, which is why—as with 7(d) violations—prejudice to the process must be shown in order to make out a violation. *See Strickler v. Greene*, 527 U.S. 263, 282–82 (1999) (stating that "prejudice must have ensued" from suppression of evidence for there to be a *Brady* violation).

to traceability, there is no doubt that Plaintiffs' injuries will be "fairly traceable" to the Corps' actions, including the signing of the Chief's Report. *See In re U.S. Office of Personnel Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 54 (D.C. Cir. 2019) ("Article III standing does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be 'fairly traceable' to the defendant." (citation omitted)). Reallocation would not occur now but for the Corps' actions, 33 U.S.C. § 701b-8; reallocation will prejudice the ongoing ESA consultation over the Willamette Project as a whole, Pls.' PI Memo. at 22–35; this prejudice will lead to a 2023 BiOp for the Willamette Project that is worse for fish than it would have been without reallocation, *id.*; and the resultant harm to fish will, in turn, harm Plaintiffs, *id.* at 30–32. Thus, the Corps would be the key instigating factor leading to Plaintiffs' harm. *Mumma*, 956 F.2d at 1517–18. And, under *Mumma*, the involvement of Congress does not break the chain of causation. *Id.*

As for redressability, the key difference between a procedural violation and a substantive violation is that "a plaintiff alleging a substantive violation must demonstrate that its injury would *likely* be redressed by a favorable court decision." *Salmon Spawning & Recovery All.*, 545 F.3d at 1228 (emphasis added). But whether a favorable decision is "likely" to provide relief turns on the "practical consequences" of the decision, not necessarily its legally coercive effect. *See Novak v. United States*, 795 F.3d 1012, 1019–20 (9th Cir. 2015) (stating that plaintiffs must show that their injuries would be remedied as a "practical consequence" of a favorable decision (citation and internal quotation omitted)); *Utah v. Evans*, 536 U.S. at 463–64 (holding that the plaintiffs had standing despite the fact that judicial relief would not be coercive).

Here, vacatur of the Chief's Report, a declaratory judgment to the effect that the Corps' actions violate ESA section 7(d), and/or the requested injunctive relief would likely have the

"practical consequence" of causing Congress to stay its hand. *See Franklin*, 505 U.S. at 803

(plurality opinion) ("[W]e may assume it is substantially likely that the President and other

executive and congressional officials would abide by an authoritative interpretation of the . . .

statute . . . by the District Court, even though they would not be directly bound by such a

determination."). The ESA is a "landmark" piece of environmental legislation, *Otay Mesa*

*Property, L.P. v. U.S. Dep't of the Interior*, 646 F.3d 914, 915 (D.C. Cir. 2011), and Congress

would likely look askance at the Corps if an Article III court concluded that the agency had

violated the statute in the course of carrying out its duty to propose water resources development

legislation. And, unlike the cases relied on by Defendants, this case involves a detailed statutory

scheme in which (1) Congress regularly passes legislation that simply adopts the substance of

agency reports and (2) Congress does not, as a matter of policy, enact legislation without a valid

report. *Supra* pp. 7–10. Finally, given Plaintiffs' evidence concerning the prejudicial effects of

the reallocation plan on the ongoing ESA consultation over the entire Willamette Project, Pls.' PI

Memo. at 22–35, it is almost certain that delaying reallocation would prevent Plaintiffs' injuries.

"[S]tanding inquiries are inherently fact-specific," *Navajo Nation*, 876 F.3d at 1161, and the

facts of this case show that the requested relief would be "likely" to redress Plaintiffs' injuries.

### III.    THERE IS NO OTHER JUSTICIABILITY BAR THAT PRECLUDES RELIEF

Defendants contend that, separate and apart from a lack of Article III standing, this Court

is precluded from awarding relief to Plaintiffs due to a justiciability bar (or multiple related bars)

grounded in concepts of separation of powers. Fed. Defs.' Oppo. at 13–21; OWUC Oppo. at 7–9.

Defendants' arguments boil down to this: (1) the relief requested by Plaintiffs would interfere

with communications between the political branches and the legislative process, thus violating

the Recommendations Clause and/or general separation-of-powers principles; and (2) there are

no manageable standards against which this Court can judge the Corps' actions. Both of those arguments are wrong.

### A.   The Requested Relief Will Not Interfere Unduly With Interbranch Communications or the Legislative Process

Federal Defendants and OWUC both argue that the requested injunctive relief will unduly interfere with interbranch communications and the legislative process, and that such relief is therefore beyond the power of this Court to award. Fed. Defs.' Oppo. at 14–17; OWUC Oppo. at 8–9. Federal Defendants ground their justiciability argument in the Recommendations Clause's supposedly "exclusive" grant of authority to the President to recommend legislation, while OWUC grounds its justiciability argument in the political question doctrine.[13] And Federal Defendants argue that this case should be dismissed entirely, because the justiciability concerns it identifies rob this Court of jurisdiction. Fed. Defs.' Oppo. at 2, 21.

As an initial matter, these arguments ignore the fact that Plaintiffs have sought as final remedies (1) vacatur of the Chief's Report already submitted to Congress and (2) declaratory relief to the effect "that [Federal] Defendants are violating and will violate section 7(d) of the ESA by proposing . . . the reallocation plan." Complaint at pp. 24–25.[14] Even assuming that

---

[13] The political question doctrine overlaps substantially with the justiciability concerns raised by Federal Defendants, and so this Reply deals with Federal Defendants' and OWUC's arguments together. But there is one aspect of the political question doctrine mentioned by OWUC that is not raised by Federal Defendants and that deserves a response. OWUC claims that if this Court awards the requested relief, it would express a "lack of respect" for Congress. OWUC Oppo. at 7–8. It is the "rare case" when that particular concern "alone render[s] a case nonjusticiable." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 207 (2012) (Sotomayor, J., concurring in part and concurring in the judgment). Moreover, the "lack of respect" that counts is something much more serious than anything involved in this case—for instance, a judicial inquiry into "the good faith with which another branch attests to the authenticity of its internal acts." *Id.* at 205.
[14] Federal Defendants suggest that the ESA citizen-suit provision only allows for injunctive relief. Fed. Defs.' Oppo. at 13. Not so—vacatur of an agency action and declaratory relief are both available in cases brought under the ESA citizen-suit provision, even when the federal government is the defendant. *See Pac. Rivers Council v. Shepard*, No. 3:11-CV-442-HU, 2012

Defendants' justiciability bars apply to some or all of the injunctive relief sought by Plaintiffs, they would not preclude those two forms of final relief, which do not in any way interfere with communications between the political branches or the legislative process. Thus, dismissal of this case is unwarranted. Nor would Defendants' justiciability bars preclude *preliminary* versions of vacatur and declaratory relief—this Court could, without interfering with interbranch communications or the legislative process, preliminarily declare the Corps' actions unlawful and/or preliminarily vacate the Chief's Report.[15] *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Doe*, 868 F. Supp. 532, 535–36, 540 (S.D.N.Y. 1994) (awarding preliminary declaratory relief).

But the bigger problem with Defendants' arguments is that the justiciability doctrines they invoke do not preclude even the injunctive relief[16] sought by Plaintiffs, for two reasons. First, the Recommendations Clause[17] does not come into play in this case. Contrary to Defendants' argument, the Recommendations Clause is not an "exclusive" grant of authority to

---

WL 950032, at *4–*5 (D. Or. Mar. 20, 2012) (holding that the ESA citizen-suit provision "preserves the Court's equitable powers, including vacatur, to take those actions necessary to implement specific dictates of the ESA"); *see also United States v. Jones*, 336 U.S. 641, 671–73 (1949) (discussing the "equity or declaratory jurisdiction" of district courts); *Navajo Nation*, 876 F.3d at 1171 (holding that 5 U.S.C. § 702 "waives sovereign immunity for all non-monetary claims" against the federal government, not just APA claims).

[15] The fact that Plaintiffs did not ask for these specific forms of preliminary relief in their motion does not preclude the Court from awarding them. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982) ("The essence of equity jurisdiction has been the power of the [court] to do equity and to mould each decree to the necessities of the particular case." (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).

[16] In their Motion for Preliminary Injunction, Plaintiffs asked this Court to "enjoin the Corps from taking any other steps to implement . . . the reallocation plan pending final judgment." Pls.' PI Mot. at 2. Plaintiffs clarify here that they did not intend to ask this Court to enjoin the Corps from "implementing" any statute that Congress might pass concerning reallocation, only to prevent further action by the Corps prior to any Congressional action. Federal Defendants understandably misread this request. Fed. Defs.' Oppo. at 14, 16.

[17] The Recommendations Clause provides that the President "shall from time to time . . . recommend [for Congress's] Consideration such Measures as he shall judge necessary and expedient." U.S. Const., art. II, § 3.

the President to recommend legislation. As the D.C. Circuit put it when discussing the difference between the Take Care Clause and the Recommendations Clause, "[o]nly the President can ensure that the laws be faithfully executed, but anyone in the country can propose legislation." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 908 (D.C. Cir. 1993). Because the President's authority to recommend legislation is not exclusive, Congress may, consistent with the Constitution, place recommending duties on officers of the Executive Branch other than the President, so long as the President retains the authority to make recommendations on the same subject separate and apart from the Congressionally-requested recommendation. *See* Harold J. Krent, *From a Unitary to a Unilateral Presidency*, 88 B.U.L. Rev. 523, 541–46 (Apr. 2008) ("[A]lthough [the] argument that Congress cannot compel the President to recommend measures may rest on firm ground, congressional directives to agency heads stand on a different footing. There is nothing in the constitutional text to suggest that the Constitution vests in the President the exclusive power to make recommendations." (footnote omitted)). When Congress places such recommending duties on members of the Executive Branch, it does not implicate the Recommendations Clause; it follows that it does not implicate the Recommendations Clause for a court to enjoin a report or recommendation made pursuant to such statutory authority. Here, the authority or duty to prepare and submit a Chief's Report and feasibility report has been placed directly on the Corps *by Congress*. *See* 33 U.S.C. § 2215, 2282, 2282a; *see also* Pls.' Ex. 16 at 1. Because the Chief's Report is made pursuant to a Congressional directive, not the President's authority under the Recommendations Clause, judicial interference with the Chief's Report would not implicate the Recommendations Clause.

Second, the Ninth Circuit has already rejected the argument that separation-of-powers concerns prohibit a court from enjoining an agency from submitting a report to Congress. In

*Trustees for Alaska v. Hodel*, the plaintiffs sued the Secretary of the USFWS for refusing to

publicly circulate an environmental impact statement under NEPA in connection with a report to

Congress before submitting the report. 806 F.2d 1378, 1379–80 (9th Cir. 1986). The plaintiffs

obtained from the district court an order "enjoining [USFWS] from submitting the . . . report to

Congress until [it] compl[ied] with [NEPA] and its implementing regulations." *Id.* at 1379.

USFWS argued that the injunction violated the separation-of-powers doctrine, but the Ninth

Circuit disagreed:

> [USFWS] contends that by preconditioning the Secretary's report to Congress, the district court's injunction unconstitutionally hinders the legislative process. This argument assumes, however, that the district court's injunction requires a procedure not found in the . . . regulations. If the . . . regulations require public comment at the administrative level, then the district court's order simply enforces Congress's mandate under NEPA and does not violate the separation of powers doctrine.

*Id.* at 1383 n.8.[18] So too here: Plaintiffs' requested relief would enforce ESA section 7(d)'s

requirement that the Corps refrain from "mak[ing] an[] irreversible or irretrievable commitment

of resources" with respect to the operation of the Willamette Project while engaged in

consultation over the Project. 16 U.S.C. § 1536(d). Far from invading the province of the

political branches, this Court would be ensuring that members of the Executive Branch comply

with the commands of Congress, a remedy expressly authorized by the ESA and well within the

Court's power. *See* 16 U.S.C. § 1540(g)(1)(A) ("any person may commence a civil suit on his

own behalf to enjoin any person, including the United States and any other governmental

instrumentality or agency . . ., who is alleged to be in violation of any provision of this chapter or

---

[18] *Hodel* and *Mumma* make clear that there would be no justiciability bar to a NEPA challenge against the Corps for failing to do a proper environmental analysis in connection with its reallocation plan. Plaintiffs intend to bring such a challenge, but cannot yet do so, because Defendant James has not signed a "finding of no significant impact." Fed. Defs.' Oppo. at 29–30. Hopefully the delay is due to a genuine reassessment of the environmental impacts of the plan and is not the result of a stalling tactic intended to avoid judicial review.

regulation issued under the authority thereof"). Defendants' argument to the contrary is more or

less an argument that Congress gave the Corps a free pass from the ESA when it prepares and

submits to Congress recommendations for water resources development projects. But the ESA

"give[s] endangered species priority over the 'primary missions' of federal agencies," *Tenn.*

*Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978), so such an argument is implausible.

### B.    The ESA Provides a Judicially Manageable Standard for Reviewing Plaintiffs' Claim

Defendants point to another justiciability concern: that there are supposedly no standards

to guide the Court's review of the Corps' actions, because it is for Congress, not the courts, to

review the Chief's Report. Fed. Defs.' Oppo. at 17–22; OWUC Oppo. at 8–9. Anticipating that

there is an obvious rejoinder to this argument—the Corps' actions can, and should, be judged

against the ESA—Federal Defendants go on to make the startling assertion that "the ESA does

not apply to the Corps'" recommendation to Congress. *Id.* at 18–19. Defendants are wrong on

both counts.

The most significant error with Defendants' argument stems from their misinterpretation

of Plaintiffs' claim. Plaintiffs are *not* asking this Court to usurp the role of Congress and assess

whether the Chief's Report (or the feasibility report it incorporates) comply with the statutory

requirements that govern feasibility studies. Rather, Plaintiffs are claiming that the Corps, by

continuing to move forward with its reallocation plan during ESA consultation over the entire

Willamette Project, is violating the ESA, a statute that has nothing to do with the laws governing

the Corps' feasibility study process. The cases relied on by Federal Defendants all involved

situations where, unlike here, courts were being asked to judge the legality of an agency's report

or recommendation against the statute authorizing and setting out standards for the report or

recommendation—in other words, to stand in the shoes of Congress. In *Guerrero v. Clinton*, for

instance, the plaintiffs sought a judicial determination of the *adequacy* of a report sent to Congress. 157 F.3d 1190, 1191–92 (9th Cir. 1998). The Ninth Circuit concluded that the adequacy of the report was not subject to judicial review under the APA because Congress, "[h]aving requested the report, [wa]s in the best position to decide whether it[] had gotten what it want[ed]." *Id.* at 1195. *Guerrero* and the other cases cited by Federal Defendants do not control this case, because Plaintiffs are not asking this Court to decide "whether [Congress] ha[s] gotten what it want[ed]" with the Chief's Report; instead, they are claiming that the Corps is violating the ESA, a statute external to the feasibility study process.

Perhaps recognizing this, Federal Defendants pivot to a second argument: that "the ESA does not provide legal standards that could guide the Court's review of the timing or contents of the" Chief's Report. Fed. Defs.' Oppo. at 18–21. Federal Defendants offer two reasons for this conclusion. First, they assert that the Ninth Circuit cases holding that courts cannot review the adequacy of reports to Congress have involved many different statutes. *Id.* at 19–20. That is true, but irrelevant. What matters is that, in each of those cases, the plaintiffs were asking a court to stand in the shoes of Congress and assess a report against the standards set out in the statute(s) that authorized the reports. *See, e.g.*, *United States v. Martinez-Cortez*, 924 F.2d 921, 924–25 (9th Cir. 1991) (per curiam) (holding that no court could review the adequacy of a report to Congress because it was for Congress to assess the report's adequacy). That is not the case here.

Second, Federal Defendants argue that the ESA does not provide a standard against which to judge the Corps' actions because "the ESA does not apply to the Corps' report and recommendation." Fed. Defs.' Oppo. at 18–19. According to Federal Defendants, "nonbinding agency advice neither authorizes nor prohibits any action and therefore does not constitute 'agency action' under Section 7 of the ESA." *Id.* at 19. This argument rests on the false premise

that section 7(d) only prohibits agencies from taking "agency actions" that prejudice the

consultation process. In fact, section 7(d) is different in scope: it prohibits an agency engaged in

consultation *over* some "agency action" from "*mak[ing] any irreversible or irretrievable*

*commitment of resources* with respect to [that] agency action" that prejudices the consultation

process. 16 U.S.C. § 1536(d). The plain text of the statute does not require, or even suggest, that

the "irreversible or irretrievable commitment of resources" must *itself* constitute a separate

"agency action" as that term is used in ESA section 7(a)(2). Had Congress intended to limit the

scope of section 7(d) in that way, it would have said so. *See Sosa v. Alvarez-Machain*, 542 U.S.

692, 711 n.9 (2004) ("The Government's request that we read th[e] phrase ['act or omission']

into the foreign country exception, when it is clear that Congress knew how to specify 'act or

omission' when it wanted to, runs afoul of the usual rule that when the legislature uses certain

language in one part of the statute and different language in another, the court assumes different

meanings were intended." (citation and internal quotation omitted)). And, aside from being

atextual, it makes no sense to read section 7(d) to prohibit only "agency actions" that prejudice a

consultation, because section 7(d) applies to both federal agencies *and* private "permit or license

applicant[s]." 16 U.S.C. § 1536(d). Of course, such private entities cannot take "agency action."

So it must be true that an "agency action" and an "irreversible or irretrievable commitment of

resources" are entirely different things, and that an agency may do one without doing the other.

Here, the "agency action" at issue is "the ongoing operation of the Willamette Project."

*NEDC v. U.S. Army Corp of Eng'rs*, Case No. 3:18-cv-00437-HZ, 2019 WL 2372591, at *9 (D.

Or. June 5, 2019); *accord* Pls.' Ex. 5 at 1-3. As explained more fully below, *infra* pp. 26–32, the

Corps is "mak[ing] an[] irreversible or irretrievable commitment of resources" with respect to

that agency action through its activities related to reallocation. It is entirely irrelevant whether

the Corps' reallocation-related activities themselves separately constitute "agency actions."[19]

Defendants have dug deep to try to find a reason why this Court cannot award relief to Plaintiffs, but their attempts are in vain—there is no justiciability bar grounded in separation-of-powers principles that precludes the relief sought by Plaintiffs, and the ESA itself provides a standard against which to measure the Corps' actions.

## IV.    PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

Defendants also challenge Plaintiffs' entitlement to preliminary relief. Despite the existence of black-letter law to the contrary, Defendants claim that Plaintiffs have not shown that the balance of equities and public interest favor such relief. They also argue that Plaintiffs have not raised "serious questions" going to the merits of their section 7(d) claim or shown a likelihood of irreparable harm. Their arguments on those two prongs of the preliminary injunction test are once again based on a misapprehension of the nature of Plaintiffs' claim and/or a misunderstanding of the law, or they suffer from the same flaws as the justiciability arguments discussed above.

### A.    The Balance of Equities and Public Interest "Tip Sharply" In Favor of Plaintiffs

Defendants concede that there is a "presumption" in this case that the balance of equities and public interest favor preliminary injunctive relief, but they argue that the presumption has been rebutted. Fed. Defs.' Oppo. at 33; OWUC Oppo. at 16–17. Defendants' arguments ignore the standards articulated by the Ninth Circuit and certainly do not overcome the heavy weight given to protecting species when seeking an injunction under the ESA.

As the Ninth Circuit has repeatedly made clear, "[t]he traditional preliminary injunction analysis *does not apply* to injunctions issued pursuant to the ESA. In cases involving the ESA,

---

[19] At any rate, the Corps' activities *are* "agency actions." *See infra* pp. 27–28.

Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. ("NWF v. NMFS 2005")*, 422 F.3d 782, 793–94 (9th Cir. 2005) (internal quotations and citations omitted and emphasis added). In other words, in an ESA case, the "balance of [equities] *always tips sharply* in favor of endangered or threatened species." *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996) (emphasis added), *abrogated on other grounds by Winter v. NRDC*, 555 U.S. 7, 22 (2008). So too does the "public interest" factor. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. ("NWF v. NMFS 2018")*, 886 F.3d 803, 817–18 (9th Cir. 2018). This Court cannot deny injunctive relief to Plaintiffs based on an assessment that such relief would disserve the public interest or that the equities do not favor Plaintiffs, because Congress has foreclosed that option. *Id.*; *NWF v. NMFS 2005*, 422 F.3d at 794. For that reason, Defendants' arguments concerning the supposedly negative effects of preliminary injunctive relief on the public and them are irrelevant.

Defendants attempt to escape the consequences of this black-letter law by means of several creative, but ultimately unconvincing, arguments.[20] OWUC suggests that there is a "public safety" exception that allows courts to deny injunctive relief in ESA cases when such relief would threaten the public's well-being. OWUC Oppo. at 16–18. Even if such an exception exists, the preliminary relief requested by Plaintiffs in this case would in no way threaten public safety, for two related reasons. First, preliminary relief would simply *delay* reallocation, not

---

[20] In addition to the arguments addressed in this section, Federal Defendants argue that the preliminary relief sought by Plaintiffs disserves the public interest because it interferes with the separation of powers and the legislative process. Fed. Defs.' Oppo. at 33. As discussed *supra* pp. 15–23, the premise of this argument is incorrect.

forever foreclose it.[21] If the Court were to grant preliminary relief and Plaintiffs then lost on the merits, the Corps could simply re-submit the existing Chief's Report to Congress for inclusion in WRDA 2022, resulting in minimal (if any) harm to Defendants or the public. Thus, the "marginal harm" of preliminary relief to the public is miniscule, if it exists at all. *See League of Wilderness Defs./Blue Mtns. Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 765–66 (9th Cir. 2014) ("Because the jobs and revenue will be realized if the project is approved, the marginal harm to the intervenors of the preliminary injunction is the value of moving those jobs and tax dollars to a future year, rather than the present."). Second, as Defendants are eager to point out when it suits their purposes, the on-the-ground effects of reallocation itself (as opposed to the effects flowing from its prejudicing of the current consultation process) are many years off and dependent on the actions of many third parties. *See* Fed. Defs.' Oppo. at 22–23 (describing the supposedly "contingent and uncertain" chain of events that would have to occur for reallocation to be implemented). Given that fact, the idea that a short delay in the reallocation process would somehow threaten public safety is fanciful.

Federal Defendants argue that the requested preliminary relief may actually cause net *harm* to listed fish by interfering with "facilitating the protection of instream flows" for fish, which is contemplated by one of the RPAs in the 2008 BiOp for the Willamette Project. Fed. Defs.' Oppo. at 34–35. This argument ignores that *preliminary* relief would, at most, *delay* measures intended to secure instream flow rights for fish. It also ignores that, as Plaintiffs' expert explained, it is highly uncertain whether reallocation would actually lead to meaningful protected instream flows for fish. Domingue Decl. ¶ 24d. On the other side of the ledger, reallocation will

---

[21] Indeed, even the *final* relief sought by Plaintiffs would not foreclose reallocation. It would simply require that the Corps wait to proceed with reallocation until the completion of the ongoing ESA consultation with NMFS over the Willamette Project as a whole.

prejudice the ongoing consultation process, leading to harm to fish that will occur much sooner and likely be more substantial. Pls.' PI Memo. at 22–35; Domingue Decl. ¶¶ 29–35. Thus, preliminary relief would have a net positive effect on UWR Chinook salmon and steelhead and would not disserve the public interest.[22]

### B.    Plaintiffs Have Shown "Serious Questions" Going to the Merits

Because the balance of equities and public interest factors tip "sharply" in their favor, Plaintiffs need only show that there are "serious questions going to the merits" to be entitled to preliminary injunctive relief. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc).

According to Defendants, (1) the ESA doesn't even apply, because the Corps hasn't engaged in "agency action," Fed. Defs.' Oppo. at 18–19, 26–29; and (2) Congress, not the Corps, will legally cause any commitment of resources, *id.* at 26–27. These arguments evince a profound lack of understanding of the ESA and basic principles of causation. It should be noted, too, that these arguments are purely legal: Defendants do not dispute that, as a factual matter, the ongoing ESA consultation over the entire Willamette Project will be impaired by the Corps' actions, but instead argue that the Corps simply can't be held liable under these circumstances because of Congress's involvement. This focus on the law is unsurprising given the facts here.

---

[22] Federal Defendants contend that Plaintiffs in this case and the plaintiffs in the related case, *NEDC v. U.S. Army Corps of Eng'rs*, Case No. 3:18-cv-437-HZ, have taken "contradictory litigation positions," which supposedly shows that Plaintiffs' position in this case "makes little sense." Fed. Defs.' Oppo. at 34–35. This argument betrays a lack of understanding of Plaintiffs' requests. In the related case, the plaintiffs asked this Court to alter the status quo *to benefit fish*. In this case, Plaintiffs are asking this Court to maintain the status quo *to benefit fish*. And in both cases, the plaintiffs are concerned with securing a better BiOp in 2023 for fish.

The Corps cannot explain or justify its decision to continue with the reallocation process after reinitiating consultation with NMFS over the entire Willamette Project—especially given that (1) the Corps *did* suspend the reallocation process under nearly identical circumstances in 1999–2000, Pls.' Ex. 8 at 3; and (2) NMFS wanted the Corps to combine the reallocation consultation with the larger Willamette Project consultation, Pls.' Ex. 24 at 3; Pls.' Ex. 10 at 5.

      1.     *The ESA Applies to the Corps' Actions*

Defendants' argument that the ESA simply doesn't apply to the Corps' discretionary actions at issue in this case is wrong, for at least three reasons. First, as discussed *supra* pp. 21–23, an agency can violate section 7(d) by making a decision or taking an action even if that decision or action does not constitute an "agency action" within the meaning of the ESA. For that reason, it is irrelevant whether the Corps' actions in this case concerning the development of the reallocation plan and recommendation of that plan to Congress constitute "agency actions" within the meaning of the ESA. As explained *supra* pp. 22–23, the relevant "agency action" for purposes of Plaintiffs' 7(d) claim is the operation and maintenance of the Willamette Project, which is currently undergoing ESA consultation.

But even putting that aside, it is clear that the Corps' reallocation-related actions *are* "agency actions" within the meaning of the ESA. Section 7 of the ESA and its implementing regulations "apply to all actions in which there is discretionary Federal involvement or control," 50 C.F.R. § 402.03, and "action" is defined broadly to include "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States," *id.* § 402.02. *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012) (en banc) ("We have repeatedly held that the ESA's use of the term 'agency action' is to be construed broadly."). "Agency actions" include only those actions where an agency has

"discretionary control" to shape the action so as to "inure to the benefit of a protected species." *Id.* at 1024–25. Here, the development of the reallocation plan through the feasibility study and Chief's Report and the recommendation of the plan to Congress are plainly "activit[ies] . . . carried out" by the Corps, and the Corps had discretion to shape the contents of the plan and to decide when to propose the plan to Congress. In particular, the Corps had discretion to put the plan on hold after reinitiating consultation with NMFS over the entire Willamette Project—as it did in the past. Therefore, the Corps' actions relevant to this case are "agency actions."[23]

Third, the Corps itself has always considered its reallocation-related actions to be "agency actions," which is why it consulted with NMFS over the reallocation plan. *See* Pls.' Ex. 4 at 146–47 (discussing how the Corps consulted with NMFS over the proposed reallocation plan). Federal Defendants now argue that the consultation with NMFS over reallocation "centered on the . . . *implementation* of . . . reallocation and not on the . . . recommendation itself." Fed. Defs.' Oppo. at 28–29. This is inconsistent with the language of the 2019 Reallocation BiOp, where NMFS included RPA measures concerning the content of the reallocation plan, not just its implementation. Pls.' Ex. 2 at 97–103. Moreover, if the consultation was just for the purpose of ensuring that the Corps *implemented* the reallocation plan in accordance with the ESA, there would have been no need to consult *at all* prior to proposing the plan to Congress.

In short, the ESA applies to the Corps' actions at issue in this case. Under the ESA, the question is whether, through those actions, the Corps is "mak[ing] an[] irreversible or irretrievable commitment of resources with respect to the [ongoing operation of the Willamette

---

[23] Federal Defendants' argument to the contrary on this point is that the Corps' actions in this case do not "authorize" anything because Congress can disregard the Chief's Report. Fed. Defs.' Oppo. at 18–19. This ignores the fact that the Corps has "carried out" the task of devising and recommending a reallocation plan and will eventually "carry out" the plan.

Project] which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d).

    2.    *The Corps Is Violating Section 7(d)*

Section 7(d) makes it unlawful for an agency engaged in consultation to "make an[] irreversible or irretrievable commitment of resources" in a way that prejudices the consultation process. 16 U.S.C. § 1536(d). The prohibition is limited to circumstances in which the agency has some discretion. *See Houston*, 146 F.3d at 1125–26 ("Where there is no agency discretion to act, the ESA does not apply."). And, as the word "make" implies, the prohibition requires a causal connection between the agency's exercise of discretion and the "commitment of resources." *See* Black's Law Dictionary, Make (11th ed. 2019) ("1. To cause (something) to exist"); *United States v. Giles*, 300 U.S. 41, 48 (1937) ("The word 'make' has many meanings, among them 'To cause to exist, appear or occur.'" (quoting Webster's Int'l Dictionary (2d ed.))). If an agency decides to conduct a timber sale in the middle of a consultation concerning an endangered species living in the forest where logging will occur, the agency is clearly violating 7(d) by "mak[ing]" a commitment of resources that threatens to prejudice the consultation. *See Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 293, 295 (9th Cir. 1992) (enjoining the Bureau of Land Management "from conducting any new [timber] sales" under section 7(d), even those that had not yet been announced). On the other hand, if an arsonist burns down part of the forest, the agency would not be in violation of section 7(d): though the loss of habitat would undoubtedly constitute a loss of resources that would prejudice consultation, the agency wouldn't have played any part in causing the loss to come about. This reading of section 7(d) reflects the fact that the ESA incorporates "ordinary requirements of proximate causation and foreseeability." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 696 n.9,

700 n.13 (1995).

Here, everything the Corps has done has been discretionary. The Corps could have chosen to suspend the feasibility study when it reinitiated consultation with NMFS over the entire Willamette Project—as it did when the agencies first consulted over the Project, Pls.' Ex. 8 at 3–4—and wait until the completion of consultation to resume the study. Or it could have included RPA Measures 1 and 4 in the feasibility report and the Chief's Report, or otherwise altered the reallocation plan to benefit fish. As for causation, the Corps is clearly playing the lead role in bringing about reallocation: as discussed *supra* pp. 7–15, reallocation would not occur but for the Corps' actions, and it is very likely that reallocation will proceed precisely as the Corps has recommended. Finally, as discussed at length in Plaintiffs' opening memorandum—and not disputed by Defendants—the reallocation plan will very likely foreclose the development of RPA measures during the consultation over the Willamette Project, thereby prejudicing the process. Pls.' PI Memo. at 22–29. Thus, the Corps is violating section 7(d).

Federal Defendants' primary response to this is that *the Corps* is not violating (and indeed *cannot violate*) section 7(d) in these circumstances because of Congress's involvement.[24] Fed. Defs.' Oppo. at 26–27. There are two components to this argument, neither persuasive. First, Federal Defendants state that the Chief's Report does not "commit[] any resources to [Willamette Project] operations," implying that any resources will be committed only by Congress. Fed. Defs.' Oppo. at 26. Under this theory, Congress's approval of the reallocation plan cuts off the chain of causation, such that the Corps cannot be said to have "ma[de] a[] . . .

_____

[24] OWUC's 7(d) argument is comprised of legal irrelevancies and a scurrilous attack on an employee of Plaintiff WaterWatch of Oregon and a NMFS employee. OWUC Oppo. at 9–14. OWUC appears to think that this is a case primarily about the 2019 Reallocation BiOp, which it is not. *Supra* pp. 4–5. And as for OWUC's lengthy and irrelevant attacks on the NMFS employee and the WaterWatch employee, the less said the better.

commitment of resources." That conclusion is inconsistent with *Mumma*, which held that an agency recommendation can be the cause of some effect even when Congress intervenes.[25] 956 F.2d at 1517–18. It is also inconsistent with the principles of proximate causation and foreseeability that are incorporated into the ESA. "[I]t is common for injuries to have multiple proximate causes." *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011). Here, the commitment of resources is caused by Congress *and* by the Corps, just as the commitment of resources that occurs when a timber sale is conducted is caused by both the agency and the timber buyers.[26]

Second, Federal Defendants argue that "Congress' legislation . . . cannot preclude an RPA" and that, therefore, the Corps cannot be liable for "induc[ing]" Congress to pass legislation that allegedly precludes an RPA. Fed. Defs.' Oppo. at 27 n.18. This is a baffling argument. A RPA is an "alternative action[] . . . that can be implemented in a manner consistent with the intended purpose of the [proposed] action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, [and] that is economically and technologically feasible." 50 C.F.R. § 402.02. If Congress passes a law that limits the relevant agency's "legal authority and jurisdiction" in such a way that that a once-viable alternative action is no longer possible, then a RPA has been foreclosed. So Federal Defendants cannot seriously mean that "Congress' legislation . . . cannot preclude an RPA"; what they really mean is that, if

---

[25] *Mumma* was a case about causation in the context of Article III standing, but Defendants' arguments concerning the merits of Plaintiffs' claim are, at bottom, the same "bright-line" causation arguments foreclosed by *Mumma*.

[26] Alternatively, one could view the "commitment" as occurring at the point when the Chief of Engineers signs his Report and sends it to Congress. At that point, the Corps—the entity bound by section 7(d)—has taken the last step it must take to commit resources. *See Metcalf v. Daley*, 214 F.3d 1135, 1144 (9th Cir. 2000) (concluding, in the NEPA context, that the agency made a commitment of resources when it "surrender[ed] [its] right to prevent activity in the relevant area"). Whether that commitment violates section 7(d) turns on whether it "has the effect of"— that is, causes—RPAs to be foreclosed. As discussed, the Corps' recommendation to Congress will both factually and legally cause the consultation process to be prejudiced.

Congress forecloses a RPA through legislation, it is the sole legal cause of the RPA being foreclosed. As discussed above, *that* argument is wrong.

As Plaintiffs have explained to no rebuttal, the Corps' reallocation plan will determine water storage rights that reduce the Corps' discretion to manage water flows and eliminate potential RPA measures from the 2023 BiOp that could benefit UWR Chinook and steelhead, such as deep drawdowns of reservoirs or prioritizing flows for fish in low-water years. Pls.' PI Memo. at 22–29. Even the Corps recognized in the past that it is "impossible to determine how much of the water stored in the [Willamette Project] would be available for other purposes until after requirements for ESA-listed fish ha[ve] been clearly specified," Pls.' Ex. 8 at 3, making reallocation inappropriate and illegal until the consultation process is complete. The Corps has failed to explain why it has changed its position this time when the situation is identical. And NMFS concluded that the reallocation plan "would limit the Corps' flexibility to comply with . . . ESA Section 7(d) requirements in relation to the . . . reinitiation of the 2008 BiOp now underway" unless the Corps agreed to revisit the reallocation after completion of the Project consultation. Pls.' Ex. 2 at 95, 97, 100. The Corps rejected that recommendation. Pls.' Ex. 16. Because NMFS is the agency that implements the ESA, its opinion that the Corps is violating section 7(d) should be given substantial deference. *See Kraayenbrink*, 632 F.3d at 497 (deferring to USFWS's conclusions regarding another agency's compliance with the ESA). Finally, as discussed *supra* p. 10, both agencies already assume the reallocation plan is a done deal, and therefore are likely proceeding with the Willamette Project consultation under that assumption, thereby influencing the ongoing consultation even before Congress acts.

Plaintiffs have shown that there are *at the very least* serious questions going to the merits of their ESA section 7(d) claim. Defendants' arguments to the contrary are based on fundamental

misunderstandings of the ESA, Ninth Circuit precedent, and basic principles of causation.

### C.    Plaintiffs Have Shown a Likelihood of Irreparable Harm

Finally, contrary to Defendants' arguments, Plaintiffs have shown a likelihood of irreparable harm sufficient to justify preliminary relief. Because the purpose of a preliminary injunction is to preserve a court's ability to award meaningful relief at the time of final judgment, the "likelihood of harm" inquiry is whether it is (1) likely that, (2) absent preliminary relief, the court will be unable to remedy or prevent irreparable harm to the plaintiffs by the time of final judgment. *See* Pls.' PI Memo. at 29, 32–33; *see also Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008) (discussing how "[t]he purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits" (citation omitted)), *abrogated on other grounds by Winter*, 555 U.S. at 22. As discussed more fully below and in Plaintiffs' opening memorandum, Plaintiffs have introduced largely uncontroverted evidence that it is likely that the consultation process over the entire Willamette Project will be irreversibly prejudiced unless the Court awards preliminary relief. Pls.' PI Memo. at 22–35. The prejudicing of the consultation process will result in harmful real-world effects to UWR Chinook salmon and steelhead and Plaintiffs. *Id.*

Defendants attack Plaintiffs' showing of irreparable harm on several grounds. First, OWUC insists that Plaintiffs cannot show a likelihood of irreparable harm because there will not be *on-the-ground* harm to fish (or Plaintiffs) in the period between now and final judgment. OWUC Oppo. at 15. Such a showing is not necessary. As explained in Plaintiffs' opening memorandum, it is possible to show irreparable harm by demonstrating that events will transpire before trial that will lead to *future* on-the-ground harm which cannot be remedied by a court.

Pls.' PI Memo. at 29, 32–33. That on-the-ground harm does not have to occur before trial; rather, the events that will lead inexorably to that harm must be likely to happen before trial. *Id.* This formulation of the irreparable harm requirement follows logically from the purpose of a preliminary injunction, which is to preserve the court's ability to award meaningful relief at the time of final judgment.[27] *Golden Gate Rest. Ass'n*, 512 F.3d at 1116.

Second, Federal Defendants contend that Congress, not the Corps, will be "the legally relevant cause of any harm," and that finding irreparable harm would thus "make little sense" because Congress can still act even if preliminary relief is awarded. Fed. Defs.' Oppo. at 31. This argument is similar to and suffers from the same flaws as Defendants' arguments about standing and the merits of Plaintiffs' section 7(d) claim. As discussed *supra* pp. 26–32, Ninth Circuit precedent and the tort principles underlying the ESA foreclose the argument that the Corps cannot or will not be a legal cause of harm flowing from reallocation. And though Congress could *theoretically* adopt the reallocation plan in a WRDA even in the face of this Court awarding relief to Plaintiffs, it is unlikely to do so. *Supra* pp. 11–15; *see also* Pls.' PI Memo. at 7–8, 18–20 (discussing the WRDA process).

Finally, Defendants argue that any injuries (or events leading inexorably to injuries) are not "likely" to occur before this Court can enter a final judgment on the merits. Fed. Defs.' Oppo. at 31–32. Defendants first assert that the chain of events leading from the Corps' reallocation proposal to Plaintiffs' injuries is highly conjectural. *Id.* at 32. This argument rests on

---

[27] Tobacco exposure claims brought by prisoners are the most common claims in which courts have awarded preliminary injunctive relief based on a likelihood that events during the pre-judgment period will cause future on-the-ground harm. *See, e.g.*, *Cassady v. Owens*, Case No. CV408-250, 2009 WL 2997909, at *4–*6 (S.D. Ga. July 2, 2009) (ordering prison to move the plaintiff to a smoke-free area pending a judgment on the merits because "continuous exposure to heavy levels of [smoke] pose[d] a serious threat to his future health"), *report and recommendation adopted as modified*, 2009 WL 2920879 (Sept. 11, 2009).

the mistaken idea that Plaintiffs are claiming injury from the far-in-the-future effects of reallocation rather than the much more immediate effects flowing from reallocation's prejudicial effect on the ongoing ESA consultation over the entire Willamette Project. *Supra* pp. 2–5. Second, Defendants claim that it is not "likely" that Congress will authorize reallocation before this Court can enter a final judgment on the merits. Fed. Defs.' Oppo. at 31–32. This argument is more or less a rehash of Defendants' arguments concerning Plaintiffs' standing. As discussed *supra* pp. 7–10, it is *highly likely* that, absent any relief from this Court, Congress will authorize reallocation in 2020 WRDA, which is under discussion right now. Defendants' arguments to the contrary, like their standing arguments, rely on generalized statements and citations about the supposed unpredictability of legislative action and ignore the specific facts of this case.[28]

In sum, Plaintiffs have shown that, under the facts of this particular case, it is *likely* that Congress will soon approve the Corps' reallocation plan as submitted. That plan will prejudice the ongoing consultation over the Willamette Project by foreclosing RPA measures that could benefit UWR Chinook and steelhead, which in turn will harm these species for decades. The continuing decline of these fish does not leave room for the Corps to eliminate options that could be needed for the species' very survival. Plaintiffs have established the irreparable harm that will almost certainly occur absent relief by this Court.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion for a preliminary injunction and order their requested relief.

---

[28] Were it truly so "speculative" that Congress will soon authorize the Corps' plan, it is hard to see why OWUC and the Oregon Farm Bureau Federation ("OFBF") bothered to try to intervene in this case at all. The truth, of course, is that both groups know that the Corps' reallocation plan will soon be authorized without judicial intervention, which is the desired result that they seek to protect. See OFBF Mot. to Intervene (ECF No. 28) at 4 ("Plaintiffs' claims, if successful, *will delay Congress* from moving forward with a reallocation process . . . ." (emphasis added)).

Dated: April 28, 2020                    Respectfully submitted,


                                         _/s/ Andrew R. Missel_____
                                         Lauren M. Rule (OSB # 015174)
                                         Elizabeth H. Potter (OSB # 105482)
                                         Andrew R. Missel (OSB # 181793)
                                         ADVOCATES FOR THE WEST
                                         3701 SE Milwaukie Ave, Suite B
                                         Portland, OR  97202
                                         Tel: (503) 914-6388
                                         lrule@advocateswest.org
                                         epotter@advocateswest.org
                                         amissel@advocateswest.org

                                         Attorneys for Plaintiffs

**Additional Exhibits to Plaintiffs' Motion for Preliminary Injunction**

Exhibit 24    Emails from Various Army Corps of Engineers Employees Regarding the Feasibility Study and Consultation With NMFS (Sep. 2018)