Lauren M. Rule (OSB # 015174)
Elizabeth H. Potter (OSB # 105482)
Andrew R. Missel (OSB # 181793)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org
amissel@advocateswest.org

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON
# PORTLAND DIVISION

| | |
|---|---|
| **WATERWATCH OF OREGON**, **NORTHWEST ENVIRONMENTAL DEFENSE CENTER**, and **WILDEARTH GUARDIANS**,<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. ARMY CORPS OF ENGINEERS** and **R.D. JAMES, in his official capacity as Assistant Secretary of the Army (Civil Works)**,<br><br>Defendants,<br><br>and<br><br>**OREGON WATER UTILITY COUNCIL** and **OREGON FARM BUREAU FEDERATION**,<br><br>Intervenors-Defendants. | Case No. 3:20-cv-00413-HZ<br><br>**SUPPLEMENTAL REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

On May 5, 2020, this Court granted the Oregon Farm Bureau Federation's ("OFBF") motion to intervene insofar as OFBF sought permissive intervention under Federal Rule of Civil Procedure 24(b). ECF No. 38. In its order granting intervention, the Court gave Plaintiffs leave to file a reply to OFBF's opposition to Plaintiffs' preliminary injunction motion. *Id.* Later that same day, Federal Defendants filed a "Notice of Recent Actions Related to Plaintiffs' Preliminary Injunction Motion." ECF No. 39. Plaintiffs hereby submit this supplemental reply in support of their Motion for Preliminary Injunction (ECF No. 7) for two purposes: to respond to OFBF's opposition to Plaintiffs' Motion for Preliminary Injunction (ECF No. 33) and to respond to Federal Defendants' notice. *Cf.* Fed. R. App. P. 28(j) (any response to a notice of supplemental authorities "must be made promptly and must be . . . limited").

OFBF's opposition is largely duplicative of the oppositions filed by Federal Defendants and Intervenor Oregon Water Utility Council ("OWUC"). And, like both Federal Defendants and OWUC, OFBF has completely misunderstood the nature of Plaintiffs' claim, leading it to make several arguments that are irrelevant. Plaintiffs will not address at any length the arguments made by OFBF which have already been addressed in Plaintiffs' Reply (ECF No. 36). Instead, Plaintiffs will offer a short summary of each of OFBF's duplicative arguments coupled with citations to the portions of Plaintiffs' Reply that address those arguments. Plaintiffs will address at greater length the few "new" arguments made by OFBF, none of which is convincing.

As for Federal Defendants' notice, the event that Federal Defendants have brought to the Court's attention has little, if any, relevance. Federal Defendants' suggestion to the contrary is based on a misunderstanding of the legislative process in general, the "facts on the ground" related to Willamette reallocation legislation in particular, and the law.

### I. Most of OFBF's Arguments Are Duplicative of Those Made by Federal Defendants and OWUC and are Adequately Addressed in Plaintiffs' Reply

Most of OFBF's arguments are duplicative of arguments made by Federal Defendants and OWUC. Plaintiffs' responses to those arguments are contained in Plaintiffs' Reply and will not be repeated at length here. Instead, Plaintiffs provide the following summary of OFBF's duplicative arguments, together with citations to the portions of Plaintiffs' Reply (and, in some instances, Plaintiffs' opening memorandum) that address those arguments.

**Argument 1:** Plaintiffs lack Article III standing because any future injury is too speculative, any future injury will not be "fairly traceable" to the Corps' actions, and this Court cannot redress any injury. OFBF Oppo. at 15–17.[1]

**Response to Argument 1:** *See* Pls.' Reply at 5–10 (there is a "substantial risk" of future harm sufficient to support standing), 10–15 (Plaintiffs have shown traceability and redressability).

**Argument 2:** Plaintiffs have no chance of success on the merits of their claim because it is Congress, not the Corps, that will be solely legally responsible for any commitment of resources.[2] OFBF Oppo. at 10–13.

---

[1] All references are to page numbers in the original document, *not* ECF-generated page numbers.
[2] OFBF, much like Federal Defendants and OWUC, appears not to appreciate that *the Corps* has *already* made a prohibited "commitment of resources." *See* OFBF Oppo. at 11 ("The commitment of resources at issue here . . . is effectuated by Congress, not the Corps."). As Plaintiffs explained in their Reply, an agency makes a commitment of resources when it gives up regulatory authority or discretion in such a way that could limit its options with respect to an ongoing consultation—that is, when the agency takes the last step that *it* must take to prejudice a consultation. Pls.' Reply at 31 n.26. This is perhaps best exemplified by *Metcalf v. Daley*, a case cited in Plaintiffs' Reply, in which the Ninth Circuit found that the agency made an "irreversible and irretrievable commitment of resources" in the NEPA context when it signed a contract "to support the Makah [Indian Tribe's] whaling proposal." 214 F.3d 1135, 1143–44 (9th Cir. 2000). Before leading to on-the-ground harm to whales, the Tribe's proposal had to be approved by the International Whaling Commission. *Id.* at 1137–40. But that fact was immaterial to the court, because, at the point that the agency signed the contract with the Tribe, the *agency*

**Response to Argument 2:** *See* Pls.' Reply at 26–33 (the Corps can be and is legally responsible for committing resources in connection with the reallocation plan); Pls.' PI Memo. at 28 (discussing the legal significance of the role of Congress to the section 7(d) analysis).

**Argument 3:** Plaintiffs have not established a likelihood of irreparable harm because Congress's actions are too unpredictable. OFBF Oppo. at 17–19.

**Response to Argument 3:** *See* Pls.' Reply at 34–35 (very likely that Congress will act); Pls.' Reply at 7–10 (further discussion of the likelihood of Congressional action in the context of standing).

**Argument 4:** Plaintiffs have not established a likelihood of irreparable harm because they have not shown that there will be on-the-ground harm before final judgment. OFBF Oppo. at 20–21.

**Response to Argument 4:** *See* Pls.' Reply at 33–34 (showing interim on-the-ground harm not necessary); Pls.' PI Memo. at 29, 32–33 (same).

**Argument 5:** Plaintiffs have not established that the balance of equities and public interest weigh in their favor, instead relying on the "presumption" applicable in ESA cases. OFBF Oppo. at 22–24.

**Response to Argument 5:** *See* Pls.' Reply at 23–26 ("presumption" is effectively unrebuttable and has certainly not been rebutted here).

**Argument 6:** Plaintiffs' requested injunction would not be in the public interest because it would "jeopardize the stability of irrigation water supplies." OFBF Oppo. at 25–26.

**Response to Argument 6:** *See* Pls.' Reply at 24–25 (preliminary relief would have miniscule, if any, effect on water supply).

---

"surrender[ed] [its] right to prevent [whaling] activity in the relevant area," prejudicing the NEPA process. *Id.* at 1144–45.

## II. OFBF's Remaining Arguments are Unconvincing

OFBF makes essentially four arguments that are not made by Federal Defendants or OWUC. First, OFBF argues that, because the Corps consulted with NMFS over reallocation under section 7(a)(2) of the ESA, its subsequent reallocation actions are immune from section 7(d) liability. Second, OFBF argues that Plaintiffs have not made a showing of likely irreparable harm to *them*. Third, OFBF argues that this Court's ruling on the plaintiffs' preliminary injunction motion in the related case "all but requires" this Court to deny preliminary relief here. Finally, OFBF argues that preliminary injunctive relief would disserve the public interest by "derailing years of work toward reallocation." None of these arguments is convincing.

### A. The Corps Is Not Shielded from Section 7(d) Liability Merely Because It Consulted With NMFS Over Reallocation

OFBF argues that the Corps is shielded from section 7(d) liability for its reallocation-related actions because it consulted with NMFS over reallocation. OFBF Oppo. at 14–15. This argument reflects a deep misunderstanding of the ESA. The mere fact that the Corps consulted with NMFS over reallocation under section 7(a)(2) of the ESA has *nothing to do* with whether pursuing reallocation violates section 7(d) by threatening to prejudice the overall Willamette Project consultation.[3] And the *outcome* of the reallocation consultation—as opposed to its mere existence—unequivocally supports Plaintiffs' claim that the Corps is violating section 7(d): NMFS concluded in the reallocation consultation that reallocation runs a serious risk of

---

[3] OFBF states that "Plaintiffs d[id] not cite, and OFBF did not identify any case establishing or even suggesting, that an action can be an irreversible or irretrievable commitment of resources where that action itself has undergone ESA consultation." OFBF Oppo. at 14. That is likely because any reasonable agency contemplating taking an action serious enough to trigger formal consultation while already engaged in consultation over a related action would simply combine the consultation processes. Indeed, that is precisely what NMFS wanted the Corps to do. Pls.' Ex. 24 at 3; Pls.' Ex. 10 at 5. The lack of cases involving the situation presented here does not equate to a lack of support for Plaintiffs' legal arguments; rather, it is a testament to the recklessness of the Corps' behavior with respect to Willamette reallocation.

prejudicing the consultation over the entire Willamette Project unless the reallocation plan includes certain features (RPA Measure 1, in particular), and the Corps has not included all those features in its plan. Pls.' PI Memo at 25–27; Pls.' PI Reply at 32. Under OFBF's reading of the ESA, though, the Corps now has *license* to prejudice the larger consultation process—notwithstanding NMFS's conclusion—simply because it *participated* in a reallocation consultation. This is a bizarre and incorrect reading of the statute.

There is a procedure by which an action agency engaged in consultation can "clear" its activities with the consulting expert agency and ensure that it does not violate section 7(d)—but that procedure is not a separate section 7(a)(2) consultation. Rather, an action agency may obtain from the expert agency (or make in conjunction with the expert agency) a "7(d) finding" or "7(d) determination." *See* U.S. Ex. 1 (ECF No. 26) ¶ 4 (discussing how the Corps "issued an ESA Section 7(d) finding . . . in coordination with NMFS staff" with respect to the continued operation of the Willamette Project following the reinitiation of consultation over the Project). Here, there was no 7(d) determination. Quite the opposite: NMFS, following a much more thorough review than would have occurred during a 7(d) determination, concluded in the 2019 Reallocation BiOp that the Corps *will* likely violate section 7(d) by moving forward with its reallocation plan. It makes no sense to conclude, as does OFBF, that that somehow operates as *permission* for the Corps to violate section 7(d).

    **B.**    **Plaintiffs Have Shown That *They* Will Be Harmed in the Absence of Preliminary Injunctive Relief**

OFBF argues that Plaintiffs have not shown that there will be harm to *them* without preliminary relief. OFBF Oppo. at 22. According to OFBF, "Plaintiffs' vague implication that the Reallocation Plan will 'caus[e] harm to many generations of UWR Chinook and steelhead and the people—such as Plaintiffs—who derive pleasure from their existence,' is wholly

inadequate." *Id.* (quoting Pls.' PI Memo. at 33). OFBF ignores the portion of Plaintiffs' opening memorandum discussing reallocation's effects on UWR Chinook salmon and steelhead *and the resultant effects on Plaintiffs and their members*. *See* Pls.' PI Memo. at 31–32 (discussing how Plaintiffs' members "have aesthetic, recreational, and spiritual interests in the survival and abundance of UWR Chinook salmon and steelhead" and supporting that statement with citations to four personal standing declarations). It is difficult to see what more Plaintiffs could do to show that, if UWR Chinook salmon and steelhead are harmed by reallocation, Plaintiffs and their members will also be harmed. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) (upholding a finding of irreparable harm to the plaintiffs based on evidence substantially similar to the evidence submitted by Plaintiffs in this case).

  **C.** **This Court's Ruling in the Related Case Does Not "All But Require" the Denial of Preliminary Injunctive Relief in this Case**

  OFBF argues that this Court's denial of preliminary injunctive relief in the related case "all but requires" that the Court deny preliminary relief here. OFBF Oppo. at 21–22. This argument fails to recognize the very different theories of irreparable harm advanced by the plaintiffs in the related case and Plaintiffs in this case. In the related case, the plaintiffs argued at the preliminary injunction stage that UWR Chinook salmon and steelhead would suffer serious *on-the-ground* harm from the ongoing operation of the Willamette Project while the Corps and NMFS complete their consultation over the entire Project. Pls.' Memo. in Support of Mot. for Prelim. Injunction at 31–33, *NEDC v. U.S. Army Corps of Eng'rs*, Case No. 3:18-cv-00437-HZ. This Court denied preliminary relief, finding that the on-the-ground harm that would likely occur before a judgment on the merits was not so great as to be irreparable. 2019 WL 2372591, at *11–12 (D. Or. June 5, 2019). In this case, by contrast, the threatened on-the-ground harm is in the future, but that harm will become impossible for this Court to prevent—and thus irreparable—if

SUPPLEMENTAL REPLY IN SUPPORT OF PLAINTIFFS' PI MOTION           6

the Corps succeeds in pushing its reallocation plan through before final judgment. Pls.' PI Memo. at 29, 32–33; Pls.' Reply at 33–35; *see also Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988) (en banc) (affirming a preliminary injunction because "[i]t was imperative for the district court to preserve the status quo lest the defendants prevent resolution of the case"). This Court's conclusion in *NEDC* regarding interim on-the-ground harm has little to no bearing on the irreparable harm inquiry in this case, and certainly does not "all but require" this Court to deny preliminary relief.

        **D.**        **Relief Would Not Disserve the Public Interest By "Derailing Years of Work Toward Reallocation"**

Finally, OFBF argues that preliminary relief would disserve the public interest because it would disrupt the reallocation process, "derail[ing] years of work toward reallocation." OFBF Oppo. at 23–25. This argument is doubly wrong. First, as explained in Plaintiffs' Reply, preliminary relief would not "derail" anything, but would merely *delay* reallocation by (at most) two years. Pls.' Reply at 24–25. The "marginal harm" to the public interest from preliminary relief—which is what matters for purposes of assessing the public interest factor in the context of a preliminary injunction—is thus the harm of delaying by two years authorization of reallocation. *See League of Wilderness Defs./Blue Mtns. Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 765–66 (9th Cir. 2014) ("Because the jobs and revenue will be realized if the project is approved, the marginal harm to the intervenors of the preliminary injunction is the value of moving those jobs and tax dollars to a future year, rather than the present."). Given that the on-the-ground benefits of reallocation are far in the future and (as OFBF likes to remind us) contingent on the actions of several third parties, OFBF Oppo. at 20–21, a two-year delay in the reallocation process would cause minimal, if any, real harm to the public.

Second, OFBF's argument fails to recognize the prime importance that Congress has

placed on protecting and restoring endangered and threatened species. Congress has determined that the survival of UWR Chinook salmon and steelhead is more important than the public's time and money (including OFBF's time and money). *See Sierra Club v. Marsh*, 816 F.2d 1376, 1386 n.13 (9th Cir. 1987) ("Although we do not denigrate the [district] court's concern with the expense and inconvenience to the public an injunction would cause, Congress has decided that these losses cannot equal the potential loss from extinction."), *abrogated on other grounds by Winter v. NRDC*, 555 U.S. 7, 22 (2008). Even if it were true that preliminary injunctive relief would "derail" the reallocation process, the ESA calls for such derailment of agency activities when those activities threaten the existence of listed species. Indeed, that is the key takeaway from perhaps the most well-known ESA case, *Tennessee Valley Authority v. Hill*. *See* 437 U.S. 153, 172–73 (1978) ("It may seem curious to some that the survival of a relatively small number of three-inch fish among all the countless millions of species extant would require the permanent halting of a virtually completed dam for which Congress has expended more than $100 million. . . . We conclude, however, that the explicit provisions of the [ESA] require precisely that result."). OFBF may not like the choices that Congress has made in the ESA—many agricultural and industrial interests don't—but it cannot undo those choices through the courts.

### III.     Federal Defendants' Notice Adds Little of Relevance

Federal Defendants' notice purports to alert this Court to a supposedly relevant event— the release, by the Senate Committee on Environment and Public Works, of a draft WRDA bill. Federal Defendants argue that the draft bill "shows that Congress is exercising its own independent judgment in reviewing the Corps' recommendation . . . and developing its own legislative proposals, such that future legislation (if any) would be attributable to Congress and not the Corps." Notice at 2. This is wrong on both the facts and the law.

SUPPLEMENTAL REPLY IN SUPPORT OF PLAINTIFFS' PI MOTION                                          8

On the facts, Federal Defendants fail to grasp that draft legislation—particularly draft legislation that has only been through one chamber of Congress—is often a poor indicator of what the final product will look like. "[L]aws are like sausages, in that it is better not to see them being made," *Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 815 n.3 (9th Cir. 2016), and laws, like sausages, often do not resemble their packaged form until the end of the production process. The best indicator of what Congress will ultimately do with respect to the Corps' Willamette reallocation proposal is what it has *already* done with respect to similar proposals in the recent past: approve them without substantial changes. Pls.' PI Memo. at 18–20; Pls.' Reply at 7–10. Even more importantly, Federal Defendants ignore the fact that it is the House Committee on Public Works and Infrastructure—chaired by Congressman DeFazio, a key proponent of Willamette reallocation—that will have primary responsibility for drafting Willamette reallocation language for WRDA 2020. The language in the Senate draft bill is a "placeholder" for the House language, and thus of very little, if any, relevance.[4]

On the law, Federal Defendants are simply wrong that Congress's exercise of "independent judgment" automatically relieves the Corps of legal responsibility for reallocation's prejudicial effect on the ongoing Willamette Project consultation. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419–20 (2011) ("We do not think that the ultimate decisionmaker's exercise of judgment automatically renders the link to the supervisor's bias 'remote' or 'purely contingent.' The decisionmaker's exercise of judgment is *also* a proximate cause of the

---

[4] To the extent that the Senate draft bill is relevant, it supports Plaintiffs' position that approval of the reallocation plan is impending. The draft bill includes a provision appropriating money for the Secretary of the Army to "assist the State of Oregon in the implementation of the reallocation of water within the Willamette Basin"—a provision that makes sense only if reallocation is sure to happen. *See* Substitute Amendment, § 1050, *available at* https://www.epw.senate.gov/public/_cache/files/6/8/6863dd97-f6e5-426d-bdb9-b14f069959fb/7D2E8A70AEBCB705C219959E72A6357F.substitute-amendment-to-awia-2020.pdf.

SUPPLEMENTAL REPLY IN SUPPORT OF PLAINTIFFS' PI MOTION                                  9

employment decision, but it is common for injuries to have multiple proximate causes."). Indeed, because it is the *timing* of reallocation rather than its details that is largely responsible for threatening to prejudice the ongoing consultation process, Pls.' Reply at 1–5, and because reallocation would not be happening *now* absent the Corps' actions, 33 U.S.C. § 701b-8, the specifics of how Congress might modify the Corps' plan are largely irrelevant to the question of the Corps' liability. As the Corps itself acknowledged 20 years ago, "it [is] impossible to determine how much of the water stored in the reservoirs would be available for other purposes until after requirements for ESA-listed fish ha[ve] been clearly specified," Pls.' Ex. 8 at 3, so *any* reallocation[5] at this time runs the risk of prejudicing the consultation process.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion for a preliminary injunction and order their requested relief.

Dated: May 18, 2020

Respectfully submitted,

/s/ Andrew R. Missel
Lauren M. Rule (OSB # 015174)
Elizabeth H. Potter (OSB # 105482)
Andrew R. Missel (OSB # 181793)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave, Suite B
Portland, OR 97202
Tel: (503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org
amissel@advocateswest.org

Attorneys for Plaintiffs

---

[5] The one possible exception is if Congress were to incorporate RPA Measure 1 into the authorizing legislation, in which case the threat of prejudice to the overall Willamette Project consultation process would be substantially diminished.

SUPPLEMENTAL REPLY IN SUPPORT OF PLAINTIFFS' PI MOTION                              10